Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

| | | |
|---|---|---|
| TRANS VIDEO ELECTRONICS, LTD., an Indiana corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| VS. | ) ) | No. C 09-3304 MHP |
| SONY ELECTRONICS INC., a Delaware Corporation, et al., | ) ) ) | San Francisco, California |
| Defendants. | ) ) | Monday November 23, 2009 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:          LOCKE, LORD, BISSELL & LIDDELL, LLP
                  3 World Financial Center
                  New York, New York  10281-2101
             BY:  **JOHN F. SWEENEY, ESQUIRE**

                  LOCKE, LORD, BISSELL & LIDDELL, LLP
                  44 Montgomery Street, Suite 2550
                  San Francisco, California  94104
             BY:  **MATTHEW K. BLACKBURN, ESQUIRE**

**For Defendants:**          KENYON & KENYON
                  One Broadway
                  New York, New York 10004-1007
             BY:  **WALTER E. HANLEY, JR., ESQUIRE**

                  KENYON & KENYON
                  333 West San Carlos Street, Suite 600
                  San Jose, California  95110
             BY:  **MEGAN W. OLESEK, ESQUIRE**

**Reported By:**     *Katherine Powell Sullivan, CSR #5812*
             *Official Reporter - U.S. District Court*

*Katherine Powell Sullivan, CSR, RPR,CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

**P R O C E E D I N G S**

**NOVEMBER 23, 2009**                                    **4:12 P.M.**


THE CLERK:  Calling Civil 09-3304, Trans Video Electronics versus Sony Electronics.

MR. SWEENEY:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

May I have your appearances, please.

MR. SWEENEY:  Yeah.  My name is John Sweeney.  I'm with Locke, Lord, Bissell & Liddell.  And we represent Trans Video.  This is my partner, Matt Blackburn.

MR. BLACKBURN:  Good afternoon.

THE COURT:  Good afternoon.  And your name is?

MR. BLACKBURN:  Matthew Blackburn.

THE COURT:  Okay.  Here it is.

MR. HANLEY:  Good afternoon, Your Honor.

My name is Walter Hanley.  I'm with Kenyon & Kenyon.  And I represent the Sony defendants.  And with me is my partner, Meg Olesek.

THE COURT:  Good afternoon.

MS. OLESEK:  Good afternoon.

THE COURT:  Okay.  Well, what I just said earlier about discovery applies doubly and triply to patent cases, where there seem to be all kinds of horrid disputes regarding discovery.  And I know money is no object, apparently, in the

fight for whatever it is we're fighting for.

But where do we stand?  Is everybody served that needs to be served?  Where is that?

MR. SWEENEY:  There was some delay in serving the Japanese companies.  But there is a stipulation, I think, where Mr. Hanley accepted service.

THE COURT:  You can put these things down.  Is there no table at the end there?

MR. BLACKBURN:  There is no table.

MR. HANLEY:  Our one advantage in the case, Your Honor.

THE COURT:  Yes, you have a table over there.

MR. SWEENEY:  They have been served.  And I think those two foreign corporations their answer or their response to the complaint is due December 15th.  And, at that point, everyone will have been -- have responded to the complaint.

THE COURT:  And I think this is the case where I notice that you're really close, as far as dates.

You couldn't get together on some of these dates where there are only about a few weeks apart or a week apart?

MR. SWEENEY:  I thought we actually did get together on all of the dates.

THE COURT:  Did you get together on all of them?

MR. HANLEY:  Yeah.  The proposal that Your Honor has, the dates are basically offset by a couple of weeks.  And that

two weeks, two additional weeks that Sony wants, is basically related to the initial disclosures or, rather, the invalidity contentions, which include some document production requirements.

And Sony is shut down for a couple of weeks around the holidays.  So we wanted two additional weeks to do that document production.  And that has, basically, a ripple effect down the rest of the schedule, at least in so far as the Markman process is concerned.

**THE COURT:**  Well, let me ask you this, before talking about Markman.

You made reference to either defenses of -- well, invalidity or unenforceability.  Do you have a good sense now already of what those defenses may be that -- legitimate defenses that you think you have strong arguments on?

**MR. HANLEY:**  Well, we think we have strong arguments on noninfringement, invalidity and unenforceability.  But the missing piece -- and this is true of most patent cases, as I'm sure Your Honor has perceived -- the key issue is the scope of these claims, how they should be read.

