Pages 1-46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN H. PATEL

THOMAS WEISEL PARTNERS, LLC,      )
et al.,                           )
                                  )
              Plaintiffs,         )
                                  )
         vs.                      )NO. C 07-6198 MHP
                                  )
BNP PARIBAS, et al.,              )
                                  )SAN FRANCISCO, CALIFORNIA
              Defendants.         )MONDAY, MARCH 22, 2010
                                  )2:30 P.M.
_____   )

**TRANSCRIPT OF PROCEEDINGS**
**(MOTIONS HEARING)**

**APPEARANCES:**

**For Plaintiffs:**
                              **HOWARD, RICE, NEMEROVSKI,**
                              **CANADY, FALK & RABKIN, PC**
                              Three Embarcadero Center
                              Seventh Floor
                              San Francisco, CA 94111
                              BY:  **GILBERT R. SEROTA, ESQ.**
                                   **CLARA J. SHIN, ESQ.**
                                   **MICHAEL L. GALLO, ESQ.**

**For Defendants:**
**BNP PARIBAS SECURITIES AGENT:**

                              **DAVIS, WRIGHT, TREMAINE, LLP**
                              505 Montgomery Street - Suite 800
                              San Francisco, CA 94111
                              BY:  **JOSEPH E. ADDIEGO, III, ESQ.**
**(Appearances continued, next page)**

*Reported by:    MARGARET "MARGO" GURULE, CSR #12976*
             *PRO TEM COURT REPORTER , USDC*

2

**APPEARANCES (Continued):**

**For Defendant**
**BNP PARIBAS SECURITIES AGENT:**

> **CLIFFORD, CHANCE, US, LLP**
> 2001 K Street, NW
> Washington, DC 20006
> BY:  **STEVEN T. COTTREAU, ESQ.**

**For Defendant Praveen Chakravarty:**

> **DURIE, TANGRI, LLP**
> 217 Leidesdorff Street
> San Francisco, CA 94111
> BY:  **JOHANNA CALABRIA, ESQ.**

**MONDAY, MARCH 22, 2010**

**2:30 p.m.**

**P R O C E E D I N G S**

**THE CLERK:** Calling Civil 07-6198, Thomas Weisel Partners vs. BNP Paribas, et al.

**THE COURT:** May I have your appearances, please.

**MS. SHIN:** Clara Shin, Howard, Rice, representing plaintiffs, TWP and Weisel.

**MR. SEROTA:** Gil Serota. Same.

**THE COURT:** Good afternoon.

**MR. SEROTA:** Good afternoon.

**MS. CALABRIA:** Good afternoon, Your Honor. Johanna Calabria, on behalf of Defendant Praveen Chakravarty.

**MR. COTTREAU:** Good afternoon, Your Honor. Steve Cottreau on behalf of the BNP Paribas and BNP Paribas Securities, ASIA, along we with local counsel, Joe Addiego.

**MR. ADDIEGO:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon. So what we're really dealing with here is that eighth cause of action, right?

**MS. SHIN:** Yes, Your Honor, along with a motion for protective order and a motion for sanctions.

**THE COURT:** Yes, and I love the paperwork on those things, you know, but we're going to give that all short script.

**MS. SHIN:** Okay. Would you like to proceed with the

PDF created with pdfFactory trial version www.pdffactory.com

summary judgment motion?

**THE COURT:**  Yes, I think we should.

**MS. SHIN:**  And I'll be arguing that.

**THE COURT:**  Okay.  Well, I don't know how much argument we're going to have.

**MS. SHIN:**  I will be happy to respond to any questions the Court has.

**THE COURT:**  Yes.  Well, that's probably what we will do more of than anything else.

Now, what about all of these declarations that were filed by the various employees, I guess, who were, quote, lured away or stolen or whatever?

**MS. SHIN:**  Yes, Your Honor, our position is that --

**THE COURT:**  Does that add -- I guess let me finish that.  What about it?  That was rather open-ended.

You know, what does that tell us, if anything, about whether it's appropriate to grant summary judgment?

**MS. SHIN:**  It tells you nothing.

Let's assume that everything in those declarations, every single allegation in the declarations are true.  There is nothing material to respect to whether Mr. Chakravarty breached his fiduciary duty to TWP.

The case law is clear under both California Supreme Court as well as Ninth Circuit authority that a fiduciary who packages a list identifying a key employee of his employer,

PDF created with pdfFactory trial version www.pdffactory.com

along with their then current compensation, the compensation that's desired to be lured to the other company, as well as the background, packages all that up in a concrete list, provides that to the other company, and then at the end, the whole group of employees departs from that other company, that's all that is necessary to establish the breach.

**THE COURT:**  Don't they all say they were just lured by the opportunity to more money and other dissatisfactions they had and so forth?

**MS. SHIN:**  What those declarations don't say is that they knew about this BNPP opportunity other than from Mr. Chakravarty.  What those declarations don't say is that BNPP contacted the discovery research analysts and the other employees.

What is undisputed here is that those employees learned of the BNPP opportunity from Mr. Chakravarty.

**THE COURT:**  Do you wish to respond to any of this?

**MS. CALABRIA:**  I do, Your Honor.  What the declarations do say is what this Court acknowledged, which is that all of them were fearful that they were about to be unemployed.  All of them were already looking for jobs because they were concerned that TWP, the U.S. company was about to pull support from the Indian research operation because there was no -- because the operation was not profitable.

Many of those declarations say that they never even

PDF created with pdfFactory trial version www.pdffactory.com

spoke to Mr. Chakravarty at all about this opportunity, but rather that Mr. Chakravarty did tell some of the analysts about it who were in his sort of close circle of friends. And it was those analysts that then told the associates about it.

So it isn't true that all of them learned of the opportunity from Chakravarty.

What happened was that BNP --

**THE COURT:** News spreads fast.

**MS. CALABRIA:** Good news does spread fast, and it's very good news when those guys are about to lose their jobs and there is going to be nothing left.

**THE COURT:** Well, what were the objective facts that led them to believe that they were going to be losing their jobs or that things were going under? I mean, all of this happened within a relatively short period of time. So within that month period, all of a sudden, they all got the idea that, you know, this company is going to tank?

**MS. CALABRIA:** No, Your Honor. And that's a very good question. The progression is actually longer than the period of time when BNP comes into the picture.