And our view in looking at the patent is that the claims are fairly narrowly drawn to specific hardware elements in a system for distributing information.

The contention of the plaintiff, basically, is their patent covers distributing video content over the Internet.

There is, obviously, a difference in the view of the scope of the patent.  And that's going to impact whether or not the infringement is a stronger defense or the invalidity is a stronger defense.

**THE COURT:**  What did you have in mind in terms of invalidity?

**MR. HANLEY:**  Well, we know prior art that we think anticipates these claims, depending how broadly they are read.  Certainly, if they are read as broadly as plaintiff seems to read them, we think there is prior art that anticipates them.

And some prior art, I guess, has been identified in the pre-lawsuit, I guess, communications to Trans Video's attorneys.

**THE COURT:**  And unenforceability sounds like a little --

**MR. HANLEY:**  We have --

(Simultaneous colloquy.)

**THE COURT:**  -- a claim of inequitable conduct?

**MR. HANLEY:**  We have an inequitable conduct defense Your Honor.  It arises from -- essentially, from the attorneys who were involved in the prosecution having been aware -- and this is evident from the record of the prosecution -- having been aware of a relevant prior art reference in connection with the earliest filing.

This patent was initial filing, and then there was

substantial changes made, or additional content added to the patent specifics.  And they filed what's called a continuation in part, where some of the stuff is original stuff and some is added material.  And then they interpose claims in the continuation in part.

The prior art that they identified to the Patent Office in the beginning was actually much more relevant to the patent, the continuation in part application.  And they did not -- and it went off to a different examiner, different groups, and so on, different examining group.  And they did not identify that art to the examiners who actually handled the claims that ultimately issued as the patents.

THE COURT:  Are you saying it was disclosed in the first application, but then in the continuation it wasn't?

MR. HANLEY:  Right.  And the continue -- it's not a continuation.  It's a continuation in part.

It's, essentially, directed at a different invention than what was presented to the initial patent examiner.  It went to different patent examiners in different art units in the Patent Office.  And the attorneys did not bring this art to the attention of those examiners.

THE COURT:  Don't the examiners have the entire prosecution history in front of them, including the previous application, with all of that?

MR. HANLEY:  They do -- in the case of continuations

they do, yes.

THE COURT:  And continuations in part, also?

MR. HANLEY:  Well, they can look back at it.  But they would not be aware of the -- because this is such a different invention that was the subject of the later -- later application, they wouldn't have been aware of its relevance, and wouldn't have been clued into the fact that although it might have been pertinent, it was actually much more pertinent to the subsequent filings.

THE COURT:  On a scale of, what, 1 to 20, where does this inequitable conduct argument fall?

MR. HANLEY:  I think it is going to depend on the issue of intent, as it often does.  To give an assessment of that is going to depend on what the explanation is on the part of the attorneys involved.

THE COURT:  Some of them jump out at you, and some of them why do we bother to raise it?

MR. HANLEY:  It's not, "Why do we even bother to raise?"  I wouldn't go so far to say it's a 10, but it's up close to that level.

THE COURT:  You're concerned that I'm already talking about invalidity and unenforceability, right?

MR. SWEENEY:  No.  I'm just wondering, I may have a comment if you will permit me at some point, Your Honor.

THE COURT:  Now, I --

MR. SWEENEY:  There are a couple of important facts I think you should know about.

THE COURT:  Yes.

MR. SWEENEY:  Both the invalidity and inequitable conduct defenses.

One, I agree with Counsel that claim construction is important.  The claims had to be construed in accordance with the prosecution history.  And if they are, this one reference that has been disclosed to us is called the York reference, is clearly distinguished.  So there is no anticipation.

Secondly, with regard to inequitable conduct, the Federal Circuit has clearly held on a number of occasions that once you have a disclosure in a parent case, you can't have inequitable conduct as a matter of law.  The cases is ATD Corp. versus Lydell.  The cite is 159 F.3d --

THE COURT:  I didn't need to go into all that for now.  I appreciate that.

MR. SWEENEY:  In terms of a zero to a ten, the inequitable conduct is actually a zero.  It's precluded by Federal Circuit precedent.

And with respect to intent to deceive, the attorney, Mark Flescher, who is being accused here, is deceased.  He died in a car accident about two years ago.

So I think this inequitable conduct is really bogus. It's at a zero level.