For a long time, Mr. Chakravarty had been warning TWP senior management that the analysts and the associates were severely underpaid. He said it over and over again, and he was ignored.

The declarations, every single one of them, say that

PDF created with pdfFactory trial version www.pdffactory.com

they were, throughout 2007, the viability of discovery research was a real concern for them.

Don't forget:  These guys, their job is to analyze companies.  That's what they do.  And they can look at their own company and see that things aren't working.  For instance, they know that in order to sell research --

**THE COURT:**  But how does that help Mr. Chakravarty?  Even if the company is going under, if he has a fiduciary duty, he still has a fiduciary duty to that company.  I mean, his fiduciary duty to that company is to make sure that he does the best job for them so it doesn't go under.

**MS. CALABRIA:**  Well, and there is no allegation that he didn't continue to do that.  He didn't stop doing his job.  The only thing allegation is that he solicited employees.  But the declarations controvert that and say that Mr. Chakravarty didn't encourage them to leave; that they were going to leave of their own accord.

The other critical part of this is that there did come a time in late September of 2007 where Steve Beull, who is the head of research for the overall TWP company, said to Chakravarty, "This thing is going to shut down."

And he obviously told more than Mr. Chakravarty.  He must have also told Mr. Dhillon because Mr. Dhillon -- there is uncontroverted evidence that Mr. Dhillon, in a confidential exchange with one of his colleagues says, "Beull wants me gone

PDF created with pdfFactory trial version www.pdffactory.com

by the end of the year."  And the colleague says, "Why is that?"

And he says, "Simple.  Because he wants the money that he's spending with discovery research to go to -- reallocated back to his U.S.-based analysts."

So everyone knew that it was just a matter of time before the thing was shutting down.  Again, there is no allegation that Mr. Chakravarty stopped performing the functions of his job.  All he did was start interviewing for a new job.  And when he learned that there was a possibility that that new employer could employ analysts who he knew were looking for jobs, he said, "Hey, check this out."

THE COURT:  Are you still contending that he didn't have fiduciary duty to his employer, that he was not in a capacity to have a fiduciary duty?  How can that argument go.

MS. CALABRIA:  The argument that we're making on the existence of a duty, Your Honor, is that he owed a duty of loyalty to his employer, who we contend is TWIPL, the Indian entity.

Aside from that, we don't believe that he owed a fiduciary duty as an officer or director to either TWIPL or TWP.  But we do contend that he clearly owed a duty of loyalty as an employee to his employer, TWIPL.

THE COURT:  Well, TWIPL -- that's what it's called -- was wholly owned by TWP, right?  It's a wholly-owned

PDF created with pdfFactory trial version www.pdffactory.com

subsidiary?

**MS. CALABRIA:** Almost. I believe there was a one percent ownership by some other entity there, but close. But for the most part. Two different entities, though, two separate corporate entities.

**THE COURT:** What about that theory?

**MS. SHIN:** Sure, Your Honor.

**THE COURT:** Does that work?

**MS. SHIN:** It doesn't. The theory does not work. First of all, Mr. Chakravarty, himself, has submitted evidence that establishes that during the relevant time period, he continued to be an employee of TWP.

In fact, if you go to Exhibit 17 of the Calabria declaration, there is an employment document that specified that Mr. Chakravarty continues to be an employee of TWP.

**THE COURT:** Now, he went to Mumbia in 2005, correct?

**MS. SHIN:** He did.

**MS. CALABRIA:** Correct.

**THE COURT:** But he was then promoted as a principal of --

**MS. SHIN:** Of TWP.

**THE COURT:** -- of TWP in 2007.

**MS. SHIN:** Exactly.

**THE COURT:** When in 2007 was that.

**MS. SHIN:** That was February 2007, and that

PDF created with pdfFactory trial version www.pdffactory.com

document -- the announcement for that is also attached to the Calabria declaration as Exhibit 50.  And the relevant time, the events here all happened well after that, after he was promoted to principal.

He was introduced to BNPP in September of 2007 and then began collaborating with them to solicit the TWP employees soon thereafter.  And, of course, by early December all of the critical mass of the discovery employees were gone from TWP and had joined the 27-person strong research platform that BNPP announced in December.

Not only that, Your Honor, but in a telephone call that's attached as Exhibit A to the Shin declaration, Mr. Chakravarty represents himself to BNPP as, quote, running the India office for the San Francisco Investment Bank, TWP.

THE COURT:  Was he essentially, on paper at least, number two in that office?

MS. SHIN:  Exactly, with respect to discovery research, Your Honor.  And there is evidence to support that, and this piece is attached to the Chakravarty declaration as Exhibit F.  And if you look at that, there is a section of that brochure that's entitled, "Management Team."  And it has K.V. Dhillon, who is in India, and Mr. Chakravarty, the director and head of research, along with two U.S.-based individuals.  So it's clear that he was management.

It's clear under California law that individuals and

PDF created with pdfFactory trial version www.pdffactory.com

employees with management responsibilities -- one doesn't need to have action authority so long as one participates in management the way Mr. Chakravarty did.  In fact, he admitted that the discovery research employees, specifically the discovery research analysts, the senior analysts, the core group of TWP's discovery research operation, he supervised.  He said that.  And that deposition testimony is attached to my declaration.  He also acknowledged that he recruited and trained this team of research analysts and associates.  So that's all clear.

And just to respond to what Ms. Calabria has to say in terms of the evidence of employee dissatisfaction, the evidence of his business model reportedly failing, even assuming that's true, California Courts, Ninth Circuit authority, has explicitly rejected that as saying -- and this is in *American Republic*, which says that employee dissatisfaction and turnover, irrelevant to whether one breached the duty of loyalty.

*Bancroft-Whitney* --

**THE COURT:**  Well, it goes to they're certainly free to get up and leave.

**MS. SHIN:**  Absolutely, but so long --

**THE COURT:**  And it has to do with -- what you're arguing is that the party with the fiduciary duty that may be orchestrating this or at least implementing --

PDF created with pdfFactory trial version www.pdffactory.com

**MS. SHIN:**  Right.

**THE COURT:**  -- it or making it possible, that is the party that you look to for liability, not to the individual employees who have decided to leave?

**MS. SHIN:**  And that's who we've brought the claim against, Your Honor.  We're not out there suing the analysts and the associates.