There will be arguments of obviousness and maybe anticipation.  But I think they are going to be precluded, ultimately, by claim construction based upon exclusive arguments made during the prosecution history.

THE COURT:  It may not be bogus.  It may not be provable, right?

MR. SWEENEY:  I don't think it's provable on the Federal Circuit authority and the prosecution record as it is.

THE COURT:  Okay.  Well, let me ask you about this patent.  Now, I gather, although it describes itself very roughly -- and I don't want to try to go over the whole -- even the whole abstract, but an information distribution system, et cetera, et cetera.  And I gather that there is no -- this is not a method patent, as such.  It requires actual -- an actual network with signals and --

MR. SWEENEY:  Yes, correct.

THE COURT:  There is no Bilski issue?

MR. SWEENEY:  No Bilski issue.

THE COURT:  Would you agree?

MR. HANLEY:  Yes.

THE COURT:  Get over that one then.

MR. SWEENEY:  The primary accused product is the Sony PlayStation 3 product.  It downloads video digital information, and is capable of also uploading video digital information based upon menu-driven access.

So it's not -- this is not a business method patent.

THE COURT:  Okay.  I just -- or any kind of method patent?

MR. SWEENEY:  Correct.

THE COURT:  It's clearly not a method patent.  I wanted to make sure -- business method.  But I wanted to make sure it wasn't a method patent.

And we are looking at how many -- let me see -- independent claims?  One, two --

MR. SWEENEY:  Well, there are lots of claims in the patent.

THE COURT:  A number of them.  And which ones are in dispute?  Which ones are you claiming have been infringed?

MR. SWEENEY:  Our contentions will be due ten days after today.  We have identified, already, to Sony in negotiations Claim 3 in particular.

THE COURT:  And what are we looking at in terms of the claims to be construed?  Can you come to some agreement as to what those are?

MR. SWEENEY:  There may be more than just Claim 3, but I think there will be a limited number of claims.

In my past experiences in this court with other judges, we have been asked to select six claims or less than six claims.  And we would certainly be willing to do that.

THE COURT:  I am much too generous.  I usually say no

more than ten.

MR. SWEENEY:  I don't think we will have as many as ten.

THE COURT:  Ten, then, I am safe in saying that, right?  Certainly no more than that.  I guess, choose well then.

MR. SWEENEY:  Sure.

THE COURT:  But I can live with that.  If there are seven, eight, nine, that's fine.  Ten.  But no more than ten. So we can just focus on -- then you focus, obviously, on the ones that are the most critical.

And I gather that -- that even though Claim 3 is the one you're focusing on, if there are any other claims, probably to the extent that they are similar terms in other claims, that those terms would mean the same thing, generally.

MR. SWEENEY:  I think that's probably correct, Your Honor.

MR. HANLEY:  That's the correct statement of the general rule, Your Honor.

THE COURT:  Well, I'm just wondering whether somebody is going to try to say, well, it means that in Claim 3, but not in Claim 1.  That's always a little difficult, I think, to establish.

So we are, in fact, headed down the road to claim construction, I gather?

**MR. SWEENEY:**  Yes.  One other thing that has come up -- and we had a chat with your ADR specialist on Friday -- is I think there is interest on both sides in mediation of some type.

And we did agree, I believe with the assistance of your ADR specialist, that the timing of that would be around April, after the parties' claim construction positions had been made known to one another.  And it was also discussed that, perhaps, mediation could be conducted by the JAMS group here in San Francisco.

**THE COURT:**  And you would agree upon a mediator from JAMS; is that correct?

**MR. HANLEY:**  We will need to do that.

**MR. SWEENEY:**  Yes.

**THE COURT:**  And so, I mean, I see that Sony had proposed mediation from the court's panel.  But you're agreeing to private mediation?

**MR. HANLEY:**  We had our conference, telephone conference, with the head of the ADR unit, and we arrived at a compromise, Your Honor.  Our timing, which is after the claim construction statement is submitted, and their proposal on the private mediator from JAMS --

**THE COURT:**  I see.  I see.

Okay.  But you would be doing this before the claim construction hearing, but after the claim -- the claim

construction briefs have been submitted, right?  Or even before that?

MR. HANLEY:  Yeah.

THE COURT:  When?  Which window?