We brought the claim against the individual who we entrusted, we entrusted with responsibility of operating us and -- let's take a step back here.

There would be chaos if a fiduciary said, my company is not doing well.  There is high employee dissatisfaction, and so my duty of loyalty diminishes or even terminates.  In fact, GAB anticipating that -- or G-A-B anticipating that specifically outlined a bright line rule and said, "The duty of loyalty terminates only when an employee resigns from office." And Mr. Chakravarty did not do that until well after participating with BNPP to solicit, to recruit, going so far -- not just sending lists of compensation, desired compensation, but as Mr. Harris' deposition, which also is attached to the Calabria declarations attests, help set up interviews.

Mr. Chakravarty admitted in his declaration to being an intermediary between the two companies, or one might even, to use the language of the cases, his "dual masters."  They're now allowed to have dual masters.  So long as you're an

PDF created with pdfFactory trial version www.pdffactory.com

employee, you only have one master, and that's your company.

In his deposition, he also admitted to functioning in a messenger role.  And BNPP -- and we've submitted this testimony -- acknowledged and verified that they asked Mr. Chakravarty to identify the core employees, asked for their compensation, asked for their desire compensations, asked for their background, testified that Mr. Chakravarty provided to this to them, testified that it was helpful to them to recruit these employees.

**THE COURT:**  That's Mr. Rousseau?

**MS. SHIN:**  That's Mr. Harris, Your Honor, in his deposition.  And we have also quoted this language in our opening motion.

**MS. CALABRIA:**  There is a lot to respond to, so if I may?

**THE COURT:**  Yes, yes.

**MS. CALABRIA:**  First, let's talk about the cases that plaintiffs are citing in support of their contention that there was a duty breached.  The first case --

**THE COURT:**  Well, the first thing is:  Was there a duty or not?

**MS. CALABRIA:**  Okay.  Well, I can take them in reverse order.

**THE COURT:**  Are you telling me there is not a duty? You don't worry about breaching a duty unless you have one,

right?

**MS. CALABRIA:**  Okay.  Let's first talk about that, then.

**THE COURT:**  Is this under California law?

**MS. CALABRIA:**  Well, we contend it's not.

**THE COURT:**  Under what law would it be, then?

**MS. SHIN:**  Well, Your Honor has already ruled on that in your October --

**THE COURT:**  Did I do that?

**MS. SHIN:**  In the Court's 2008 order -- we're now looking in the rearview mirror here.  But in the Court's 2008 order, the Court ruled that TWP does have a direct action against Chakravarty because we're alleging injury to the company and not just on behalf of TWIPL.  And then on page 16 of that order, the Court also held and directed that California law applies to the breach of fiduciary duty and that the only claim not covered under California law is the CFAA claim and that's covered under federal law, Your Honor.

**MS. CALABRIA:**  Your Honor, that's not --

**THE COURT:**  We're not going to revisit that, are we?

**MS. CALABRIA:**  Well, no, we're not, because it's not an established law of the case.

The Court didn't actually rule on that; the Court just ruled on jurisdiction.  But it didn't rule as a matter of law that California law was going to apply to all these claims

PDF created with pdfFactory trial version www.pdffactory.com

because that issues wasn't before the Court at the time.

**MS. SHIN:**  If I may, I have that order in front of me, and the Court said --

**THE COURT:**  Hold on.  What are we going to do, plum the depths of Indian law to figure out what -- you know, what the fiduciary duty is or if there is one?

**MS. CALABRIA:**  Well, Your Honor, here's the thing. That is unfortunately what is required, if you're talking about an Indian national who is alleged to have done any sort of wrongful conduct in India and the players are all foreign companies.

Every single act that's alleged occurred in India, and the only part of the case that resides in California -- granted it is a fact that plaintiffs are here, and so that's why we're here.

But if you're talking about the breach of duty of loyalty as an employee, certainly that duty has to be governed --

**THE COURT:**  But the employee is the employee of whom?

**MS. CALABRIA:**  We contend that it's TWIPL.  Obviously they contend that it's TWP.  And the fact that --

**THE COURT:**  But TWIPL is essentially wholly owned by TWP, isn't it?

**MS. CALABRIA:**  But it is a corporate entity that is established in India.  And just as to sort of -- the

PDF created with pdfFactory trial version www.pdffactory.com

16

corporate -- the Internal Affairs Doctrine would dictate that Indian law would apply to the question of whether there is an existence of a duty of an Indian officer or director.  So too does that principal apply here where, if you're talking about a corporate entity that is a incorporated in India, and you're talking about conduct that occurred entirely in India, India law has to apply.

Now, the good news is that there is a claim for a breach of -- I was hoping not to get into this.  But there is -- there is -- Indian law does recognize the existence of a duty of loyalty, and it's based on similar common law principles as United States because it's a British colony.  The difference is that there are different damages that are available, but it is the same sorts of principles that apply.

**THE COURT:**  Well, it's all very interesting.  Maybe we should apply the Gandhian principle that you should not neglect the duty that is nearer to you for the sake of the remote.  How about that one?  Maybe that sort of fits right in there with fiduciary duty.

At any rate, we're going to go back to California law.  Okay?  Why is this man, under California law, not a fiduciary.

**MS. CALABRIA:**  Well, Your Honor, he is an employee of TWIPL.  We're not getting away from that.  He isn't a fiduciary, however, because he was not an officer or director

PDF created with pdfFactory trial version www.pdffactory.com

of TWP.  That's not disputed.

Because he was a director of TWIPL, which is the Indian entity, but we -- but there's facts in the record that show that the board of directors operated as a sham.  It never met.  It never called meetings.  Nobody knew who was on it or wasn't on it.  And we haven't been permitted discovery on that.  And so if the board is operating as a sham, GAB says that a mere title can't confer a fiduciary duty upon an employee.

**THE COURT:**  Well, managerial employees have fiduciary duties.  You don't have to have that term "director" or "president" or "CEO" or whatever to have fiduciary duty.

**MS. CALABRIA:**  Your Honor, I agree with that.  But in this case, if you look at what the cases says -- and I'm speaking here about GAB.  In GAB, the Court -- the defendants there, there was a situation where the person at issue was a regional vice-president and there were 3,000 employees in this corporation.  There were eight regions, and he was the vice-president of one of them.  And there, what the defendants tried to do is argue that you had to have some sort of control over company instead of some management discretion.