MR. HANLEY:  It's the joint claim construction statement.  So we go through the process of which Your Honor is very aware, and then we arrive at a statement where we each identify the claims and the proposed constructions, and our intrinsic evidence support.  And, at that point, that's where we felt, at least on behalf of Sony, that we have a little better information to assess our defenses.

THE COURT:  You would do that even before the briefing, and in preparation for the claim construction hearing.

MR. SWEENEY:  That's correct, Your Honor.

MR. HANLEY:  Sure.

THE COURT:  That's fine.  That sounds like a good idea.

And you're looking at, in terms of claim construction -- first of all, have you agreed upon these dates which Trans Video or plaintiffs are going to make initial disclosures?  And then your exchange of initial disclosures on January 29th?  Those are dates you all agree to; is that correct?

MR. SWEENEY:  Yes.

MR. HANLEY:  Yes.

THE COURT:  And then the next is the invalidity contentions, et cetera, that -- when are you making your preliminary infringement contentions?

MR. SWEENEY:  December 9th.

THE COURT:  Oh, I see.  I just went right by that. Okay.  And then the --

MR. SWEENEY:  And that's, basically, ten business days after today, with Thanksgiving coming.  So there is no extended time there.

THE COURT:  Exactly.  And Sony is going to prepare its invalidity contentions.  Is there any reason you need that extra week there?

MR. HANLEY:  It is actually two weeks.  It's basically because we get their infringement contentions, which identifies the so-called accused instrumentality.

They are going to, hopefully, set out in sufficient detail how they read the claim on the Sony systems.  And, then, as part of our obligations in response, we have to state our invalidity contentions.  But we also have to produce documents that relate to or describe in sufficient detail the so-called accused instrument.

Because we will have the intervening holiday period, and Sony, at least the Sony U.S. entities, are shut down for two weeks, we wanted additional time to do that document

collection, having their infringement contentions on December 10th.

So, basically, our proposal just advances that deadline to February 8th.

THE COURT:  And everything else gets pushed another two weeks?

MR. HANLEY:  Exactly.

THE COURT:  Do you have any problem with that?

MR. SWEENEY:  No, Your Honor.  That's all right with us.

THE COURT:  Okay.  That's two weeks when they are not infringing, right, according to your theory?

MR. SWEENEY:  I don't know about that, Your Honor, but I don't have any problem with the dates.

THE COURT:  Okay.  Fine.  Then, that gets us up to a claim construction hearing on June 28th.  Is that correct?

MR. HANLEY:  Well, that's -- that's obviously a suggested date.

THE COURT:  Yes.

MR. HANLEY:  It's whenever Your Honor can have it.

THE COURT:  How much of a tutorial do you think will be needed for this?

MR. SWEENEY:  I think 45 minutes a side, an hour a side should be sufficient.  Judge Alsup lets you do about 15 minutes a side on tutorials.  Speak really fast up there.

THE COURT: He operates on a fast track. Really fast track. We'll see. We won't take any more time than necessary.

MR. HANLEY: Probably can be done in less time. I think an hour would be -- or two hours worth of --

THE COURT: Would be too much.

MR. HANLEY: Might be too much. I expect we would need at least half an hour.

THE COURT: Half an hour each sounds about right. We will keep that in mind. You can do that the day of claim construction, anyway.

MR. SWEENEY: Correct. I think we do the tutorial and go right into the --

THE COURT: Go right into it, right.

Tony, can you come to June 28th. What day of the week is that?

THE CLERK: Monday.

THE COURT: Okay. Not a good day for that kind of thing because I won't be able to give you that kind of time on a Monday.

But Wednesday, the 30th, how would that be?

MR. SWEENEY: I think that would be fine. I think both Mr. Hanley and I will be coming from New York, so it would be better for us actually to have it Wednesday, as well.

THE COURT: Wednesday.

MR. HANLEY: That's fine.

THE COURT: June 30th. At 2 o'clock in the afternoon. Generally, if we have trials in the morning, then we can start up with claim construction at 2:00 or 2:30.

MR. SWEENEY: That's fine.

THE COURT: As we get in closer, we can modify the time if we need to.

And then you know what we would do at that time is, I think, set dates for the remainder of the case. And that's easy enough to do at that time.

Let's see. Does it make sense to have any kind of an interim further case management conference?

MR. SWEENEY: I don't think it's really necessary. I think we'll be together for the Markman. And if we're successful in the mediation, we'll let you know. Otherwise, we will keep filing along.