And the Court found, A, you don't have to have just control, you have to have management discretion.  And B, as one of the eight regional VP's of the entire company, he had management discretion.

You couldn't get away from that.  He had hiring

authority, firing authority.  He set salaries.  He set budgets. He had responsibility over his region.  He had management discretion over the corporate affairs of his company.

In this case, you have a guy who graduates from business school.  He goes into TWP as a research --

THE COURT:  Which business school did he go to? Wharton?

MS. CALABRIA:  I'm sorry?  He went to Wharton, yeah.

THE COURT:  Do they teach business ethics there.

MS. CALABRIA:  They do.  I actually went to law school there, and I know that they do.

But in any event, we have a fresh -- a recent business school grad who goes into work as an associate, which is a relatively low-level position.  They then decide to go -- this company decides to open operations in Indian.  And because he's an Indian citizen and wants to go back home anyway, he's a natural choice.  So they send him there and they give him this director title because they have to have somebody there as a director in order to comply with the Indian law.

THE COURT:  But did he not have the authority to hire?  He was asked to recruit people for the positions there.

MS. CALABRIA:  He did not have the authority to hire people, no.  He had to go to Van Passel in order to get that authority.  And Mark Fisher, who is the general counsel of the company, testified that he didn't have that authority.

So, yeah, he supervised them.  That's true.  And yes, he was the number two guy there, too.  That is also true.  But that doesn't make him have discretion over the corporate affairs of either of those entities.  He didn't have that.  He was -- you know, he didn't hire and fire.  He didn't set salaries.  He didn't set budgets.  He had none of that authority.

**MS. SHIN:**  Your Honor, in fact, GAB specifically on page 419 of the opinion stated that one does not need control over hiring and firing to be deemed a fiduciary.  What one needs to be deemed a fiduciary is some participation in management.

Labels aside, counsel's own descriptions aside, the undisputed facts, Mr. Chakravarty's own admissions establish he had the requisite level of participation in management.  He was a member of the management team of discovery research.  He, in his own words, said to Mr. Rousseau, the CEO of BNPP, "I run the India office of the San Francisco Investment Bank TWP."

**THE COURT:**  Is that an ostensible fiduciary duty?

**MS. SHIN:**  And it goes beyond that, Your Honor.

Mr. Chakravarty admitted that the discovery research analysts reported to him.  That's from his deposition.

**THE COURT:**  Well, let's talk about that.  Let's talk about the breach issues for a moment.  If you read that e-mail -- I think it's Exhibit A, to someone.  Maybe it's your

PDF created with pdfFactory trial version www.pdffactory.com

declaration.  But between Mr. Rousseau and someone else -- perhaps Harris was a party to it also -- and Mr. Chakravarty.

**MS. SHIN:**  Oh, this is Mr. Harris and Mr. Chakravarty, I believe.

**THE COURT:**  Is it?  But Rousseau looks like he is a party to it.

**MS. SHIN:**  Perhaps it's --

**THE COURT:**  It's a transcript of that document.

**MS. SHIN:**  Oh, Your Honor is referring to a transcript of an October 3rd telephone call between Mr. Rousseau and Mr. Chakravarty.

**THE COURT:**  Okay.  That's the one.  October 3, 2007, right.

**MS. SHIN:**  And that is Exhibit A.

**THE COURT:**  Yeah.  Okay.  It's pretty clear what's going on.  And he isn't saying anything about the company going on the skids.  He says, "It's a little frustrating."

So basically, you hit upon the point exactly.  That's the point, "It's a little frustrating because we provide really good content, but the revenue stream is not directly related to the content."  And it's pretty clear, you know, he doesn't like the way things are operating.  And it's very clear what is being set up here.

**MS. SHIN:**  And Your Honor, and not only is it clear --

PDF created with pdfFactory trial version www.pdffactory.com

THE COURT:  If there is a -- excuse me.

MS. SHIN:  I'm sorry.

THE COURT:  If there is a fiduciary duty, I don't know that you need an awful lot more than this to establish that it's being violated, except for the fact that then the acts do occur where everybody goes screaming out and over to BNPP.

MS. CALABRIA:  Your Honor, if I may respond to that.

THE COURT:  Yes.

MS. CALABRIA:  I'm not sure what the Court is referring to as it being very clear.  The conversation that is in that transcript is the very first contact that Mr. Chakravarty has with Mr. Rousseau.  They're introduced through a mutual acquaintance.

At this point, Mr. Chakravarty is speaking to two other prospective employers, and he's looking to get at.  No doubt about that, because at this point, he knows that the thing is going to tank.  Of course he's not going to say, in his first conversation to someone, "This thing is tanking."  He is trying to get a job.  And so what he does instead is he says, "Oh, this is my background, this is what I have done, please hire me.  I'm a good guy."  And then he says, "Let's meet so that we can talk further," and that's precisely what they do.  I don't think that that transcript really goes beyond that.

PDF created with pdfFactory trial version www.pdffactory.com

22

**MS. SHIN:**  Well, Your Honor, let's take that transcript, and let's look at two other documents dated soon thereafter, October 15th.  And one is an e-mail, and this is attached to my declaration.  And it's an e-mail from Harris to Chakravarty, and I believe it's Exhibit F.  And in that declaration -- in that e-mail --

**THE COURT:**  Yes, this is the one on 39416, at the bottom?

**MS. SHIN:**  Exactly, BNP 39416.  And Mr. Harris says to Chakravarty, "Pierre and I both came away feeling we had some good discussions and that there is a lot of complementary interest.  As we discussed, the way we'd like to take this forward is to first identify the core group of your team, I think you said about 20 to 25 individuals.  We'd like to then work on preparing employment documents for all of them.  Once you have them and all is satisfactory, we'd look to you to resign from Thomas Weisel enmass.  And their reaction is that they'd move to shut down the remainder of the office, we can step in and offer to take over the remainder as a gesture to save them the offer shutdown costs."

In other words, they're anticipating that it's the employee raid that will result in a shutdown of this office.

Mr. Harris goes on to ask Mr. Chakravarty to get a list of all employees, their current comp and job descriptions; for Mr. Chakravarty to highlight the 20 or 25 key individuals

PDF created with pdfFactory trial version www.pdffactory.com

with a little more description, plus an indication of what comp levels Mr. Chakravarty will think about for their move to BNP Paribas, and then there is another document, and this is --

THE COURT:  Okay.  I understand.

MS. SHIN:  And what I'm pointing to is Exhibit H dating the same day.  It's an internal memo among BNPP where Mr. Harris says, again anticipating that the enmass resignation will result or could result in a shutdown of the TNPP office, and he goes on to say that he's discussed this with Mr. Chakravarty and he feels comfortable with this approach.

So at no point is there any discussion about the shutdown of the office.  But Your Honor, that's irrelevant. Let's assume --

THE COURT:  Okay.

MS. SHIN:  -- that Mr. Beull --

THE COURT:  We're going to have to wind this up, so I'll give you the last word on this.

MS. CALABRIA:  Thank you, Your Honor.  Your Honor, at the end of the day, in a context that -- there are undisputed facts in the record that the business was shutting down.  You have Chakravarty's declaration discussing the conversation he had with Beull.  You have the CEO of TWIPL saying, "I'm out of a job by the end of the year."

You have the analysts saying themselves saying that each and every one of them was concerned because they thought

PDF created with pdfFactory trial version www.pdffactory.com

that the business was shutting down, and the vast majority of them were already looking for another job. And then you have Chakravarty who is also in this same position.

What he did -- we're not going to hide from the fact that he did serve as an intermediary. He did tell the analysts what BNP wanted, and he at times told BNP -- he communicated a message from the analysts.

But in essence, it was the analysts who told Chakravarty, Go tell BNP that I am interested. Because set up an interview because I would like to have a job with them. And he didn't hire them. He didn't participate in those interviews. He didn't conduct those interviews. He didn't tell BNP who to hire or who not to hire. He did none of those things.

THE COURT: Well, if this were a criminal case, I would say that's aiding abetting, wouldn't you?

MS. CALABRIA: I wouldn't say that. This isn't a criminal case and that's not a good --

THE COURT: It's not a criminal case.

MS. SHIN: Your Honor, I'll just burst if I have to sit down without saying one last thing which is that, assuming all of this is true, it's irrelevant because *Bancroft and Whitney* says that it's a breach of the fiduciary duty to provide a list of identified hand-selected employees, along with their compensation and background, and to participate in

the recruitment, and that's enough.

THE COURT:  Well, the matter is submitted.

MS. CALABRIA:  Your Honor, you allowed me the last word.

THE COURT:  Very briefly -- well, this is it.

MS. CALABRIA:  Okay.  This is it.

The one case that has considered the facts that are present in this case is *GAB*.  And in that case, the Court said that if these facts had been present, that it would have carried -- it may have carried the day with the jury.

In *Bancroft*, these facts were not present.  There were no analyst declarations.  There was no employee saying, We were going to leave anyway, that they were shutting down.

*GAB*, there was that evidence, that the Court --

THE COURT:  What about those analyst declarations? They seem almost as orchestrated as the exit.

MS. CALABRIA:  Your Honor, actually, if you read them, they're quite different.

THE COURT:  Well, they all read pretty much the same.

MS. CALABRIA:  No, they're actually --

THE COURT:  I have read them pretty carefully.

MS. CALABRIA:  -- they are quite different, and they're not orchestrated.  I strongly disagree with that.  But even if the Court determines that, that's an issue of credibility and that goes to a jury.

26

THE COURT:  Okay.  Well, thank you, and the matter is submitted.

MS. SHIN:  Thank you, Your Honor.

MS. CALABRIA:  Thank you, Your Honor.

THE COURT:  Um-hum.  Now, you've got these other motions, which I really hate spending time with.

Are these -- are you still having these problems with respect to the protective order, and the failure to preserve evidence?  What do we know about whether there is evidence out there that should have been out there and may have not been preserved.

MR. SEROTA:  Let me tell you the state of affairs --

THE COURT:  Quickly.

MR. SEROTA:  -- as it exists.

When I was in Hong Kong, I was the one who discovered the taping system through questions to Mr. Rousseau.  No tapes had been produced at that point.

For seven months, we asked for some written representations of what was done, by whom, how was the search made?  All we got is we found one tape, and no written representations for seven months.

Until we filed this motion, then we get a letter from counsel who was not counsel at the time, purporting to state what occurred.  What we don't know is what was the litigation hold that was put on?  No document, no declaration has ever

been submitted to verify that.

But assuming there was a litigation hold, what search was done?  What were the parameters of the search?

Mr. Didisheim claims to have done this, orchestrated this search.  He's very involved in this litigation.  He's the guy who is running the litigation, as far as I can tell.

THE COURT:  From where.

MR. SEROTA:  From Hong Kong or Singapore.  What did he do?  What did he ask for?  How come there are no tapes of conversations between Mr. Rousseau and his boss in Paris, Mr. d'Estais, to whom he testified having conversations about this.

Why were there no conversations between Mr. Leung who had a taped line.  In addition, we don't even know on the record who had the taped line.  They said, well, some employees, in their interrogatory responses, took reasonable steps.  The only representation of who had taped lines came from counsel who wasn't there at the time and no one submitted a declaration.  I mean, if you're faced with sanctions --

THE COURT:  Let me --

MR. SEROTA:  If I could just -- okay.

THE COURT:  No, no.  That's enough.  That's enough. Now what?

MR. COTTREAU:  This issue first arose, Your Honor, on July 31st of this year.  It was in the second deposition in

PDF created with pdfFactory trial version www.pdffactory.com

this case.  They have been on notice about the taping of lines.  They have deposed three witnesses on the taping of lines.  They have talked to Mr. Rousseau.  He said, "Yes, I had three telephone lines.  Only one was taped.  I took a phone" -- one of the calls that they think is missing is a phone call between Mr. Rousseau and their general counsel, Mr. Fisher.

He said, "Yes, I had that call, but it wasn't in the my office, where I had my taped line.  It was in a conference room."

That was the basis for them running into court on the sanctions motion because that this tape was missing, when there is no tape from the conference room because it's not in his office on a taped line.  Indeed he had three lines, only one of which was taped.  They know that because they deposed him and asked him.

They asked Mr. Harris, "Did you have a taped line?"

Mr. Harris said, "No."

Then they asked, "Well, why do some employees have taped lines and other ones don't?"

He said, "Well, if you have contact with brokerage customers, you have a taped line.  If you don't, you don't, and in research, we don't."

That's why we don't have taped lines of the HR people here involved.  That's why we don't have them of the research people involved.  They know this because they took depositions

PDF created with pdfFactory trial version www.pdffactory.com

29

on it.  And then they say, "Oh, Mr. Didisheim is at the center of this all."

Well, they deposed Mr. Didisheim.  Do you want to know how much questions they asked Mr. Didisheim about taped lines?  One.

"Did you have any taped lines?"

"No."

They didn't ask.  They didn't inquire.  They didn't make any inquiry during discovery about this.  It didn't become an issue, with all due respect, Your Honor, until we brought some discovery problems that we were having with them to this Court attention in November, and then they made an issue of this.

**THE COURT:**  Well, what was done --

**MR. COTTREAU:**  What was done?

**THE COURT:**  -- with respect to preservation?

**MR. COTTREAU:**  Here is what we say, and we say this in our interrogatory answers.  Right after the litigation was filed, we put a litigation hold on it.  We preserved the tapes. We identified.  We looked at all the employees who were involved in leading the recruiting efforts.  We identified two employees with taped lines, Mr. Rousseau, Mr. Lom.  Those are the only two.  Not Mr. Harris, not Mr. Pinto, not Ms. Ho, not all of the other players involved here.  Two.

We then preserved their tapes during the three-month

recruitment period.  Ever since they were introduced to Mr. Chakravarty on through the departure of the employees and the arrival at BNP.  We have all of those tapes.  They're set aside.  They have been searched in the context of this litigation, and we found one conversation.

They're only claiming the initial conversation that you pointed out in Exhibit A during the last motion.  That conversation is there, and we have it.  They're only claiming that there were two other conversations, and they write this in their sanctions motion.  Two calls.  Why aren't there these two calls with Fisher?

Well, one was from Mr. Rousseau from a conference room that wasn't taped.  The other was with Mr. Harris who doesn't have a taped lined.

There is not anything more difficult than that to understand, and I quite frankly am a little bit surprised and can't understand this.

THE COURT:  Who is responsible for the litigation, whatever litigation hold was put on any evidence?

MR. COTTREAU:  Ultimately responsible?

THE COURT:  Yes.

MR. COTTREAU:  Our general counsel.

THE COURT:  Okay.  And what role does this gentleman Didisheim?  I'm probably mispronouncing his name.  What role did he have in that?

PDF created with pdfFactory trial version www.pdffactory.com

**MR. COTTREAU:**  Sure.  Mr. Didisheim, like all the other employees who were involved with respect to the recruitment at issue, received a copy of the litigation hold and were asked to take steps to make sure that things were preserved including copies of tapes.

**THE COURT:**  Well, then what I want is a declaration from the general counsel and one other person, the person who actually implemented it as to exactly what was done with respect to a preservation hold -- or litigation hold, rather, and preservation of documents with respect to this case, including when, what, where, and all the other information that is pertinent to that.

**MR. SEROTA:**  Can I just add one thing?  How -- what were they looking for when they searched?  Because I want to know whether they looked for conversations internal to the company or just external, and how they conducted that search.  Because it's one thing to say, "We preserved."  It's a second thing -- it's completely unaddressed in any of the papers as to what was Didisheim looking for when he went through the so-called library recordings.

**THE COURT:**  Well, what was searched, but I don't think -- I think if, in fact, he says that very little conversations with -- external conversations other than with customers or brokers or something like that were preserved, that may tell you why there were so few phone calls.

PDF created with pdfFactory trial version www.pdffactory.com

**MR. SEROTA:**  I would just point out one thing, because we don't bring motions like this routinely.  I wrote down three things that he said were in the papers: that there was a litigation hold.  There is not a single word in any of the declarations or interrogatory responses saying that there was a litigation hold.

All they say is, "We took reasonable steps."  He says two employees -- only two employees had taped lines.  That's not in the --

**THE COURT:**  And I don't want to go -- I don't want to rehash.  Okay?

**MR. SEROTA:**  Okay.

**THE COURT:**  What I want is a declaration that tells us exactly what was done and the documents relating thereto.  So that if an e-mail was sent out or a memo or whatever format may have been used to communicate this hold, to whom it was sent, a copy of what was sent and what action was then taken to follow up on it, and also what was searched.  Okay?

**MR. COTTREAU:**  Your Honor, and I would be happy to do that and provide the declarations.  I would just make one request with respect to the actual litigation holds in this case, and this is -- there's other Northern District authority for this proposition, including the e-Bay antitrust litigation -- that the actual hold memos themselves are attorney-client privileged communications.  I would be happy to

PDF created with pdfFactory trial version www.pdffactory.com

file them underseal for the Court's in-camera review, but -- and I'm happy to also file declarations for their review.

THE COURT:  It depends on what that -- on what they say, whether or not they really are attorney-client privileged or not, and who drafted them and who sent them out?  I mean, if these -- I mean, presumably, if a litigation hold was communicated throughout the company, you know, that's not going to be protected by attorney-client privilege.  This would have been something sent out by somebody in either -- either the general counsel or somebody in the general counsel's office, but to employees maybe across the board.  But at least tell us to whom it was sent.

MR. COTTREAU:  And I'm happy to do that, if I could just file the actual e-mail itself in-camera.  And if Your Honor chooses to make it public at that point, I would reserve --

THE COURT:  Well, it's not a question of making it public.  It could still remain under seal but disclose attorneys' eyes only.

MR. SEROTA:  We will agree that it's not a waiver of any other attorney-client communications.

THE COURT:  Yes, right, exactly, and it wouldn't be deemed a waiver.

MR. SEROTA:  Right.

MR. COTTREAU:  Your Honor, with all due respect, I do

PDF created with pdfFactory trial version www.pdffactory.com

believe that the communication itself is privileged.  I'm happy to make it available to Your Honor.

THE COURT:  I depends on what that communication is.

MR. COTTREAU:  And I'm happy to make it available to Your Honor so she can make that determination.

THE COURT:  Fine.  Then make it under seal, but I take a very narrow view of the attorney-client privilege because it sweeps up too much sometimes.

MR. SEROTA:  I understand.

MR. COTTREAU:  Thank you, Your Honor.

THE COURT:  And will that take care of this matter.

MR. COTTREAU:  Yes.

THE COURT:  So how long -- can you get that done in two weeks?

MR. COTTREAU:  I should be able to get that done in two weeks, without checking with relevant people.  Assuming they're in the office, I think I can get it done in two weeks.

THE COURT:  People may be other locations, I understand.  But if you can do all of that in two weeks, please.

MR. COTTREAU:  I will.

THE COURT:  And get it filed within two weeks and served within two weeks.  Then what else do we have, this protective order?

MS. SHIN:  One more motion, Your Honor, and then you

PDF created with pdfFactory trial version www.pdffactory.com

will be rid of us for the day.

THE COURT:  Yes.  How about that?

MS. SHIN:  We have the motion for protective order.

THE COURT:  Can you work that out?

MS. SHIN:  We tried to, Your Honor.  In fact, we were in front of Your Honor a couple of months ago, or about a month ago, where we asked for protection from the Court.

We've had an ever-spiraling series of 30(b)(6) notices.  We first started off with 24 topics.

THE COURT:  Well, I don't understand what would be needed for the fiduciary duty claim from plaintiffs.  I mean --

MS. SHIN:  Exactly.  I mean, this is information that would uniquely be in the custody of the individuals who violated and aided and abetted in the violation of the fiduciary duty.

MR. COTTREAU:  Your Honor, they're claiming he is a fiduciary because he had the title, "Principal of TWP."

I have no idea and there is no answer from that that tells me what that title means.

THE COURT:  Well, can't you accomplish that by interrogatory?

MS. SHIN:  Absolutely, Your Honor.  And in fact, it's immaterial to our claim.  It's not on the basis of a title.  He violated his breach.  He has a fiduciary duty based on his functions as a manager.  Knowing the number of principals --

36

THE COURT:  Well, that still doesn't mean that this isn't discoverable.

MS. SHIN:  And we're happy to provide this information in written discovery responses, Your Honor.

MR. COTTREAU:  Your Honor, we asked it in writing. "Why is he a fiduciary?  Why do you claim that he's breaching a fiduciary duty?"

We got back, "Because he is a principal of TWP.  He's a corporate director of TWIPL, and he's a director of discovery research."

That's what we got back.

MS. SHIN:  Actually --

MR. COTTREAU:  And we'd like to inquire --

THE COURT:  Well, if you have specific questions, then propound an interrogatory, rather than getting a 30(b)(6) witness.  I mean, just, "Please explain the position of principal and the duties of the person.  And did this person -- did Mr. Chakravarty have all of the duties of a principal," et cetera, and what were they, whatever.  Probably you could think of 5,000 questions you would ask.

MR. COTTREAU:  I could.

THE COURT:  Don't do that.

MS. SHIN:  And we're happy to respond in writing.

MR. COTTREAU:  Your Honor, I'm happy to do that in interrogatory form.  As you know, there is something unique

about a deposition.  It's the interactive nature where you can actually gain an understanding of what the actual claim in.

THE COURT:  No, you don't need it and you're not -- you don't need it.  Okay?

MR. COTTREAU:  And Your Honor, with respect to those interrogatories, I -- as you might imagine asking discrete questions like that exhausts your limit very quickly, which is why I don't think any party really does it.

I would just ask leave of the Court to waive the limit for some reasonable number of questions.

MS. SHIN:  Your Honor, counsel served a contention interrogatory.

"State all facts on which you base your claim for breach of fiduciary duty and aiding and abetting."

That's pretty comprehensive.

THE COURT:  And I'm allowing them to ask these questions, not to exceed six questions.  So choose well.

MR. COTTREAU:  On the fiduciary claims, Your Honor?

THE COURT:  Yes.

MR. COTTREAU:  Okay.

MS. SHIN:  Your Honor, the next topic on which we're seeking relief is on trading information and those are interrogatories numbers 17 through 23.  And at the same time, just as an example of the type of information that counsel is seeking, "Topic Number 17, the amount of commissions paid by

PDF created with pdfFactory trial version www.pdffactory.com

38

each discovery research client from October 1, '05 through January 31, '08, including for each trade, the date of the trade, the name of the customer, the name of the security purchaser sold," et cetera.

At the same time as these interrogatories were served, BNPP served identically-worded document requests and identically-worded interrogatory requests.

**MR. SEROTA:**  You mean 30(b)(6) requests.

**MS. SHIN:**  I really doubt that.  At the same time that we served a 30(b)(6) deposition identically worded.  We, in writing, provided this information.

We provided spreadsheets, and we also responded to the interrogatory requests.

The federal rules are very clear --

**THE COURT:**  And this has to do with the trading damages.

**MS. SHIN:**  Trading information, commission-related information, exactly.

**THE COURT:**  Um-hum, but going to damages.

**MS. SHIN:**  Yes.  And we provided this information in writing, Your Honor.  This kind of -- this is unreasonably duplicative.  It's cumulative.  It also provides information they have already obtained.

We produced our director of trading, Tony Stais, for eight hours of declaration --

39

THE COURT:  Eight hours of deposition.

MS. SHIN:  -- deposition -- thank you -- for percipient witness deposition.

To get another eight hours of a 30(b)(6) information on information that we've already provided in writing, Your Honor, is unreasonable.

MR. COTTREAU:  Your Honor, let me try to respond in two ways.  One, why is it that we have a voluminous number of requests?  We initially served a discrete set of 24 topics in this litigation.  We did that on 9/16 -- on September 16th of last year.

They objected in boilerplate fashion to each and every topic that they're, quote, "Vague, ambiguous, and fails to describe the information sought with reasonable particularity," to every one of our 24 topics.

THE COURT:  Well, do they turn around then and answer them?

MR. COTTREAU:  No.  That was a 30(b)(6) notice.  They refused to put up a witness.  We're still here about that witness nine months -- or six months later.

MS. SHIN:  Your Honor, we responded to these identically-worded interrogatory responses, and they're attached to Exhibit 9.  We also produced a comprehensive spreadsheet.

THE COURT:  You couldn't find those?  Do you know

PDF created with pdfFactory trial version www.pdffactory.com

what she's talking about?

MR. COTTREAU:  Your Honor, they've produced a couple of documents, and we would like to ask a witness about the documents.  We think those documents should have been produced before we took Ms. Stais' deposition.

THE COURT:  How many pages were those documents?

MS. SHIN:  Michael, do you know?

MR. GALLO:  We don't know.

MS. SHIN:  It's not a matter of pages, Your Honor. We did not withhold any information based on the request they asked of us.  Every single item of information would go to 30(b)(6) topics 17 to 23.  In the identically-worded document requests and interrogatories, we responded and provided the information.

To now say, "Give it to us in another form," is unreasonable.  And if you look at those deposition topics, Numbers 17 to 23, what it would entail is to have a witness sit there and read the documents out loud.

THE COURT:  Well, I'll tell you what it's not going to entail.  It's not going to entail my sitting here and going over this silliness.  That's something you ought to be able to meet and confer about.  I don't do this stuff, and there is a good reason why I don't do it.  And it's because you get in this -- you know, enmeshed in this kind of stuff, this minutiae.

PDF created with pdfFactory trial version www.pdffactory.com

I don't send you to out to magistrate judges.  I'm going to send you to the lawyers' lounge, and I want you to try to get this resolved among yourselves.  If you can't get it resolved, then pick somebody as a special master that you're going to split the cost on and you can pay for it because our magistrate judges, they're, you know, too important for us to have them spend their time doing this.

Discovery disputes are really a waste of time, and you ought to be able to resolve these.  If you've got the data, then review it.  And if you don't understand what it is you have, then sit down and go over it with them.  And if you still need a deposition, then fine, take a deposition.  But first you make an effort to get it resolved.  Maybe you don't even know what you're looking at.  Maybe they have given you less than they -- you know, or things without explanation also.

**MR. COTTREAU:**  That's what we're trying to figure out, Your Honor.

**THE COURT:**  But the first thing you do is do not file a motion, and do not file anything in writing.  I don't do discovery disputes.

**MS. SHIN:**  We didn't do this lightly, Your Honor.

**THE COURT:**  Okay.  I don't want to be bothered with it, and I don't want the magistrate judges to be bothered with it.

You're going to fool around with it, fine, you can

PDF created with pdfFactory trial version www.pdffactory.com

pay your own way on it.

**MR. COTTREAU:**  Understood, Your Honor.

**THE COURT:**  So you better have somebody in mind, you know, who is willing to take your money for you to fight this out, because I've got more important things to do.  So you work out the rest of these.  Go to the lawyers' lounge and then come back with your resolution and put it on the record.  Okay?

**MS. SHIN:**  This afternoon?

**THE COURT:**  Right down the hall.

**MS. SHIN:**  Yes, Your Honor.

**THE COURT:**  Right down the hall.

**MR. COTTREAU:**  Thank you, Your Honor.

(The matter was recalled as follows:)

**THE CLERK:**  Do you want me to recall the Thomas Weisel matter, or do you want me to call the 4:00 calendar?

**THE COURT:**  Yeah.  Do you have everything worked out in the Weisel matter so that we can get it done quickly?

**MR. COTTREAU:**  We do, Your Honor.  I think it will just take a few minutes.

**THE COURT:**  Because we have other people waiting and they want you to set a good example for them.

**MR. COTTREAU:**  Your Honor, we've worked together in the lawyers' lounge and came to the following four agreements, I think.

With respect to the trading revenues and investment

PDF created with pdfFactory trial version www.pdffactory.com

bank revenue topics that we had, which were topics 17 through 23, we have reached a joint stipulation that the plaintiffs are not going to be seeking any damages related to execution, commission, revenue or investment banking revenue in connection with this matter, and so we will drop the topics.

Do I have that right, Ms. Shin?

**THE COURT:** That's one way to take care of it.

**MS. SHIN:** That's true. Those have been withdrawn. We agree that we're not seeking damages.

Your Honor addressed the breach of fiduciary duty claim.

**THE COURT:** Um-hum.

**MS. SHIN:** So that's also been resolved.

With respect to the CFAA claims, counsel did identify in the lounge some areas that they feel I think we should supplement our written interrogatories responses, so we are going to do that.

**MR. COTTREAU:** And just so Your Honor knows, and I think the parties are in agreement, but they're going to identify in their responses to make clear exactly what information electronic documents that the defendants allegedly unauthorized access to, when it was, what computer it was, who owned that computer and how it was used in U.S. commerce or networked in U.S. commerce.

And then with respect to trade secrets --

44

MS. SHIN:  To the extent we have information and that's not peculiarly within the defendants' possession, we are going to supplement with respect to that claim.

THE COURT:  Yeah, what are the trade secrets in this case?

MS. SHIN:  Oh, well, we identified them in our rog responses, Your Honor.

THE COURT:  You did already?

MS. SHIN:  We did.  We said two categories of trade secrets: information regarding discovery research employees including without limitation their skill levels, capabilities and expertise, educational background, and detailed information concerning their salaries, bonus and other compensation; and two, details about TWP's office lease in Mumbai, including the duration of the lease and the per-square-foot cost of the lease.

This was one area in which we are going to go back and see the best way to respond to areas that counsel would like to see supplemented, as well.  And if we can agree on the forum in which to respond, whether in writing or the two hours of deposition that counsel has asked on that topic, we may need to go see a special master.  But we are going to try to resolve that without further including this Court.

THE COURT:  Well, try to get it resolved in writing, and be as clear as you can.  And with respect to objections,

PDF created with pdfFactory trial version www.pdffactory.com

45

you know, to written interrogatories or requests for production, if you feel that you absolutely have to state an objection of some sort, state it and then preserve it. Preserve your objection and then answer the question, unless there is an attorney-client issue involved.

**MS. SHIN:**  Yes, Your Honor.

**THE COURT:**  Okay?

**MR. COTTREAU:**  Yes, Your Honor.

**MS. SHIN:**  Thank you.

**THE COURT:**  Okay.  Thank you.

**MR. COTTREAU:**  Thank you.

*(The proceedings were concluded at 4:13 p.m.)*

PDF created with pdfFactory trial version www.pdffactory.com

46

CERTIFICATE OF REPORTER

I, the undersigned, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named, or in any way interested in the outcome of the cause named in said caption.

The fee charged and the page format for the transcript conform to the regulations of the judicial conference.

Furthermore, I certify the invoice does not contain charges for the court reporter's certification page.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of March 2010.

_Margaret "Margo" Gurule_
MARGARET "MARGO" GURULE, CSR

PDF created with pdfFactory trial version www.pdffactory.com