THE COURT: I assume they will let us know that. Don't keep the case hanging around.

Well, then that's fine. The dates that are in the far right side, starting with February 8th, on page 12, will be the dates that, you know -- 12, and then over on to 13, will be the dates that are in effect.

And you heard what I had to say about discovery. I expect you to work things out. If you have a problem, you know what to do. Don't file any papers, please. Nobody wants to waste their time reading motions to compel or motions for

protective orders.

If you have a real problem and can't work it out, we will do a phone conference.  From New York that's much easier, right?

**MR. SWEENEY:**  No, I think we will be able to do that.

**THE COURT:**  Fine.

**MR. HANLEY:**  We will work with each other.

**THE COURT:**  Very good.  Very good.

And I gather that your discovery is going to be focused during this first period on what you need to know and do with respect to claim construction.

**MR. SWEENEY:**  Right.  There's one other issue, and I don't think we necessarily have to resolve it today.  And that's the issue of whether certain of the Japanese defendants' managing agents or employees would be deposed here in San Francisco, or whether we would be required to go to Japan.

I think Mr. Hanley suggested that some of the foreign company officials could come here, but maybe not all of them.  And my suggestion is, we just leave that for further negotiation, depending upon the individuals involved.

**MR. HANLEY:**  Yeah, I would -- I think that's probably best.  Because right now we don't have any witnesses identified who are Japanese nationals.

And there may be instances where the relevant witness frequently comes here, and we're not going to stand on

principle and say, no, you must go to Japan in that instance.

On the other hand, they may be your engineers who are lower level, who have never been here and for whom the time coming here might be burdensome enough for us to --

**THE COURT:**  Or an opportunity.

**MR. HANLEY:**  Anyway, to make a long story short --

**THE COURT:**  I assume you can work that out.  And your clients are local, or where are they?

**MR. SWEENEY:**  Well, the company is incorporated in Indiana.  There are people in Washington, D.C.  And the president of Trans Video actually operates his business in Saudi Arabia.  But he certainly will come to be deposed.

**THE COURT:**  He filed the lawsuit.

**MR. SWEENEY:**  Of course.

**THE COURT:**  That's it.

**MR. SWEENEY:**  And he is an American citizen.  So he does business here, as well.

**THE COURT:**  I'm sure you can work that out.  It sounds like at this point you are getting along very well.  I trust that will continue.

And what do you anticipate in terms of a date by which you would try to finish up your mediation?

**MR. SWEENEY:**  Well, I think my experience there, with JAMS, is once you contact them and they -- you agree on a person, they usually want mediation briefs of some type.

And my thought would be perhaps we could work on getting a person lined up, you know, beginning now really so that when April rolls around, someone would be ready.  And perhaps at the beginning of April or the end of March, that's when the mediation briefs could go in.  And sometime in April we have the meeting.  Normally --

(Simultaneous colloquy.)

THE COURT:  Excuse me.  With your schedule that you proposed here, would be sometime after the April 9th date then.

MR. SWEENEY:  Correct.

THE COURT:  Looks like.

MR. SWEENEY:  Correct.  And it usually just takes a day, that mediation.  Sometimes less than a day.

THE COURT:  Okay.  Well, anything else we need to worry about?

MR. SWEENEY:  I think that's all for the moment.

THE COURT:  You've got preservation orders and protective orders in place, or will have them in place?

MR. SWEENEY:  Yeah, there is a preservation statement in this case management order.  The protective order, we haven't done yet.  But we will work on that.

THE COURT:  Do you need to also work out a preservation order, or are you comfortable living with what you have here?

MR. SWEENEY:  I think that what's in here is probably

adequate.  If Mr. Hanley thinks we do, we can work on that.

MR. HANLEY:  It doesn't strike me that we need to.

THE COURT:  Okay.  Fine.  I will leave it up to you.
Don't complain later, okay.

Anything else then?

MR. SWEENEY:  No, that's fine, Your Honor.

THE COURT:  Okay.  Fine.  Thank you.

MR. SWEENEY:  Happy Thanksgiving, Your Honor.

THE COURT:  We will see you on claim construction
day.

MR. SWEENEY:  Yes, absolutely.

THE COURT:  Have a very good holiday.

(At 4:36 p.m. the proceedings were adjourned.)

- - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:    Saturday, December 12, 2009


s/b Katherine Powell Sullivan
_____

Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter