1

```
                                                Pages 1 - 95

                 UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE MARILYN H. PATEL

TRANS VIDEO ELECTRONICS, LTD.,     )
                                   )
              Plaintiff,           )
                                   )
           vs.                     )NO. CV 09-03304 MHP
                                   )
                                   )
SONY ELECTRONICS, INC., et al.,    )
                                   )SAN FRANCISCO, CALIFORNIA
              Defendants.          )Thursday, May 5, 2011
                                   )2:42 p.m.
_____)
```

**TRANSCRIPT OF PROCEEDINGS**

**(CLAIMS CONSTRUCTION HEARING)**

**APPEARANCES:**

**For Plaintiff:**
            **LOCKE, LORD, BISSELL & LIDDELL, LLP**
            3 World Financial Center
            New York, New York 10281
            (212)415-8625
            BY:  **JOHN F. SWEENEY, ESQ.**
            and  **ZACHARY D. SILBERSHER, ESQ.**
                 **MATTHEW K. BLACKBURN, ESQ.**


**For Defendant:**
            **KENYON & KENYON, LLP**
            One Broadway
            New York, New York 10004
            (212)425-7200
            BY:  **WALTER E. HANLEY, ESQ.**
                 **MEGAN WHYMAN OLESEK, ESQ.**
                 **BRETT N. WATKINS, ESQ.**


*Reported by:   MARGARET "MARGO" GURULE, CSR #12976*
            PRO TEM COURT REPORTER, *USDC*

2

**P R O C E E D I N G S**

**MAY 5, 2011**                                                    **2:42 P.M.**

**THE CLERK:**  You may be seated.

Calling Civil 09-3304, Trans Video Electronics vs. Sony Electronics, Inc.

**THE COURT:**  May I have your appearances, please.

**MR. SWEENEY:**  Yes.  Good afternoon, Your Honor.  John Sweeney for Trans Video, and my partner, Matt Blackburn, and Zach Silbersher are also present.

**THE COURT:**  Good afternoon.

**MR. SWEENEY:**  And if I may, Mr. Rebeck, who is the president of Trans Video, is also here, and Mr. Vasquez, who was the patent attorney involved in the reexamination recently completed, is also here.

**THE COURT:**  Good afternoon.

**MR. HANLEY:**  Good afternoon, Your Honor.  Walter Hanley for the Sony defendants.  And I have with me my partner, Megan Olesek, and my associate, Brett Watkins.

And I would like to -- I think Your Honor has met Mr. Leong before, last time, but this is Jim Leong.  He's a senior corporate counsel at Sony Computer Entertainment America.

**THE COURT:**  Good afternoon.  I gather some show-and-tell equipment was brought in, either for PowerPoints or something else?

**MR. SWEENEY:** Yes. And I think the parties worked together. Counsel worked together on the equipment, and I think both sides have a PowerPoint.

**THE COURT:** Um-hum. Is that with respect to the actual claim construction?

**MR. SWEENEY:** Yeah. We have a brief tutorial, and then followed by the claim construction.

**THE COURT:** Yeah, I don't know if we need much of anything in the way of a tutorial.

**MR. SWEENEY:** Ours is very short.

**THE COURT:** It seems to me pretty straightforward, until you get to construing the claims.

**MR. SWEENEY:** Right. Well, we only have a few slides, and they're related.

**THE COURT:** Okay. Okay. Okay.

**MR. SWEENEY:** So it's not a long thing. It should take less than ten minutes.

**THE COURT:** Okay. And there are no ducks or animals on them or anything like that?

**MR. SWEENEY:** No, no. They're pretty simple.

**THE COURT:** Thank you. Thank you. Somebody tried that once, and I --

**MR. HANLEY:** Ours is likewise very short. We can dispense with it or not. I think, you know, it will take little time.

**THE COURT:** Okay.

**MR. SWEENEY:** And what I thought I would do, subject to Your Honor's wishes, is that we would start with our very brief tutorial and just go right into our Markman construction.

**THE COURT:** Fine. But I'm probably -- why don't you -- why don't you do whatever you have to say with respect to your tutorial, and then why don't you do the same with respect to your intro or tutorial.

And then we will take one or more of the claims at a time and bounce them back and forth. Because, you know, to go through all of them and then for you to go through all of them, it's really -- I think it's better to have a little give and take. And I have some questions and so forth, and maybe I'll come to my own interpretation.

**MR. SWEENEY:** Sure. That's fine, Your Honor.

**THE COURT:** Okay? Fine. So do you want to get started? Do you want to tell us what you want to tell us that we don't know?

**MR. SWEENEY:** Yeah. We will put up some of these tutorial slides.

Go to the first one, Zach, and just keep going here. Two of the things we're going to be talking about -- and it's in the patent -- is this point-to-point communication versus point to multi point.

Point to point is obviously like we'd pick up the phone and call someone. Multi-point communication is when you

broadcast something or you order pay-per-view TV or video is going out to multiple locations. That's one of the points of this patent.

We can go to the next slide. This is a discussion about digital signals. You know, in an electrical signal, voltage goes up and down if it's in a wire or if it's in a, you know, being sent by an antenna into the air. The electrical field gets stronger and weaker and it undulates and you know, the engineers describe it in a sinew sort of wave curve, you know, and they can use an-trigonometric concepts, you know, to analyze what is going on.

In an analog signal, as the voltage gets higher, it usually represents some underlying phenomena, like if you talk louder into a microphone, the voltage will go up. When you talk a little lower, the voltage will go down.

With a digital signal, you still have a wave, an electromagnetic wave or a sign wave showing the variance in the voltage. But it's coded so that if you, for instance, modify the wave, you modify the amplitude -- that's called amplitude modulation -- you can also modified the frequency called frequency modulation like AM/FM radio.

And for instance, in this example, when the amplitude is higher, that represents a 1. When it's lower, it's represents a 0. And if both the sender and the receiver have this code book, like Morse Code, they can figure out what the signal

6

means.  So that is going to come up a little later, as well.

One of the things in the patent referred to is a hard -- you know, an available device.  It's available off the shelf.  It's called a CSU/DSU.

I think that stands for channel service unit/data service unit.  It's basically an interface.  It's an interface between a network and a hub, a hub where you might have servers and amplifiers, storage equipment, things of that sort, and it's sort of a gateway to the hub.  It's that interconnection.

And CSUs are used in the patent specification.  They're mentioned in a number of places.  And I just wanted you to know that it is -- you know, it's something you can buy, and the patentee made use of these.

This also refers to --

**THE COURT:**  Is there some reason why, in the patent, it's referred to not as a channel service unit, but as a customer service unit?

**MR. SWEENEY:**  I think that's a mistake, Your Honor.  I think the official name is a channel service unit, but --

**THE COURT:**  I thought maybe it was a modified channel service unit?

**MR. SWEENEY:**  Well, I asked that same question, and I think, in drafting it, that initial was misinterpreted.  But it is an available commercial device.

**THE COURT:**  Yes, I noticed that.

**MR. SWEENEY:**  And we will see that in the spec.

**THE COURT:**  In this particular -- excuse me.  In this particular one, it was one manufactured by a company that's probably not even around anymore -- I don't know -- by Integrated Network Corporation.

**MR. SWEENEY:**  That's right.

**THE COURT:**  Now, did that tell any -- the reader of this, the knowledgeable or person, you know, familiar, you know, with the art, anything in particular --

**MR. SWEENEY:**  Well, I think.

**THE COURT:**  -- or unique about that particular model?

**MR. SWEENEY:**  I don't think it's going to be that big of a point in this discussion.  But at the time the application was filed back in 1993, I'm sure it would tell, you know, one of ordinary skill in the art something.  But I don't think exactly what this device does is really in dispute here.

This device communicates both synchronously and asynchronously.  We're going to get into a discussion of what those mean.

Synchronous, from my high school Latin, means time, you know, and synchronous means same time.

Asynchronous means not the same time.

So an example of -- we're going to get into this in the context of the patent.  But in general, synchronously means that a train leaves every day at, you know, 2:00 and there is a

schedule.  Regardless of how many people get on, it's synchronous; it goes at the same time.

Asychronous might be, well, the train leaves as soon as there are enough people to fill the train up.  In other words, if there are not 500 people, the train will just sit there.  And so that's one of the concepts we're going to talk about, you know, in the context of the patent.  And that is going to be in dispute later on.

So now we get to the patent.  Trans Video basically identified a problem back in the days of the Gulf War where certain time-sensitive data video clips which were taken out in the first Gulf War had to be brought in in videotapes and then combined with other videotapes and other media.  And a hard copy had to be developed and then everything was sent as a package.  That was a pretty inefficient system.

If we could continue.  Basically, they developed a system -- in this prior art, Figure 1A shows how the Television Station 28 receives a video clip from a remote location and sends that clip to another location for broadcasting.

And Figure 1A shows a satellite dish, Station 40, and then there is a dish at -- D-I-S-K is a misspelling.  It should say "dish" -- which uplinks microwaves to the satellite.  The satellite 20 in turn downlinks the microwave signals to the television station where it could be broadcast live to the surrounding area.

And that's part of the prior art that the inventor thought was inefficient.  And he came up with a solution that had, as we will see, I think a broader application.

Go to the next slide.  So this is a slide that's showing some of the drawbacks.  This is right out of the patent -- you know, I didn't write -- I just selected these from the patent to view.

The news information had to be sent from point to point rather than from a point to a multi-point.  So if that was inefficient, the television station could only receive in one direction.  It could only simultaneously transmit in multiple directions if it had multiple satellite dishes.

The process had a further problem of transmitting and storing video clips in analog form, consequently not readily compatible with land, you know, digital networks.  And the Accunet network was one of those digital networks at the time. So you couldn't have on-demand news and things of that sort.

So that's the problem that he confronted that led to this invention back in those days.

Trans Video, we think, did pioneer a novel system, a method for delivery of video over digital networks, and this is quite a long time ago.  This is back in 1993.

We think they developed the first all-in-one, analog-to-digital video converting, compressing, transmitting system, and also to reverse the process at the other end, you

know, for receiving.

If we can -- just a couple more.

There's a few drawings in the patent. We can skip this one. This is Figure 1B of the patent. If we look there at 150, we see that's sort of a portable transmitter receiver, like in a suitcase that transmits to a satellite to an earth station. It then goes to the land network. And from the network, the video signal goes into the hub. And the CSU/DSU is referred to as 108, and the spec says that's the master communications unit.

And so that's that CSU/DSU being used. It takes that video signal in. It can then store it in these backup storage units shown in this diagram. And then when a consumer -- and it goes through these distribution amplifiers to get to the storage devices. That's the routing that's described in the patent specification.

And when then a consumer or user wants the signal -- the users are down here in 188 -- they're also using the same type of suitcase that 150 is, which both has an ability to transmit and to receive. And when they want a video, they can select it from the menu, and the video is retrieved, sent through the distribution amplifiers, and these boxes here, 116, they're called communications units.

And they actually make the transmission to the network, and then the video gets to the users. These transmission

units, 116 -- or communications units -- excuse me -- are also CSU/DSUs.

THE COURT:  I'm going to ask you, are those the same?

MR. SWEENEY:  They're the same.  It's the same device.

THE COURT:  Are they exactly the same device, or is it just some, you know, reconfiguration or modification of the master?

MR. SWEENEY:  It's the same device used in a different way.  At this place, 116, they are sending the video out to the network.  It's used up in 108.

The CSU/DSU is referred to as a master communications unit, and this is receiving input in from the network.  So if you can think of the hub as a little citadel with two bridges, one on the input side and one on the output side, we have a bridge to get into the hub, 108, we have a bridge to get out of the hub, the communications units, 116.

But the CSU/DSU, this commercial device, can both -- you know, can send in both directions.  It can be used in different modes.

In this mode down here in 116, the claims call it a communications unit.  In this mode, it can also be used as the so-called master communications unit.

Now, we have some similar drawings that will highlight this.  This is -- the second drawing is Figure 2.  It shows much the same thing.  It shows the -- it doesn't show the

suitcase unit over on the left, but it shows the video signal entering the master communications unit, and it shows it going to the distribution amplifiers and then into the backup storage units.

Now, the red lines here, we have drawn based upon our belief about what the patent specification shows, and we've drawn those green lines.  This arrow here, this black arrow, that is part of the original -- you know, that's in the patent itself, Figure 2.

And just as in the previous drawing when -- the users actually aren't shown here.  I think 116 -- they're the communications units that send things out to the network.  The users would be down here.

And when the video is retrieved, it comes up through the distribution amplifiers to the communications unit and then out to the users.  And there is one other figure in the patent that is also instructive.

This is Figure 5 where you can see kind of everything together.  You have the network down here.  550 are the users. They're the transmitter receivers, so-called receiving stations.

The storage units are up here at the top.  They're part of the hub.  The communications units are 535.  They're the things that send things out to the network.  They're those CSU/DSUs. We've labeled them communications units.

Before you get to those when you're going out, you get to the distribution amplifier unit. That's 531. The storage units are up at the top. The master communications unit is indicated over here at 516. The patent calls 516 the CSU/DSU, but it's in the receiving path here. So it's taking the signal in here, and then the signal is going out on the right-hand side.

And there is a menu storing unit up here, as well. So this is a pretty complete picture of Claim 3, which is the claim asserted here.

And it's clear -- okay. Well, we won't get into that until later. This sort of completes the tutorial.

One of the terms used in the claim is a distribution amplifier equalizer, and I just thought I would put up a picture of it from the specification just to let you know what that looks like. And that's -- you know, if we go back to the previous drawing, you know, the distribution amplifiers are indicated in that box there. They're the -- when we say plural, you know, there are a number of them. You know, they're in parallel here, 531A, B, C, D, E, F, G, et cetera.

And I think that completes my tutorial.

**THE COURT:** Okay. Thank you.

Do you want to pick up from there?

**MR. HANLEY:** Very good, Your Honor.

**THE COURT:** Or start over again or whatever this is?

**MR. HANLEY:** Yeah. Well, interestingly enough, we have a brief sort of tutorial and an overview. The elements of our tutorial are actually different from theirs, so maybe that's a good thing.

We thought there were two concepts that might be helpful for the Court to bone up on, if you will, because they do tie in with some of the substantive arguments.

The first is what is synchronous signal communication. Mr. Sweeney referred to synchronous versus asynchronous. In synchronous communication, essentially you have shared timing information.

And the reason one does that is, if you simply had a device sending a stream of data bits -- and we've represented those by this pulse train with the ones and zeros over them on the top -- and you've got a receiver at the other end. The receiver, in that scenario, that very simple scenario where you have alternating pulses, would be able to tell what is a 1 and what is a 0, because every transition between a 1 and a 0 and back again would be noted as a new data bit and a change in the value.

The problem arises, however, when you have, as you have in most cases, not a simple alternating pattern but data where you have several 1s in a row or several 0s in a row. And if the transitting unit sends this to the receiving unit, the receiving unit then, if it's just looking at the transitions,

isn't going to know that there's like three 0s in a row or over here there's three 1s in a row.

So in order for the receiver to know that this is just, you know, a continuation, three 0s in a row, it has to have a common timing with the sending unit.

So what we have done -- if I can just stop that.  Go back.

What we have here is basically we're analogizing two metronomes, and the metronomes have a common timing.  It's where you have a metronome that goes back and forth at the same time.  And the one on the left is transitting this signal to the one on the right.

And because they have a common timing, the receiver on the right knows when to look at the signal to see whether or not it's a 1 or a 0.  So you can see that it sees it as a 1.  Now it knows when to look and it sees it as a 0 and so on, and then back to 1.

It can therefore detect that you have, you know, three 1's in a row or three 0's in a row because its timing is set to the same timing as the transmitter.

**THE COURT:**  And what sets the timing?

**MR. HANLEY:**  The timing is set by what is called a clock.

**THE COURT:**  But is it really a clock?

**MR. HANLEY:**  Well, it's a clock not in the sense of a --

**THE COURT:**  So it's a timer or it's a pulse that sends some message in it?

16

**MR. HANLEY:** Right. Yeah, it's an oscillator, basically, that sends out a signal as a set frequency. And that frequency can then be tuned in by the sending equipment and the receiving equipment, and they can then establish their common timing so that the receiver can then receive the data and determine which bit is a 1 and which bit is a 0.

So it's not a clock in the sense of an analog, you know, clock with a clock face. It's basically an oscillator that has a signal that's set at a particular timing.

**THE COURT:** Well, for example, in the specification, when it says that the land network, and that's referring -- I think that is referring to Figure 4, actually, 170, the land network is a synchronous digital system, and consequently is coupled to hub receiver -- and it gives the number -- and in particular to the master CSU/DSU by input, et cetera, which receives lines.

Now -- and it sounds as though they receive it synchronously also.

**MR. HANLEY:** Right. Correct.

**THE COURT:** So the land network is synchronous already. How does the -- how does the receiver then achieve synchronicity with the land network?

**MR. HANLEY:** Well, in that -- in the patent, they basically have a network that is a synchronous network. There is a clock -- there's a network clock --

**THE COURT:** Um-hum.

**MR. HANLEY:** -- and the devices that are on the network will set their timing relative to that network clock.

**THE COURT:** And what are those devices then?

**MR. HANLEY:** Well, the devices can be a transmitter. The example shown in the -- if I can just skip ahead.

It can be a -- here, in this example, you know, you have a transmitting unit here. It says, Earth station that's sending a signal out to the network. The network synchronization is established, and that transmitter will be synchronized to the same clock signal as this receiver, this CSU/DSU 108, in that example.

So they do a handshake and they establish the common timing through the synchronous clock. We have a clock signal that's established on the network in that example.

Could we go back to this? There we go.

So if Your Honor -- we're done with that. Because we will be talking about more of this, believe me.

The other concept is -- that comes up in the patent is single amplification and single splitting.

Now, Mr. Sweeney referred to amplification. Basically, it is what he said. You'll have an input signal to a device and amplifier, and the amplitude is basically the height. It's the distance between the lowest value of low voltage and the high voltage. And what the amplifier will do is basically enlarge that height, enlarge that amplitude.

It doesn't affect the frequency of the signal, and it doesn't affect the distance between -- between waves or the size of the waves or the size of the pulses in this example. It just affects the amplitude.

Another device is called a signal splitter.  And Your Honor, if you have a cable TV or satellite TV and you have more than one television in your house, chances are -- you may not be aware of it, but you have -- somewhere you have a signal splitter that basically takes in the input cable signal and copies it, makes multiple copies and puts it on output lines that go out to your various TVs so they can share the signal.

So, in our example here, we see a signal splitter.  We see the input signal.  And then we're shown the output signal. They're basically copies.

But in our illustration, the copies have reduced amplitude.  Since it takes energy to create the various signal copies, there can be a reduction in amplitude of the signal as a result.

So if you have your cable splitter and you have too many TVs, chances are the cable company has to provide -- in addition to a splitter, they have to provide something that will amplify the signal to make sure that the various copies of the signal have sufficient amplitude, you know, to power your television.

**THE COURT:**  But again, those don't change the frequency

that you're seeing by virtue of both what is going in and coming out of the amplifier and also the splitter.

MR. HANLEY:  That's correct.  There is no change in frequency.  That would basically change the data stream.

THE COURT:  Um-hum.

MR. HANLEY:  And so it's simply a change in the amplitude of the signal.

So, as I mentioned, you know, you may have a unit that both amplifies and splits.  And as I said, the reason for that is there can be some loss of amplitude in the splitting process.  And so it can either amplify the input signal before it's split, or you can actually have amplification of the signal copies on the output.

THE COURT:  Now, the amplifier -- is this an amplifier -- on Figure A3, is that an amplifier and an equalizer also, or is that -- is that just an amplifier that doesn't -- that also does any splitting?

MR. HANLEY:  Well, it does -- that one does both.  And we will get to this in the argument proper.  But as they pointed out --

THE COURT:  I'm sorry, I'm getting ahead of you.

MR. HANLEY:  As Trans Video pointed out to the Patent Office, that unit both amplifies and splits.

Equalization is basically equalizing the amplitudes of the output signals to some value that is needed by the equipment to

which it's being transmitted.  But it says --

**THE COURT:**  So this has all three of them, then?

**MR. HANLEY:**  Right.  That has all three, correct.

**THE COURT:**  Um-hum.  Right.

**MR. HANLEY:**  Now, I would also like to do an overview -- I'll try to do this briefly because I don't want to duplicate what Mr. Sweeney has done.  But I'm going to take a slightly different approach.

And the bottom line, I think, is that, in understanding the patent and approaching the claims, it's really necessary, unfortunately, to do what the person that's skilled in the art is presumed to do in interpreting the claim; that is to basically read the patent from the beginning to the end, arriving at the claims after getting a full understanding of the invention that the inventors have described.

So we thought it was important to briefly go through that exercise simply because there is a basic disagreement between the parties about what is the invention that the inventors described in their specification.  And our view is that Trans Video is mischaracterizing the invention and using that as essentially the foundation for some of their arguments on some of the claim terms.

And it really goes to this issue that has bounced around in this case.  You know, it has been alluded to by Mr. Sweeney in prior conferences we've had.  That is:  Is this a system

which, as they say, is one where a user can both upload video clips to a library and download video clips to a library?

And we contend that's not what is described, and therefore that construct, which is the foundation for some of their claim constructions, you know, is a false construct.

So what one sees when one reads the patent, first as an abstract and then you read the background, and then you arrive at the summary of the invention which courts' view -- and this is typically true -- is the place where the inventors put forth the most general description of their invention, essentially, they're saying, This is what we've invented and the description typically one will find reflected, in large measure, in the claims.

So in the summary, basically, in this patent you've got -- two systems are described. The first system is characterized as an information distribution system, and it has four elements.

It has a master communications unit and that receives a signal from the network.

It has a distribution amplifier unit coupled to the master communications unit. That receives a signal from the master communications unit.

You have a plurality of communication units that receive the copies of the signal made by the distribution amplifier.

And then you have a master controller that exercises some

control over the communications units.

So those four elements.

It also describes a second system which is characterized as an information disseminating system.  And that system likewise has four elements.  First is a plurality of video clip storage units that each store data related to a particular subject matter; a plurality of distribution amplifier units, each of which is coupled to a video clip storage unit; a plurality of communication units that receive signals from the distribution amplifier units; and then a menu storing unit that stores certain information about the content of the video clip storage units.

So, in this system, what we don't see is a master communications unit receiving a signal from the network, and we don't see a master controller in this system.  Likewise, in the prior system, we don't see a plurality of video clip storage units organized by subject matter, and we don't see a menu storing unit.

And that delineation that's set forth in the summary is carried through -- excuse me -- is carried through the description of the preferred embodiment.  So you basically have two embodiments -- and I'm going to skip ahead a little bit on this one.

There is the first system, which is characterized as the digital information distribution system.  And Mr. Sweeney put

up Figure 1.  And that system basically tracks the first system described in the summary.

So you have a master CSU/DSU 108 which corresponds to the master communications unit, and that receives a signal from the network.  You have the distribution amplifier, and that is what takes the input signal from the master communication unit and splits, makes the copies.

You have the communications units, each of which gets a copy of the signal output by the distribution amplifier.  And you have that signal being sent over the network to these receiving stations in 184.

Now, the patent also -- there is these crosshatched things over here to the right which are not units 184.  There is one sentence in the spec that describes what they do.

Basically, it says, "If no digital network is available, these remote suitcases, 188, can be used as receiving stations."

So it's saying, "This whole thing basically is cut out of a picture.  You don't have a network over which to receive the transmission from this originating unit."

So, basically, it has to be a direct communication from Item 150 to Items 188.  And as it says here, This is described in -- and this is the parent application of -- the grandparent application which has a disclosure that's very, very different from what is set forth in the specification of the 801 patent.

24

So the operation of these units -- and we will come back to this -- basically is not particularly relevant to our case and our claim because our claim has to do with a system that uses the network.  So this is a non-network embodiment.

**THE COURT:**  But 150 is used in the network embodiment, correct?

**MR. HANLEY:**  Right.  When the network is available --

**THE COURT:**  That's what has been referred to as a suitcase transmission unit?

**MR. HANLEY:**  Yeah, a suitcase transmission unit, correct, since it's some kind of portable device that one can capture -- can capture, store a video clip, and then has some sort of satellite communications equipment to uplink to a satellite.

And when the network is available, what the patent says is, As downlinked to an earth station which it has a presence on the network, and then sent over the network to this hub receiver, which is basically the guts of the system, and then back out -- copies are made back out over the network to the receiving station.

So basically, Figure 1 is like a point-to-multi-point communication system.  Point of origination of transmission; multi-point reception at the receiving stations.

There is also a discussion in Figure 1 of backup units. And these backup units basically do what the name implies. They provide a backup copy of the incoming signal to the

distribution amplifier.  And what the patent clearly says is not that everything that comes into the distribution amplifier goes into the backup and is stored there for a while and there is some sort of request process that is engaged in by these receiving stations to get a copy from the backup unit.  There is nothing about that in the discussion of the embodiment of Figure 1B.

Basically, what it says is that the backup unit, the backup signal is received by the backup units, 134 and 136 at the same time it is transmitted out of distribution amplifier equalizer 112, the CSU/DSUs 116.

So we have a flow-through.  Input signal to the distribution amplifier; copies made and then sent out multi-point broadcast to receiving stations; and it makes a backup copy.  So that's how that operates.

Now, if we can go to Slide 33.  Mr. Sweeney put up Figure 2.  Figure 2 basically, it's stated in the specification that it provides more detail.  It's essentially the same setup as Figure 1.

This statement about what the backup hub of the signal going to the backup at the same time it's transmitted out to the CSU/DSUs is part of a discussion of Figure 2.  So I think -- perhaps I'm jumping ahead.

As I gather, their position is going to be somehow that everything comes into the distribution amplifier.  It gets

copied, and then, at some later time, it gets called up. That's not what happens.

It's basically essentially a realtime system, you know, point input, multi-point output, and make a backup copy, you know, in case one is needed.

Could we go back to 18, please.

Figure 5 basically represents the second system that is described in the summary, and it essentially tracks the elements of that system. It's characterized as a video on-demand news distribution system. And essentially the way it works is you have users identified down at the bottom, 550A through C. They have computers. They're at printing houses or television stations and they're able to dial a phone number to call up Video Menu Unit 104.

And they receive from the video menu unit -- excuse me -- 504 a menu. So a list of available clips, video clips. And they can send a request up to that video menu unit.

And you have in the -- you have -- sort of intermediate between the video menu unit and the network and these users, you have these components here: a telephone line unit 508 and what the patent calls menu CSU/DSUs 516.

So they are basically involved in the communication back and forth of a menu down to the user and request back from the user to the video menu unit for a video clip.

There is no discussion that this part of the system is

27

involved in uploading or downloading actual video clips.  It sends menu information; it receives a request back.

You do have video clip storage units in this embodiment. Those are 525A through H, and they are set to store video clips by subject matter.  And in the process of a request being made, a user selects a requested video.  The video menu unit then will command the appropriate one of these video clip storage units, the one that has the clip being requested.  And the video clip storage unit, let's say 525A, will then send the clip down through its intermediate components down to the network and ultimately to the user.

So we have an example here.  The request has been made, and the video clip happens to be in the 525A video clip storage unit.  That sends -- that has connected to it a distribution amplifier unit, and there is one -- there is one distribution amplifier unit for each video clip storage unit in this system. And then the distribution amplifier unit then -- that sends the data corresponding to the clip to a communications unit.

Here it's 535A, but there are multiples of them, one or more, coupled each, distribution amplifier.  And then that communications unit establishes communications with the requesting user, and then it sends the video that's been requested to the requesting user.

So, in this system, there is no discussion about how the video clips get into these video clip storage units.  There is

no discussion of uploading them.  There is no discussion of how a particular video clip that pertains to a particular subject matter ends up in the right unit.  That's not trivial management.  There has to be some encoding to decide where it goes.  None of that is described.

Basically, in this embodiment, we have video clips that are stored, and it's an on-demand system where users can request those stored video clips.  Nothing about users sending them up to video clip storage units, no provision for that at all.

THE COURT:  Now, if you can go back to that for just a moment, there are, for example, from -- if I'm reading the numbers correctly, 535A, C, F, et cetera, there are arrows going in the direction -- going in the upward direction, right?

MR. HANLEY:  Okay.  Now, Your Honor's pointing -- these arrows here?

THE COURT:  No, no.  Just below that, right there, right there.

MR. HANLEY:  Right, right.  Yeah.

THE COURT:  What is the significance of those?

MR. HANLEY:  Those arrows, like the arrows we see over here, 533A, B, basically pointing to the item that is being referenced in the patent.  So there isn't a whole lot of room to put 535A on these uplinks that are referred to.

So it's basically a way to -- it's part of the process of

referencing or identifying what that number corresponds to in a figure.

THE COURT:  It's not telling us anything about direction?

MR. HANLEY:  It's not telling us anything at all about direction.  And if you look at the text in the specification, it says nothing about that.

What it says about it, actually, is it's downloading or sending it down from the video clip storage units onto the network and then to the requesting user.  We know nothing about video clips going the other direction.

So, with that, Your Honor, that concludes my sort of warmup, unless Your Honor has any questions?

THE COURT:  Okay.  Okay.  Well, it seems that through a lot of -- running through a number of these terms at issue and the claim, that there is a theory, if I'm correct, on behalf of plaintiffs, that there is not only this function of getting information from the network and then having it transmitted from the network, but there is also, in other words, essentially a download function, for want of a better term.  But there also is some sort of an upload function?

MR. SWEENEY:  Yes, I think so, Your Honor.

THE COURT:  Is that correct?  Is that your theory?

MR. SWEENEY:  Yes.

THE COURT:  And so what I'm trying to figure out is, from reading all of this, is:  Where is that in the patent?

MR. SWEENEY: Right. We're going to be covering that as -- you know, we just have covered our tutorial, and actually, in one of the very first --

THE COURT: But that's one of the most critical, it seems to me, one of the most critical issues here.

MR. SWEENEY: Yes. Yes, it is. And we're going to get back into this. In fact, in the very first claim term that I'm going to discuss, we'll get back into that.

THE COURT: Well, that's one way to get into it, then, I guess.

MR. SWEENEY: Yes. So this is -- you know, we're finished with the tutorial now.

Before I start with the first claim term, I just wanted to advise the Court that, you know, we do have a stipulation on some of the terms. These are some of the terms that where the Patent Office, during reexamination, reached a construction, and the parties have agreed to that. So we don't have to worry about that. I just thought we may --

THE COURT: Right. Plurality has always meant that, not just now but for all time, I believe.

MR. SWEENEY: Right. Walter and I struggled to agree on that one, but we finally did agree.

Okay. Let's go to the --

THE COURT: These are the ones?

MR. SWEENEY: Yeah. The first one, this is the claim

itself, Claim 3, and this is the claim that's in dispute. Each of the claims, you know, define the invention a little bit differently.

And Claim 3 has certain things that some of the other claims don't have, for instance.

If we can just look at the claim itself, it talks about an information distribution system for a network comprised in a plurality of video claim storage units -- I have a little laser pen here -- that each store data related to a particular subject matter.

And the term we're going to discuss -- I'm going to discuss first is the master communications unit.

But it says, The master communications unit coupled to the digital network that establishes communications with the network in order to receive a synchronous signal, digital signal -- so the master communications unit is definitely receiving a signal -- and it's corresponding to the data related to said particular subject matter stored in a respective one of the clipped storage units.

So I believe that we will show that this means that it's receiving video similar to, corresponding to, the video that's already been stored. So this claim, as opposed to some of the other claims, does have a vehicle or mechanism, this master communications unit, for taking video up, collecting it from the network and from the users.

Going to the next term, it talks about this plurality of distribution amplifier units.  They're coupled in terms, as we've seen in the drawings, to the master communications unit where each of the plurality of the distribution units has an input that receives a synchronous digital signal corresponding to the data from the respective one of the plurality of video clip storage unit.  So it's getting an input from a storage unit.  And it leaves one output to divide said synchronous signal into corresponding -- it divides that synchronous signal corresponding to the data from the plurality of video clip units into a plurality of synchronous signals, similar to what Mr. Hanley said.

And then we have these plurality communications units. Those are the things on the right-hand side of Figure 5 that we've been covering.  Each have said communications units being coupled to one of said plurality distribution amplifier units to respectively establish communications between respective ones of said plurality of distribution amplifier units and of plurality of receiving stations in the digital network to receive an output so that it's the amplifiers that are -- excuse me -- the communications devices that are receiving and outputting corresponding ones of said plurality of synchronous signals to the receiving stations.

So the communications units are associated with this downloading function.  The master communications unit is

associated with the uploading function.  And I would point out, too -- and we will get into this later.  But this does not say that the receiving stations receive a synchronous signal.  It says that the communications unit send a synchronous signal.  But it does not say the network is a synchronous network.  So we will get into that later.

But I think if we look at these metronome devices that Mr. Hanley put up, we read this claim as requiring one metronome.  The train leaves on schedule, but there is no requirement that it can't stop, you know, along the way.  And then we have the menu storing unit which allows the user to access videos.  He's giving information to access the videos that he wants.

So now let's go to just the first term, and that's where I'll begin and then stop.  We're proposing, for this claim term, a unit with an input for receiving videos from the network, which is what I have tried to explain already from the drawings.

Sony is proposing a device that receives a synchronous signal, a digital signal, from a digital network for distribution over the digital network to the receiving station.  So Sony's approach is:  It's sort of a fast-forward.  You receive it; send it out.

We say it's a unit with an input for receiving videos from a network transmitted by a user.  Actually --

34

THE COURT: And what do you mean by "transmitted by a user"? The user cannot --

MR. SWEENEY: Uploaded. For instance, this person in the field who can receive video can also send them into the system. He can upload and download.

THE COURT: Exactly how is that done? Can you pull up, for example, one of the -- one of figures that would explain that?

MR. SWEENEY: Yeah. Well, let's go to the next figure. For instance, in this suitcase unit, this suitcase unit describes a portable transmission devices that takes a picture. It has a camera. And it converts that analog.

It converts that photograph to an analog electrical signal to a digital signal. It sends it to a satellite, and then it's uploaded to the network.

That video then enters this hub through the CSU/DSU. And this is the suitcase unit that the patent says is capable of both uploading and downloading.

And, as we will see, this is -- we have a few other things to show you, but the prosecution history is also, you know, very clear on this. A couple of the passages of the specification, the parent application which is, in part, incorporated by reference here, it says, "An object of the invention is to provide a receiving system which is also capable of transmitting audio/video information." So it does

35

both.

Suitcase 150, that's the transmitter we just saw.  It says, "The suitcase transmission unit such as a suitcase unit described in this parent 08/9 patent gathers the video clip, compresses that clip, and then transmits or uplinks" -- uplinks means upload -- to the satellite system and then ultimately to the network and into the hub.

This suitcase unit, this type of suitcase unit, can also be used as a receiving station, and that's described in the 08/9 patent.

Okay, let's go to the next drawing.  This goes back to Figure 2 which I described earlier.  This shows the network sending a signal into the CSU/DSU.  And it certainly can distribute a signal, but it also stores the signal.

Okay.  Let's continue.  Now, you know, the federal circuit has held that the prosecution history must be considered in construing the claims.

And these claims, including Claim 3, were under rejection at one point, and the solicitor made an argument here.  He said, "Thus the applicant's video news distribution 500 can receive already edited video with audio news clips from their remote suitcase 188 and store them."

Down here, "Accordingly, the video news distribution system 500 can start with no video clips and accumulate an extensive library over the time.  The users can make the

library.  Something like an Associated Press AP, but for video/audio clips."

This makes it explicit that the user is adding to that library.

THE COURT:  Well, where is that, though, in the claim?

MR. SWEENEY:  Let's go back.  If we can go back to the claim, Claim 3, it says, "A master communications unit coupled to the digital network that establishes" --

THE COURT:  Um-hum.

MR. SWEENEY:  -- "that establishes communications with the network in order to receive" -- not to transit -- "to receive a synchronous digital signal" --

THE COURT:  Well, where is that receiving coming from? It's coming from the network, isn't it?

MR. SWEENEY:  It is coming from the network.

THE COURT:  Okay.

MR. SWEENEY:  That's correct.  It's coming from the network.

So it both receives, uploads, and it can download to the receiving stations.  It can do both.  This claim has a distribution system that receives, uploads a video and can download.

THE COURT:  But you're referring to the user uploading, are you not?  Are you claiming that the user can upload also?

MR. SWEENEY:  Yes.  However, I'm starting with the term

"master communications unit."

THE COURT: Um-hum, um-hum.

MR. SWEENEY: The master communications unit doesn't upload. It receives uploads. And where does it say "receive"? It's in the text of the claim, in order to receive a synchronous digital signal.

This claim term deals with what is received by the master communications unit, this hub. Now, when we get to the term "receiving station," which is another term in dispute -- that's Number 5 -- I can go to that now, if you would like. But it does -- I mean, the patent talks about these suitcase units having the ability to both download and upload. They do both.

THE COURT: Well, let's read the whole -- let's read that whole section. "A master communication units coupled to the digital network" --

MR. SWEENEY: Yes -- that establishes communications with the network --

THE COURT: -- "that establishes communications with the network in order to receive" --

MR. SWEENEY: Yes.

THE COURT: -- in order to get from the network -- "a synchronous digital signal corresponding to the data related to said particular subject matter stored" -- not being stored, not that may be stored, "stored in a respective one of said plurality of video clip storage units."

In other words, they're already in the storage units?

**MR. SWEENEY:**  Correct.  In other words, let's say we have a hub and we decide to store certain types of movies.  We have movies, we have sports, we have news, and we have stored them. Now we're going to be receiving new video from the network to the master communications unit.

It corresponds to what we've already received.  If we're receiving news, we're going to put it in the news bin.  If we're receiving sports, we're going to put it in the sports bin.

So you're receiving this synchronous signal.  The question is:  What is this synchronous signal?

Well, it corresponds to what we already have.  It corresponds to the video.  It's more of the same type of video we already have.

So, I agree, there is video stored there.  But that video had to either be part of the initial system when it was initialized, or it had to be accumulated, as the prosecution history says, because the users can add to the library.

**THE COURT:**  Well, there's a lot of other ways in which information can be stored than just having the user store it.

**MR. SWEENEY:**  I'm not suggesting the user store it; that the users can add to the library by uploading.

**THE COURT:**  Or by virtue of the users adding to it, even?

**MR. SWEENEY:**  Yes.  But the prosecution history -- I've

read you that explicit paragraph -- it says that this invention is distinguished because users can add to the library.

And how do they add to the library?

They upload to the network and then the video comes into the master communications unit which is there for one purpose, to receive that digital signal, that video. And it corresponds to what it already had and is stored accordingly. News goes to news.

THE COURT: Do you think that explains the claim language, or is that, in fact, adding to the claim language?

MR. SWEENEY: I think that simply explains the claim language. It says -- there is no question that the master communications unit receives a synchronous signal. That's exactly what the words say.

I think you have to look now at what does corresponding to -- and we're going to get -- we're going to talk about corresponding again in Number 3. What does it mean, corresponding to the data related to said particular subject matter stored, already stored. What does that mean?

Does it mean it's exactly the same thing? I don't think so. It means that it's similar. It corresponds to what is already stored.

If it -- I mean, it clearly means -- when you asked me to show you where it says "receives." It says "receives" right there.

THE COURT:  Um-hum.

MR. SWEENEY:  Let's go to the next one.  I think we've covered that.  There is one thing -- oh, well, let's go to -- before we get to that, I wanted to say one more thing about the prosecution history, and the -- I think Sony recognized that the prosecution history is quite clear about the user uploading the video.

And their comeback is that when that statement was made, it really wasn't about Claim 3 that was -- which was Claim 17 during the time of prosecution.  I'm reading now from the -- I don't have it up, but I'm reading from the next page of this.  And there is a reference to Claim 18 and 24, these other claims.  However, that reference says, quote, "Further, although users may call the system 500 serially in time to request video news clips, the requested information is sent in parallel or non-linearly and without delays."  And it says, See Claims 18 to 24.

So the references to these claims other than Claim 3 were about something totally different.  This is a broad statement that applies, you know, to Claim 3 and the other claims that were rejected.  And this has to be given cognizance and the claims have to be interpreted in light of this statement.  And Claim 3 certainly has the language to do it when it says, "This master communications unit receives signals corresponding to the video that's already stored."  That's the only thing that

this could mean.

THE COURT:  Well, is this talking about actually adding to, you know, what is in the -- what is being stored?

MR. SWEENEY:  Yes.

THE COURT:  Or is this talking about cataloging what is already there?

MR. SWEENEY:  I don't think -- it says, "The applicant can receive already -- "Thus, Applicant's video news system" -- that's the hub -- "can receive already edited video" -- receive it -- "with new clips from remote suitcases 188..."

THE COURT:  "...and store them."

MR. SWEENEY:  So they're sending the video.

"Multiple different newly stored video news clips can then be accessed by any number of television stations, having three separate television stations 550A-C are shown and retrieved concurrently over distinct or parallel communications paths. Accordingly, the video news distribution system 500 can start with no video clips and accumulate an extensive library."

So users are adding more video to what is already stored.

THE COURT:  It says, "The users can make the library, something like an Associated Press, but for video/audio clips."

MR. SWEENEY:  Right.

THE COURT:  That sounds to me like these are video/audio clips that have been downloaded like from the library -- from some bigger library of AP or whatever, and now you're going to

42

have access to them in the future.  In other words, you can create a library.

You're not the author of all of this material.  You're not creating this material.  You're just downloading it and cataloging it.

MR. SWEENEY:  Your Honor, certainly the users can download the videos as stored in the system.  I agree.  That's the downloading side.

But this has to do with -- it says, "Applicant's video news distribution system" -- that's the hub.  That's the thing that the CSU is the entrance to -- "can receive already edited video."

Where are they getting it from?  The remote suitcases 188. Those are the people out in the field.  Those are users.

THE COURT:  Well, I guess therein lies the difficulty --

MR. SWEENEY:  Right.

THE COURT:  -- or the inquiry.

MR. SWEENEY:  And it says, "The video news distribution system 500 can start with no video clips and can accumulate them over time."  The users can make them up.

It's not something that the user is accumulating at the user site.  It's something that he's sending into the central hub.

Okay.  Let's go to the next one.  So Figure 5 kind of puts that all together.  There's the master communications unit of

43

the claim.

Now, the claims that it receives, synchronous signals corresponding to the videos already stored. So that is videos coming from the users.

The communications units over here, they deal with the downloading. The storage devices here are within the hub. They're not across the network. They're a part of the hub. And when the videos come from these suitcase units, they can go into these storage units according to subject matter.

**THE COURT:** Now, the arrows essentially go one way, right?

**MR. SWEENEY:** Well, the red arrows -- the red arrows are mine --

**THE COURT:** Um-hum.

**MR. SWEENEY:** -- to illustrate my position. The black arrows that Mr. Hanley talked about, they're simply -- I agree with Mr. Hanley. They're just simply to identify -- you know, 525 is the communications unit. They're not pointing -- that's not -- that's not direction. I agree with Mr. Hanley.

**THE COURT:** As I understand what's going up here through the telephone unit line as a video edit menu, is where, in fact, the user is making a selection of the video clips that they wish to have access to, and then that is sort of like a directory. So if you want everything that is available on Osama bin Laden, you'd probably have to go to a bigger storage unit than what you've got up there, but in any event, it will

44

direct you to one of those storage units, right?  It picks out the right one amongst all the storage units that are there, whether there are other things about Donald Trump and about -- I don't know -- whatever else.

MR. SWEENEY:  Well, with the master communication unit, it has to receive -- the claim says, "Thus, receiving a signal corresponding to video that's already stored."

THE COURT:  Right.  In other words, it's a request for?  I get it.

MR. SWEENEY:  I think it's --

No.  My position is that that is -- that may be a user adding to this library by sending new video taken in the field, adding.  And that video can be edited before it's stored.

THE COURT:  Well, I guess that's an interesting take on this.

MR. SWEENEY:  And I think that's exactly what the prosecution history says when he says the users can make the library.  The library isn't being formed down here at the user level.  The users can not only download information but can upload information, as well.

Now, I related -- I think, to be complete, I would like to go to term 3 because I think it's part of this same phrase. It's --

THE COURT:  The corresponding data.

MR. SWEENEY:  It's exactly -- yeah, at the top here, I put

master communications unit.  That's just what we were talking about.

And the next claim in dispute talks about this corresponding to the data related to said particular subject matter stored in respective one of said video clip units.

Now, it's all part of the same passage, so I think it's useful to do them together.

Sony says that a recited signal corresponds to the data that is already stored in one of the video clips.

Now, corresponds is an unusual word because we're defining corresponding by corresponds.  I think what Sony really is saying is it is the data that is already stored.

Our position is it does really correspond.  It's similar video.  We say data that will be stored in a video clip that's coming in that stores data related to a particular subject matter.

So we are reading the claim pretty literally here that the video that's coming in corresponds to the video that's already there.  That's the point of the thing.

**THE COURT:**  But you've got that data that will be stored.  I mean, this says "stored."  It doesn't say, "Will be stored."

**MR. SWEENEY:**  Well, it says "that establishes communications with the network in order to receive a synchronous digital signal."  Okay.  That could be receiving.

What is that digital signal?  It corresponds to the data

related to the subject matter already stored.

**THE COURT:** Stored.

**MR. SWEENEY:** So it is new video similar to what is already stored in a particular subject matter bin. For instance, if there is news on Mr. bin Laden and it's already stored, if we receive more information on that same subject matter, it corresponds to what is already being stored, and that's where it's stored.

Let's go to the next slide and I think it will become clearer. There is definitely, in Figure 2B, there's storage accommodations here. This is the CSU -- this is this master communications unit. It is receiving things from the network.

What is it receiving? It's receiving these uploads, these video uploads from potential users who are using these suitcases. Let's go to the next slide.

Let's look at Sony's statement. They say, "A master communications unit coupled to the digital network that establishes communications with the network in order to receive a synchronous signal that is already stored."

Now, their position is that, if video is received, it would be distributed immediately. It wouldn't be stored. That really doesn't conform to what's in the prosecution history, that the users are adding to this library that consists -- the library consists of these storage units of video.

Okay. Is there one more?

Okay.  That brings us to the -- now, I didn't -- I think we will rest there and let Mr. Hanley take over until the next term.

THE COURT:  Okay.  Yes.

MR. SWEENEY:  We skipped one -- we skipped claim term 2. We will go back to that later because this is all part of a piece, I think.

THE COURT:  Well, claim term 2 is digital network.

MR. SWEENEY:  Yeah, I'll go back.

THE COURT:  Whatever that means.

MR. SWEENEY:  Well, I covered these together because they were all related from one phrase.

MR. HANLEY:  As Your Honor might imagine, I have a somewhat different view on many of the things Mr. Sweeney said.

First of all, with regard to claim 3, you know, I'm not going to walk through the entirety of it, but there is an issue I think we have to, you know, inform Your Honor about.  And it does have an impact on claim construction but it's really not for today to decide.

You see claim 3, it defines an information distribution system for a network.  Video clip storage units, we talked about those before, in conjunction with Figure 5 in the so-called second system that I mentioned in the summary.

Now, as a master communications unit, as I pointed out before, in the patent, both in the summary of the invention and

in the description of the preferred embodiments, you don't have a system that has both plurality of video clip storage units that store data related to a particular subject matter and a master communications unit.  It simply doesn't fit.

And for that reason, we submit, but not today, that the claim does not comply with the written description requirement.

The specification doesn't describe the invention as it's set out in this claim.  Basically, this, in combination with the other elements, is not described.

It goes on.  It talks about the distribution amplifier unit.  It says they're coupled to the master communications unit and then so on.  It includes the master controller.

Now, we're not arguing this term today.  But similarly, that's an element of the first system described in the specification, the so-called point-to-multi-point distribution system, as I characterized it.  It's not the second system.  It's not part of the video on-demand distribution system.  It entered into Figure 5 and there is a box that's labeled the same way as the box in Figure 1B.

During prosecution, the Patent Office allowed the attorney to make a drawing amendment to add the master controller unit.  But there is nothing in the patent specification that says that unit is part of the system that has the menu storing unit in plurality of video clip storage units.

So the master communications unit's presence in this claim

has been troublesome, and not just troublesome in this case. It was troublesome in the prosecution because basically the Trans Video, try as they might, could not correctly identify where that appeared in an embodiment or anywhere in the specification in combination with a plurality of video clip storage units and a menu storing unit. They couldn't do it. They made mistakes. And as I'll point out, they're making more mistakes even now.

And that flip-flopping, I think, will show -- just underscores the fact that it's simply not described. That combination of elements is not described.

So let's go to the term itself. And there is no dispute -- we don't dispute that the master communications unit receives signals, receives, in fact, a synchronous digital signal. That's not the issue at all.

The difference in the constructions really goes to two issues. And one of them -- one of them, I think, arises in conjunction with the construction offer with respect to this term, and one arises with respect to the construction offer for the corresponding two terms, which is part of the same limitation in the patent.

So taking this one first, Trans Video's construction says it has input for receiving videos.

Well, first of all, it doesn't say "receiving videos." It says, "It receives a synchronous digital signal." That signal

corresponds, we agree, to a video clip, not a video.

The other issue that is underlying the dispute between the parties on this term is:  What is done with the synchronous digital signal?

We contend that, in the only description of a master communications unit in the patent, it receives the video or receives the signal, sends it onto a distribution amplifier. It makes copies and sends it out to multiple receiving stations.

It does not receive a signal, send it to video clip storage units that are organized by subject matter, as the claim says, and then, you know, have a user call up a video from a menu and receive a download.  That's not what it does. So let's look at this.

Basically, the master communications unit is described in conjunction with Figure 1B and Figure 2, which, as I said, are basically the point-to-multi-point distribution system where it receives a signal.  It goes into the distribution amplifier. It goes to these communications unit and then out to the users.

**THE COURT:**  But you don't need all of that to define the master communications unit, do you?

**MR. HANLEY:**  Well, no.  But the -- what our construction -- basically we identified its purpose or function -- is for distribution over the digital network to receiving stations.

In part, it's in reaction to their position in the case that there is this video uploading function that is described where users upload video to the library.

And the library, it's not just a backup storage unit. The library is these video clip storage units that store -- each store data related to a particular subject matter.

So we felt it's necessary to include an identification of its function in the construction because of the position they're taking that this is the place in the patent -- patent claim where one finds this video uploading to video clip storage units function, they say, is there but really isn't.

**THE COURT:** Well, isn't that -- if you go back right there.

**MR. HANLEY:** Sure.

**THE COURT:** Doesn't that pretty much describe it? Not the one -- the one that just preceded that. It had a bit of a drawing and --

**MR. HANLEY:** I'm sorry. This one here?

**THE COURT:** Right, that's it. And where it describes the -- it receives the synchronous digital data stream and it essentially performs the handshaking or initiation function --

**MR. HANLEY:** Right.

**THE COURT:** -- between the network and the distribution amplifier, correct?

**MR. HANLEY:** That's correct. And I think we would be

happy with the construction --

THE COURT:  Do we need to have to say anything more than that?

MR. HANLEY:  I think we would think a construction that says basically, if it receives the synchronous digital signal or as an intermediary -- receives a synchronous digital signal for passing onto the distribution amplifier, I think we would be fine with that.

Our problem is the argument that's being made is it receives it for storage and video clip storage units.  That's simply not supported.

So, you know, we think our construction is supported that basically the object of this thing, this -- in the patent it's the CSU/DSU 108 -- is to get the signal in.  And the purpose of it is to receive it for distributing to these receiving stations in the network.

But if you want -- if Your Honor wanted to just speak of its intermediate function, it receives it basically for communication, you know, to the distribution amplifier or receives it -- it establishes the communication between the network and the distribution amplifier.  I mean, I think we would be fine with that.

THE COURT:  And handshaking has a meaning, in, you know, in -- it's a term of art?

MR. HANLEY:  It does.  Basically what it means is that

this is an intermediary.  And this -- you need to have synchronization between what is sending the signal over the network to this unit and this distribution amplifier.  And this provides that handshake.

Basically, it will set the common timing so that the signal can be received by the distribution amplifier.  And so, you know, we don't have any problem with that at all.

Now, with respect to the argument that there is an upload to the library, if you look at Figure 1, Mr. Sweeney points out the backup units.  And as I said before, you won't find anything in the patent that says that these backup units are organized by subject matter or stored data related to a particular subject matter are the library, if you will.  They simply act as backup units.

THE COURT:  And how does what is in the backup unit get to the backup unit?

MR. HANLEY:  Okay.  It gets to the backup units because -- and let me go one more.  This is actually Figure 2.  It just sets it forth in more detail.  But essentially the signal -- the handshake is established by a master CSU/DSU 108.

The signal goes to the distribution amplifier, and that sends a copy of a signal to the backup unit.  According to the specification, at the same time, it's transmitted out to these CSU/DSUs 116 which are coupled to the network and which communicate with the receiving stations.

54

So it is a function of the distribution amplifier.  It serves as a routing function where it routes the signal to the backup while it is setting -- copying the signal to send it out through these communication units to the receiving stations.  And you know --

**THE COURT:**  It's essentially being done simultaneously, then?

**MR. HANLEY:**  Yeah.  It's not -- you know, you can understand there would be a reason for that.  And in fact, the patent sort of alludes to a reason why that might be needed.

Further down, in the description of Figure 2, it talks about the CSU/DSUs sending commands to the master controller indicating which, if any, in the plurality of CSU/DSUs 116 did not receive the news clip, or received the new clip of 100 predetermined -- number of predetermined errors.

So that's an instance -- if one of these units that is going to send the clip to a receiving station didn't get it or it had errors, that would be a reason for having a backup copy.  So you could retrieve that and then send it to -- send it through to that CSU/DSU that didn't get it.

Now, one of the arguments that Trans Video made in its brief -- and I'll go briefly on this because Mr. Sweeney didn't mention it today.  But basically, it's sort of backwards logic.

They say, There is a passage in the patent that talks about the video on-demand distribution system, Figure 5, that

says, Look, these units, 525A through 525H, which are the video clip storage units that store by subject matter, they are similar to backup units 134 and 136 in Figure 1B.

So what that reasonably means is that you have one piece of equipment that has a hard drive. And that piece of equipment can be used for a different purpose in this second system. It can be used as one of the array of units divided by subject matter that store the videos that users can request.

It doesn't -- the fact that they use the same or similar piece of equipment doesn't mean that the backup units then perform the function that is described as the function of these video clip storage units.

It's just the same piece of equipment. It doesn't mean they do the same thing. The specification says what they do, describes what they do in each of the embodiments, and they have a different function.

THE COURT: Well, as a matter of fact, you can go back to that. If a backup unit is supposedly --

MR. HANLEY: Back here?

THE COURT: -- is a part of what we were just looking at from --

MR. HANLEY: Okay. You want Figure 5?

THE COURT: -- is part of that, as I understand it, then you know, the selection would be made from one of the stored units. The top goes down through 50 -- what is the next one?

56

Is that one of the -- that is one of the distribution
amplifiers, right?

**MR. HANLEY:**  Correct, correct.

**THE COURT:**  And then it goes on down to the communication
and to the receiver, right?

**MR. HANLEY:**  Correct.

**THE COURT:**  Okay.  But if, somewhere along the way, from
the distribution analyzer -- whatever it's called --

**MR. HANLEY:**  Amplifier.

**THE COURT:**  -- amplifier -- I'm sorry -- distribution
amplifier, somewhere along the way, something happened that
needed to be corrected or wasn't a complete copy or there was
some mistake, you know, and then it could go -- then that's the
point at which it would go to the backup, right?

**MR. HANLEY:**  No, because -- respectfully, no.  I'm sorry.

**THE COURT:**  No?  Okay.

**MR. HANLEY:**  Why don't you need a backup unit here?
Because you have -- you have all the video clips stored in this
primary storage.  So if you want to get it again, you just go
back and retrieve --

**THE COURT:**  You just go back and retrieve it?

**MR. HANLEY:**  -- it from the right unit that has the video
that relates to --

**THE COURT:**  But that's a different system, a different
claim, that requires a backup unit?

57

MR. HANLEY: Yeah. In this system, since it's up and out, point to multi point, you need a backup just in case, you know, one of these units doesn't get the --

THE COURT: I see. Okay.

MR. HANLEY: Otherwise, there is no storage. Then it has to be re-sent by the satellite unit that's, you know, remote.

THE COURT: Okay.

MR. HANLEY: So Mr. Sweeney also alludes again to these suitcase units and says that they are users that upload and download. I think, as I pointed out earlier, they are mentioned as an alternative where there is no network.

So, first of all, they're not relevant because the claim is about a system that uses a network. And that, according to Mr. Sweeney, was one of the innovative elements of the invention. Rather than just having satellite uplink/downlink, you know, you have this hub system on a network.

So in the context in which these suitcases 188 are discussed, you're not using the network. You're not using the hub CSU/DSU.

THE COURT: The digital network?

MR. HANLEY: You're not using the digital network.

THE COURT: If this were an analog system, it might be used?

MR. HANLEY: There is no mention of any -- there is no mention of analog systems anywhere in the patent. What

58

happens -- and there is no detail that's spelled out in the patent, at least in this patent, about how it works.

There is detail in this grandparent application which is about a very different system.  But essentially you have an uplink of a satellite and then a downlink to a suitcase unit. These suitcase units have satellite reception equipment.  And in that sense, it can be used as receiving stations when there is no network available.

It's also important to look at the language that's used. It doesn't say that these units are for doing transmitting in this context.  They are acting as receiving stations.  They are receiving, just like these receiving stations are receiving.

There is absolutely nothing in the patent about a user operating one of these units in this context to upload video anywhere.

THE COURT:  And 150, however, is a transmission unit?

MR. HANLEY:  That's a transitting unit which uplinks to a satellite down to the nearest station and then on to the network.

And so, look, there is no dispute that this unit receives signals; it receives video clips.  Is has to do with what does it do with it?

Does it send it to a library?  Do users upload -- users that receive downloads, do they also upload?  And that's where, you know, we part company with Trans Video.

59

Now, I alluded to the issue of a troublesomeness of the presence of the master communications unit in Claim 3 in combination with video clip storage units and a menu storing unit. And that's -- essentially it's the embodiment of Figure 5 which has these video clip storage units, and they have the menu storing unit, and they have this request process.

Trans Video is now identifying, as the structure that corresponds to the master communications unit in Figure 5, items 516.

Now, what the specification says about those is that they are menu CSU/DSU units 516. They are involved -- are they in the communications pathway in the request that goes up the video menu unit and the menu that's sent down to the user to enable the user to make a request. Absolutely nothing about sending the videos up to these units through a telephone line unit and to the video edit menu.

The menu unit is not described as storing any videos. It's described as receiving a request and then contacting the right unit that is storing the video to do a download. So, try as they might, they can't find anything in this figure because it's not there.

And, in fact, they did mention unit 516 in prosecution, and they claim that they identified it as the master communications unit of Claim 3.

When they talked about 516 as one of a plurality of master

60

communications units, they weren't talking about Claim 3.  They were talking about Claim 2, which was Claim 16 in the prosecution.  And what Claim 16, which became Claim 2 in the patent, says is that the plurality of master communications units, they are part of a menu storing means.  In other words, they are part of this menu system that is involved in the request process and the menu provision process.  So they are a part of -- they are a part of this -- there is a claim, Claim 2, that claims basically -- the portion of Figure 5 that is over on the right side -- or the left side, rather -- the video edit menu unit or menu storing unit, this telephone line unit and these menu CSU/DSUs, that's what they're talking about, not about the master communications unit of Claim 3.

Now, Trans Video was asked or they provided to the examiner during prosecution an identification of what the master communications unit was in Claim 3.  And Claim 3 was Claim 17 in the patent.  And they did this twice.

We only have one on the instances here.  They did it once in the application from which the 801 patent issued, and they did it once in the parent application.  But basically each time they said, "It is Unit 508," this telephone line unit, which is described in the patent as a distribution amplifier unit.

So Trans Video now says that these are mistakes.  Well, the fact of the matter is, the fact that they -- if this -- if one could identify, clearly, could find support for a master

61

communications unit in Claim 3, you know, a reasonably intelligent patent attorney would not be making mistakes. They would simply point to it.

So he points to this basically to get by the examiner, and now they're pointing to something else, you know, these menu CSUs/DSUs 516 in this case. The fact of the matter is it's not there, and they're just flailing around trying to find something to support this.

THE COURT: Well, what -- you know, when it says in column 6, Figure 5 shows an on-demand video news distribution system, according to another embodiment of the invention. System 500 includes a video menu, Unit 504, coupled to a telephone line, Unit 508, corresponding to distribution amplifier equalizer 112, et cetera, in another figure, via line 512. Telephone Line Unit 508 has a plurality of output lines 514 which in turn are coupled to a plurality of menu CSU/DSU units 516.

The plurality of menu, those units, are in -- menu units are in turn coupled to Network 520 via menu lines. So --

MR. HANLEY: Right.

THE COURT: -- it's all about a selection process?

MR. HANLEY: It's all about you need to have a communication pathway from this video edit menu block to a user to send them a menu, you know, a list of available clips. And you need to have a communication pathway back for the user to communicate a request to this unit that this unit, the 504 can

then command the appropriate video clip storage unit to send the unit to the user.

The point is that these elements, 504, 508, 514, 516, are part of that functionality.  They are not involved in video uploading or video downloading.

And, you know, if you look at the patent further on, when they're describing the operation of this, this is in column 7, it says, Your Honor, beginning at line 14, For example, if a user at the computer -- there, we have it up on the screen -- "For example, if the user at the computer wants to receive a news clip on Japan which is stored at Unit 525A" -- that's one of the video clip storage units -- "he sends a command to the menu unit 504, file 1 of the file CSU/DSUs" --

So this is the request or the originating command from the user -- "and menu amplifier equalizer 508."

So that's 508.  They're intermediate between the requester and the menu unit.

And then it says, "The menu unit then sends the command to Unit 527A via bus, 526, send that particular clip to computer 55A via amplifier equalizer 531."

So that's the download process.  Nothing in here about these elements being used to upload video or download video.

So, much has been made about the prosecution history arguments, and you know, you can read the arguments.  I'm not going to parse through them.

63

Mr. Sweeney says they are generalized to all the claims.

If you look at the arguments, specific places within the argument, they identify specific claims, and then ultimately they get to the only reference to Claim 17, which was Claim -- which is Claim 3 in the patent, and they make a distinction there.

And the distinction they make between Claim 3 in the prior art they're arguing over is that Claim 3 has a master controller; the prior art does not.

So that's the only thing they say about Claim 3 or Claim 17 in the prosecution specifically. But let's assume -- let's assume that they did make an argument and they were clear that this applies to Claim 3. That wouldn't matter. And the reason it doesn't matter is because, in order for a prosecution history argument to limit a claim, there has to be some anchor in the claim itself. That has to be supported in the specification.

You know, the patent attorney can't simply say, "Look, my invention has -- you know, my invention has, you know, some bell or whistle and the prior art does not." It can't say that unless it's actually taught in the patent and it's actually in the claim.

So cases that deal with prosecution history limitations on claims identify something in the claim that is being limited by the argument that's being made and what support there is for

that in the specification.

Here, there simply is no anchor in the claim.  It has no support in the specification for it.  So it doesn't matter that the local -- that the attorney made all sorts of arguments about how, you know, his claims differ from the prior art if they don't relate to the claim at issue or if the claim simply doesn't have that element or that limitation, it doesn't matter.

THE COURT:  Now, we've got some other terms here.

MR. HANLEY:  Yeah.

THE COURT:  Now, maybe that covered a lot of where the issues really are, but are there any of these others that we need to hone in on --

MR. HANLEY:  For --

THE COURT:  -- on the other terms?

MR. HANLEY:  In terms to be argued?  We have several other terms to be argued.

THE COURT:  I know.  I know.  But are any of them -- and do some of them embrace some of the same concepts and issues?

MR. HANLEY:  Well, yeah.  The one I would like to turn to, Your Honor, if you'll let me --

MR. SWEENEY:  Your Honor, I don't know what the procedure is, but --

THE COURT:  Well, is there one that you turn to?  Well, I'll give you a chance to respond to it, but just one now.

65

**MR. HANLEY:** Yeah. He argued two. So, basically, to round out the argument, there is this other portion of the master communications unit in addition.

**THE COURT:** Yeah. I mean, we need to deal with that. I thought maybe we had dealt with all of them.

**MR. HANLEY:** So let's look at this. We contend that corresponding to the data stored in a respective one of the video clip storage units is data that is already stored.

It seemed this morning like -- or this afternoon that Mr. Sweeney was agreeing with that. But he made a sort of confusing argument about, well, it's not data that is stored; it's data that is like data that's stored. And there is certainly nothing in the claim about that.

And you know, I'll show Your Honor why -- exactly what the claim is referring to. If you look at the claim, basically it starts off with video clip storage units that each store data related to a particular subject matter. Okay?

And then, in the next limitation regarding the master communications unit, it says, "That unit receives a signal, synchronous digital signal, corresponding to the data related to said particular subject matter stored in respective one of those units."

So the signal corresponds or represents not -- you know, not data that will be stored, not data that is like data that's already stored. The signal corresponds or represents data that

is stored in the video clip storage unit.

So, essentially, the architecture that the claim spells out here is really nothing that's described in the patent because it's agreed the master communications unit, it establishes communications with the network to receive a synchronous digital signal. So it's receiving the signal over the network. That signal corresponds to or represents the data that's already stored in video clip storage units.

So, essentially, the architecture of the claim has video clip storage units on one side of the network or attached to the network someplace, and they are sending a synchronous digital signal corresponding to data that's in them to the master communications unit that's also connected to the network.

So we have -- the video clip storage units are not in the same hub under this -- these claim recitations as the -- as the master communications unit. They are essentially remote, and the communications is happening over the network of the signal that corresponds to data that's stored in them.

Now, we submit that language is very clear. And corresponds doesn't mean it's like. Corresponds means corresponds. It means this signal represents this data. You know, it's not like the data. It represents that data.

And as a consequence, there is nothing in the patent about that -- about this sort of system architecture where the video

clip storage units are one place connected to the network, and the master communications unit is in another place.

Does that matter?  The answer, you know, we submit, is that:  It does not and should not.  The claim language is clear.

Now, there is a maxim that the federal circuit has applied, and they referred to it in the *Phillips* case, which is sort of omnibus on claim construction principles, that claims, under certain circumstances, can be construed so as to preserve validity.  And the circumstances under which they do that is, look, the term is ambiguous; the language is ambiguous.

There is a plausible construction where the claim is valid, and there is a construction where the claim results in -- where the term construction results in the claim being invalid.  And they say, "In those circumstances where there is ambiguity, a court can construe the claim -- can adopt a construction that sustains validity."

Well, here, the language is clear, we submit, and as a result, there is a -- the claim is to a system that is not described and therefore violates the written description requirement.  But you know, courts have often held --

**THE COURT:**  That's another issue?

**MR. HANLEY:**  That's another issue.  You know, you take your lumps later on, I guess, and we address that later.

So that's my argument on that term, Your Honor.

If Your Honor wants to go to something else --

THE COURT:  Yeah, we need to.

It's getting late.  We need to pick up.

MR. SWEENEY:  Your Honor, I have a suggestion.

THE COURT:  Why don't we zero in on those terms that really are important.

MR. SWEENEY:  Yes.  Your Honor, I have a suggestion.

If we could just put up the list of claim terms in dispute, and I'm going to propose that we limit the rest of the argument to just a few of them.

THE COURT:  Pick one?

MR. SWEENEY:  Well, there may not be too many, if we can just put that list up.

We've talked about master communications unit and correspondence -- numbers 1 and 3.  I would suggest we also deal with 4, synchronous signal.  I think we've talked about really receiving station already a little bit.

I think we should discuss 10, information as to how to access each of the videos.  I would think that, with storage unit, the video clip, distribution amplifier, communications unit, the briefs are pretty clear on those things.  We can go to some of those other things if we finish 4 and 10 and we have enough time.  But my suggestion is to start with 4 and 10, and it might cut -- you know, we may be able to finish a little earlier.

**MR. HANLEY:**  Your Honor --

**THE COURT:**  It won't be early, but --

**MR. HANLEY:**  -- I have a little bit different agenda.  I think we should talk about the distribution amplifier unit.  It's also a key element in the claim.  And I wouldn't pick synchronous digital signal.  I would pick these two because they can be argued together.

**MR. SWEENEY:**  Which two?

**MR. HANLEY:**  Receiving station and communications unit.

**THE COURT:**  I don't know.  Are those -- are those two really -- maybe we should hear --

**MR. HANLEY:**  There is a single point I would like to make.

**THE COURT:**  -- something about synchronous digital signal.  I mean, it's a signal, the digital signal that synchronous.

**MR. SWEENEY:**  Yeah.  I don't have a long presentation, but I would like to take it up.

**THE COURT:**  Yeah, be very brief with that.

**MR. SWEENEY:**  I would like, if I may -- Mr. Hanley was talking a long time about the master communications unit and the corresponding.  I just have about one or two more points to make on that.  I'll keep it very brief, if I may.

If you could put up Figure 2.

**THE COURT:**  So we're going to go backwards anyway?

**MR. SWEENEY:**  Just for a second, one step.

You know, Figure 2, I think Mr. Hanley and I actually

agree that the CSU/DSU is taking in video from the network. So new video is coming in from the network. That's what I mean, really, by uploading. And that uploading -- those new videos have to come from somewhere. And one of the examples the patent gives is a --

THE COURT: So you're saying they're not coming from the user; they're coming from the network? Is that it?

MR. SWEENEY: Well, they're coming from the network to the CSU, for sure. We know that the -- I think we had an agreement on that; that the video comes in through the network to the CSU/DSU.

And what the patent shows in terms of sending video to the network is this suitcase unit, 150, in the field. So -- now, master communications unit certainly receives videos, and it's new videos. And it may relate to videos that are already stored. They are going to be stored, I think. But the real question is: Where does it come from?

And the only place the patent talks about new video coming from is the user. Now, let's go to the Claim 3 again.

If we look at Claim 3, you know, I think the prosecution history is very clear that the patent solicitor was arguing that the user, you know, adds to the library. Not his own library but the system 500 gets more videos from the user because the user is adding it to the library.

And he did make that general. And he made additional

arguments for some of the claims including Claim 3.  But if --
you know, if we were facing a non-infringement petition,
Mr. Hanley would say, Well, you're bound by what you argued in
the prosecution history.

And we are bound.  We're both bound by that.  And there is
an anchor in this claim.  The anchor is the master
communications unit is coupled to the digital network and
establishes communication with the network to receive a
synchronous digital signal.  We have agreed that's a video
signal.

So the requirement is there, and that's all I want to
point out.

**THE COURT:**  Okay.  And we can move on now to the
synchronous digital signal?

**MR. SWEENEY:**  Yes.

**THE COURT:**  And what do we need to say about that?

**MR. SWEENEY:**  Okay.  I think our presentation will be
brief.  We say it's a digital signal transmitted according to a
clock, like a train that leaves every hour on the hour.

Mr. Hanley says it's a digital signal which the sending
and receiving terminal equipment are synchronized from a common
clock.  We say no, there is not a common clock.

The claim doesn't say that the receiving station receives
a signal -- a synchronous signal.  It says that the
communications unit sends one.  And if we can look at the claim

72

itself, it doesn't say -- this claim doesn't say "a synchronous network."  It says "network" at the top, but it doesn't say "synchronous network."

It uses "synchronous" in five distinct places.  No place else.

So it's -- the master communications unit does receive a synchronous signal from the network; that's true.  The distribution amplifier unit receives a synchronous digital signal, you know, from the storage; that's true.

The synchronous digital signal corresponding to data from the storage video clip units go to the communications unit.  And the communications unit send out to the network, with the receivers on the other side, they send out a synchronous signal.  But what happens in the network itself?

Well, this -- you know, network isn't recited positively as a claim element.  This is an information distribution system for a network, for a publicly-provided network.  And what happens in that network, whether there is buffering, whether there are things to divert the signal, is not within the control of this invention.

As long as the synchronous signal is sent out and as long as it's received from the master communications unit, that claim is satisfied.

So we don't want to read "synchronous" into the network.  We don't want to read the one place that it doesn't say

synchronous is the -- it doesn't say that the receiving station receives a synchronous signal because nobody knows exactly what's happening in this network.  This invention can be used in different types of networks.

THE COURT:  Well, where is the signal coming from?

MR. SWEENEY:  It's coming from the communications unit in the hub, and it's sent out over a public network.

THE COURT:  From the master communications unit?

MR. SWEENEY:  No, no.  Let's take a look at Figure 2 again, for instance.  Let's look at Figure 1.  I think Figure 1 might be better.

If I can just move more closely, the master communication unit is receiving a synchronous signal.  It's coming in here from this network, this synchronous signal.

Now, what happened during the -- in this network, you know, after this transmission is made from the suitcase unit, we don't know.  The claim doesn't say.  It's just a network.

It could be lots of different types of networks.  We're just coupling our invention to this network.

And these communication units, they send out a synchronous signal to the network.  But they don't know what -- we don't know what happens in between in this network.  And the claim could have said the receiving stations, by the way, must receive this synchronous signal from the network, but they don't do that.

74

So we sent the train out on time, every hour on the hour, but the railroad network, we're not responsible for.  Things can stop.  And this invention can be used with networks.  They keep the signal moving straight through or networks that divert the signal or delay the signal.

**THE COURT:**  Well, doesn't everybody understand what a synchronous signal is or synchronous digital signal?

**MR. SWEENEY:**  Yes.

**THE COURT:**  And aren't we building in, no matter whether you define it your way or they define it their way, building in some limitation that's not even there?  I mean, there is no clock; there is no timer.  There is no whatever might -- you know, that's a part of the invention.

**MR. SWEENEY:**  Right.

**THE COURT:**  So it could be any number of things that might serve as providing the synchronicity.

**MR. SWEENEY:**  Yes, Your Honor.

**THE COURT:**  So why even build it in there?

**MR. SWEENEY:**  Yes.  If we could just go back to the two definitions --

**THE COURT:**  Well, one has got a single clock and one has got a double clock.

**MR. SWEENEY:**  They say digital signal in which the sending and receiving terminal are synchronized to a common clock timing.  And throughout the rest of their definitions, they

talk about a synchronous network here and a synchronous network there.

The network, we don't know.  The claim says nothing about whether the network is synchronized or not.  It's true.  I think people do know what synchronous means.  And we would be content to leave -- "synchronous" is mentioned in five discrete places in the claim.  That's where it should be.  It shouldn't be read into additional places.

**THE COURT:**  Okay.  Anything else on that?

**MR. SWEENEY:**  No.

**THE COURT:**  I mean, it does say land network is a synchronous digital system.

**MR. SWEENEY:**  Well, that's true, Your Honor.  But that's not the claim, and this can be -- this invention can be used with lots of different networks.  That's an example of one.

**THE COURT:**  Um-hum.  Um-hum.  Okay.  Yes.

**MR. HANLEY:**  Sixty, please.

**THE COURT:**  Could we not leave well enough alone?  In other words, maybe it doesn't need to be construed?

**MR. HANLEY:**  I'm sorry, I need 80.

Your Honor, I think the issue -- and Mr. Sweeney, I think, has put his finger on it -- there is a difference in how we interpret this term.  But where the rubber meets the road is really in the subsequent terms and most specifically receiving station.

If I can just mention -- you know, basically the two constructions, we both talk about digital signal. The difference is, you know, how to define synchronous.

Our construction simply says what the clock does. It identifies what is synchronized to what. They just say it's a clock.

And our construction doesn't -- the construction of this term doesn't really speak to whether two particular components in the claim have a common clock timing signal. It just -- this is general. The sending equipment and the receiving equipment are synchronized to the same clock.

Now, we do contend -- we do contend that the receiving stations are synchronized to a common clock with a communications unit. Not because of this definition but because of what the specification says.

If I can just go to that very quickly. Can I have slide 99, please.

Okay. So we think that file is just both from the architecture of the claim and what the specification says a CSU/DSU or communications unit does. If you look at the claim, basically -- and this talks about the communications units.

They establish communications between digital or distribution amplifier units and receiving stations to receive an output signals to the receiving station. So they establish communications between this distribution amplifier and the

receiving stations.

In the patent specification, the inventor says, "This is what CSUs/DSUs are for."  They're communications unit which perform handshaking functions to initiate communications between synchronous digital equipment.

So they perform the handshake between the distribution amplifier and the receiving stations.  So, therefore, they are synchronized to the same clock signal.  It's a common clock timing signal between the distribution amplifier --

**THE COURT:**  That's conveyed through the handshake, so to speak?

**MR. HANLEY:**  Yeah, that's conveyed through the handshake. That's their role.  And they establish the communications between the distribution amplifier units and receiving stations.

So it's because of the language in the claim and because of, you know, what a CSU/DSU does as a communications unit that there is a common clock timing signal between the communications units and the receiving stations.  Not because of our definition of synchronous digital signal, which is actually more general than that.

**THE COURT:**  Okay.  Next term that we have to do?

**MR. SWEENEY:**  Okay.  I thought -- I'll go -- I think maybe, since Mr. Hanley and I have slightly different terms, I'll do the one I want to do next.  And then if we wants to

choose the next one, he can do that.

THE COURT:  And then pretty soon I'm going to call it quits and say, "That's the end of it all."

MR. SWEENEY:  I don't think either Mr. Hanley or I will disagree with you.

How about claim term 10, Information to how to access each of the video clip units.

THE COURT:  Yes, yes.

MR. SWEENEY:  I'll put that up.  Just give us a second here.

Okay.  So the phrase -- and it's a storage to the end of the claim, information as to how to access each of said video clip storage units.  We'd propose that's information that enables the user to request videos stored in the video clip storage units.  Information that enables the user.

Sony says it's information that enables the menu storing unit to command the video clip units to send the video clips. And we will refer to a couple of items in the specification that are pertinent here.

The specification in Column 7 there -- we have underlined it -- it says, "A connected user can then view a menu listing the various clips and/or still photographs available in the storage units 525."

"If a user uses to obtain a particular clip, he or she simply enters a command to the menu unit 504 which in turn

79

sends a request to send command to the appropriate video storing unit."

The specification also says in Column 2, "Another advantage of the invention is that it provides news information organized so that a local television station can log into a menu which provides a list of available news clip and how to acquire those clips."

So this information about how to access things, well, that's what you need when you're a user. You want -- you see the menu. You see a subject matter video that you want. You have to have the information on how to make it come to you. It's, I think, quite straightforward.

That's all I have on that.

**THE COURT:** Well, and you're talking about it in terms of enabling the menu storing unit to command?

**MR. SWEENEY:** Correct.

**MR. HANLEY:** Your Honor, just, if the Court would -- if it's okay with the Court, Ms. Olesek is going to address this point.

**THE COURT:** Surely, surely. She looked like she was ready to jump up into it.

**MS. OLESEK:** I'm glad one of my terms got selected. So if we could go to slide 68. Thank you.

So the real problem here with the proposed construction by Trans Video is there is a difference between a user being able

to request something and actually knowing how to access something.

We go to the next slide.  I think it's actually the same passage that Mr. Sweeney just pointed out.

And here it makes clear the user wishes to obtain something.  Makes a request.  But it's then the menu unit that actually goes to those video clip storage units and knows how to access those particular videos.

If we skip back to Slide 18 -- let me see if we can -- so we have this menu unit here and it's -- it knows how to go into these video clip storage units to actually access what has been selected by the users.  So the users are here.  They have a menu and simply make a request that is then acted upon by the menu -- I'm sorry -- by the menu storing unit.

The difference here -- it's like if I go to a search engine.  I know how to make a request.  I want to find out how many Mexican restaurants are open tonight in this neighborhood. I can type that in.  I know how to make a request.

I don't know what goes on behind the curtain, how the search engine actually goes out and accesses that information and then delivers it back to me.

Another point that was made in Trans Video's brief, they also talk about being able to acquire those clips, if we go back to slide 70.  So, again, there is a request made and something is acquired, but it's not actually the user that

needs the information as to how to access each of those storage units.

This invention came out of the idea that a busy news editor might want to get their hands on a video clip. They're not going to want to sit down and figure out to access it. They just want to ask for it and have some magic happen behind the curtain, and what they want is delivered, what they have selected off the menu. So I think that's where we have the fundamental difference of opinion on the proposed construction terms.

**THE COURT:** Well, let's parse that sentence out. A menu storing unit accessible from the digital network that stores -- here's the word "begins" -- that stores, one, information indicating the subject matter associated with each of said plurality of video clip storage units -- now, that's something that the user wants to know because it's not just sort of automatically making that decision on its own. It has no idea what, you know, is being sought, right, until the user actually indicates, "This is what I'm looking for."

And so then it goes on to say -- pursuant to that same that "stores information indicating the subject matter," and then it goes on and it says, "and information" -- in other words, it stores. The unit stores information as to how to access each of such video clip storage units.

I don't know. I suppose it could be either one. But

it -- one would think, ordinarily, in better grammatical draftsmanship, anyway, that one would say that the unit stores information indicating, and that's the kind of information that's being accessed by the user.  That's what they want to know, is what subject matters are available.  And then you would -- so it suggests the same party who is seeking that first type of information is also seeking the same type of -- the second type of information.

**MS. OLESAK:**  Well, the user receives a menu.

**THE COURT:**  Right.

**MS. OLESAK:**  But the user isn't actually accessing. They're just making a request in this instance.

**THE COURT:**  Um-hum.  Um-hum.  Right.  But then why doesn't it say, with respect to the message storing unit, "And then the unit determines how to access each of said video clip."

In other words, this is giving two kinds of sets of information.  It's giving information to itself and it's -- or to the user and it's giving information to itself.  That's sort of an awkward construction, I think.

But you know, reading it, you know, you could read it the way you have read it also.

**MS. OLESAK:**  Well, in reading the specification and what really, according to Mr. Sweeney, was the inspiration for this, they talk about a user being able to simply enter a command and be able to obtain it.  It would seem that it's inconsistent

with the notion of the value that's supposed to be provided here, that the user has to figure --

THE COURT: Where is that particular language in the specs?

MS. OLESEK: I think we have that -- let's see here. It's in the -- thank you. So if we look at -- let's see -- Column 7. Do we have this on something, that question. Put it up.

MR. WATKINS: Um-hum.

THE COURT: Column 7, yes.

MR. WATKINS: Line 7.

MS. OLESEK: If you look at Line 7 -- I'm sorry, starting at Line 6, "If the user wishes to obtain a particular clip" --

THE COURT: -- "he simply enters a command."

MS. OLESEK: -- "simply enter a command." So the point here is that the user just wants what they want here.

They want to just be able to get the item they want. They're not interested in how the information gets managed behind the curtain here.

And that's what -- that's what the menu storing unit is accomplishing for the user. The user is really not interested in the details.

THE COURT: And then what?

MS. OLESEK: So the user simply enters a command to the menu unit. The menu unit, in turn, sends that request to the appropriate video storing unit.

So it's clear that it's the menu unit that knows which of those menu storing units that we saw along the top of the diagram --

**THE COURT:** Yes, right.

**MS. OLESEK:** It's the one that is going out and accessing that. The user just wants that menu unit to spit back what it selected from the menu.

Now, there is also an issue that's been briefed that it's important to give meaning to each word in the claim term. It could be -- it's a little bit difficult to understand how it is that Trans Video's construction doesn't actually omit the word "each" because the user is just interested in the one thing that they are requesting.

They don't need to know how to access each of the video clips. They're just requesting something. And they have essentially, I think, read that out by equating that with the request.

**THE COURT:** Well, could both of those -- both of those items reference what is -- what the unit itself is doing? In other words, it stores information indicating the subject matter, indicating it to the unit that's performing this function associated with each of said plurality of video clips storage units and information that's had access, et cetera.

**MS. OLESEK:** Well, it's --

**THE COURT:** Could it be referred to what -- you know, to

both of those activities being accomplished by, and that information being stored in the unit?

**MS. OLESEK:**  Which unit are you referring to, the menu storing unit?

**THE COURT:**  The one that's the subject of this, the menu storing unit.

**MS. OLESAK:**  Well, only the menu storing unit actually has the information as to how to access each of the video clips. The user is requesting one that they have asked for.

Perhaps I haven't followed the question.

**MR. HANLEY:**  Yeah, if I can just -- I'm sorry, Your Honor. I think I understood the question.

**THE COURT:**  Let me see the drawing.

**MR. HANLEY:**  The answer is that, yes, the menu storing unit has both pieces of information because the menu storing unit has to know what subject matter is associated with each unit so that, when a request comes in, it knows where it go. So it --

**THE COURT:**  Is what this is referring to 504?

**MS. OLESEK:**  Yes.

**THE COURT:**  The video edit menu?

**MS. OLESAK:**  That's the menu storing unit here, yes.

**THE COURT:**  Um-hum.  Okay.

**MS. OLESEK:**  And these are the video clip storage units.

**THE COURT:**  Right, right, right.  Um-hum.

**MS. OLESEK:**  So it's only this unit that actually knows how to go to each of these units here to request it.  The user down here is simply making a request.  I would like that one clip about Cinco de Mayo.  And this unit here --

**THE COURT:**  Very timely.

**MS. OLESAK:**  Well, the last time we were here on Valentine's Day, so this is seemingly a trend here.

So this is the unit that knows how to access each of --

**THE COURT:**  Right.

**MS. OLESEK:**  -- those units.

**THE COURT:**  Well, let me ask Mr. Sweeney.

**MR. SWEENEY:**  Yeah, this is --

**THE COURT:**  Does that refer -- does that refer -- it stores information that that unit itself is using?

**MR. SWEENEY:**  I think the -- no.  It stores information that's available to the user.

It's just -- we've all, you know, selected pay-per-view movies.  You get a menu.  It's displayed and they tell you, if you want a certain thing, you know, it tells you what to do, how many buttons to press.

The key is this specification in column 2 -- I think we've put up before.  We have put up both quotes.  They're two things, not just the one that Megan read.

The bottom quote here is, "Another advantage of the invention is that it provides news information organized so

that the local TV station can log into a menu which provides a list of available news clip and how to acquire those clips."

So the user wants to know what's available and how to get them, and there may be a simple instruction given.

Now, I don't think this is about the interworkings of, you know, how the storage is accessed within a computer.  This is about how to provide -- how the user gets the information he wants.  That's the purpose of a menu, to get the information.  To allow the user to make a selection, and then get what he wants.  He's downloading.

You know, we spent the first part of this argument trying to -- Sony trying to say it has no uploading, even though the master communications unit is receiving video --

**THE COURT:**  We're not going back there.

**MR. SWEENEY:**  -- and now we're talking about, well, how can you download?  How can the user download what he wants if he doesn't have the information about how to access it?

**THE COURT:**  Okay.  Can we move -- is there another -- one more term each that's near and dear to your heart.

**MR. SWEENEY:**  I'll let Mr. Hanley select the last term.

**MR. HANLEY:**  Thank you, Mr. Sweeney.  That's very kind of you.

What I would like to turn to is the distribution amplifier unit, and it's not a complicated point.

**THE COURT:**  I didn't think so.

**MR. HANLEY:** Okay. So if we can go to -- I'm sorry, Your Honor. I've just got to find it. Yes, Slide 72.

Okay. So let's go to 73.

So we have these two constructions. And granted, ours is very lengthy. And Trans Video says, "Don't bother with it," or, "It's just a signal amplifier."

Well, first of all, it's a distribution amplifier. So just saying it's an amplifier doesn't really even capture all of the words in the term itself. Moreover, this is a fairly simple situation.

During prosecution of the parent application which also has claims and claims issued that include the distribution amplifier unit, the examiners made a rejection on Section 112.

They said, Look, this is not enabled. Tell me what this thing is and what it does. And in fact, he asked for clarification.

He said, it's not clear what structure it's comprised of. It's not clear of how it's capable of operating to convert a single synchronous digital signal into a plurality of synchronous digital signal outputs. And it's not clear whether the respective digital signal outputs of the distribution amplifier were, in fact, the same or were different.

So he had all these questions. And you know, Trans Video's attorneys answered them.

Basically they said, in response to the last question, are

they -- the signals the same as the input?

They said, "The digital signals output from the distribution amplifier equalizer 112 are the same as the signal input thereto."

And they went on and made this statement:  "It's merely a signal amplifier and signal splitter which amplifies the received digital signal into a plurality of digital signals."

And they went on and said -- the name was chosen -- so this is not like a standard.  They're not saying this is a standard technical term.  They said, We coined this.  We chose this name because it amplifies the received signal and it distributes or it splits that signal.

So our construction is basically what is highlighted in bold there.  It's simply a replication of the definition they gave the patent examiner when asked:  What does this thing do? It has both concepts.  It's an amplifier and it's a signal splitter.

Trans Video says, "It requires no construction."

Well, how can it not require construction when the patent examiner didn't even have an understanding of it, or it's just a signal amplifier and says nothing about its distribution function.

And, in fact, you know, there is a case we cited in our brief that is essentially on all fours with this situation where there is argument over a term that came up in

90

prosecution, where the examiner asked for clarification and a definition was provided.

And the patent owner was saying, "No construction required."

And the Court -- you know, this is *Juniper Networks vs. Toshiba America,* Eastern District of Texas, 2007, said, you know, the Examiner's request for clarification implies that the term is not understood according to its plain and ordinary meaning, and therefore, when he allowed the claim based on a clarification, they were limited to that clarification.

So we have actually two patents that were allowed to have this term in them. It's the parent patent, which is not at issue here, and the 801 patent.

They allowed -- both were allowed, both have this term, and they provided a definite definition. And you know, that is essentially controlling here.

**THE COURT:** And now, do I understand -- you can go back to 1, maybe?

**MR. HANLEY:** This one?

**THE COURT:** No. Maybe it was the explanation from the examiner.

**MR. HANLEY:** Oh, okay.

**THE COURT:** Oh, there we are. Okay. There we are.

Okay. Does they say in that that the signal is amplified and split at the same time?

**MR. HANLEY:**  Well, I don't know, in terms of how these things operated, it's a unit that does both.

**THE COURT:**  I don't either.  That's why I'm asking.

**MR. HANLEY:**  Whether it happens simultaneously --

**THE COURT:**  Do you have to amplify it before you can split it, and also, can you split, you know, a signal that is already -- well, can you split a signal such that its amplification will be equal amongst all of the receivers?

**MR. HANLEY:**  I think you can do it one of two ways.  You can take the input signal and you can amplify it first and then split it to compensate for the loss of the amplitude as a result of making these copies.

I gather you could also split the signal and then amplify the resultant multiple outputs.  I don't think it much matters.  The point is that the unit does both of those things.  It's not just the amplifier.  You know, their definition captures that.

**THE COURT:**  Okay.  Mr. Sweeney.

**MR. SWEENEY:**  Yeah, I'll be very brief.  If we could just put up our comparison.

**THE COURT:**  Well, yours doesn't need one, right?

**MR. SWEENEY:**  Well, first of all, we -- both of us agree that a distribution amplifier unit is a signal amplifier.  So we have some agreement here.

Now, this additional language, I think, is just -- it's the same language that follows later in the claim.

If you read that term, "distribution amplifier," in the context of the rest of the claim, which we've put up here, it says that "divides said synchronous signal, digital signal corresponding to the data from said respective one of said plurality of video clip units into a plurality of synchronous signals."

So you're saying it twice.  In other words, it's exactly the same language that they have copied into the claim here. And then they add one additional sentence, "The output to digital signals are the same as the digital signal input thereto."

So, to me, it's redundant to what's already in there, and I think it's going to be confusing to the jury as an instruction.  It's not necessary.

THE COURT:  Okay.  Anything else on that?

MR. HANLEY:  Just Your Honor, if we had cribbed from their definition and produced it in less than complete form, I think we would be criticized for that.

THE COURT:  But he's correct.  It says that the corresponding to the data from said respective, et cetera, and at least one output that divides said synchronous digital signal corresponding to the data, et cetera.

MR. SWEENEY:  Yeah.  In general, I mean, my problem with many of the Sony definitions -- and this applies to a lot of the ones we haven't discussed -- is that they put their

argument with respect to one claim term into every single claim term.

I think they have got digital synchronous network, you know, repeatedly eight times. You know, it doesn't matter whether you're talking about it as a receiving station or a magic communication unit. And you know, then the claim goes on. And somewhere else they have -- the claim actually has the language that they're trying to read into some other portion of the claim.

So I think, as you read the briefs, you know, take a look at the whole claim. A lot of the stuff that Sony is putting in is going to make you recite the claim about ten times.

**THE COURT:** Well --

**MR. HANLEY:** If you can just leave this up for a second. I'm sorry.

Now, this language here, this was also a term in dispute. Now, Your Honor limited us to ten. They disagreed with our construction of this. We said splits means divides. They said, no, that's not true.

And so we stuck with our distribution amplifier unit definition which has been the same from the beginning. From when we submitted, you know, the original claim construction statement in April of 2010, we haven't changed our construction.

And there was an issue about divides. So we felt we

needed to pursue the definition that they gave the patent examiner to make clear that it is a signal splitter and what it does.  It makes copies so that all the output signals are the same as the one that is input.

THE COURT:  Okay.  Thank you.

MR. SWEENEY:  Thank you, Your Honor.

THE COURT:  And the rest of them will be submitted them as you have submitted them on your papers, right?

MR. HANLEY:  Yes, Your Honor.

MR. SWEENEY:  Yes.  Your Honor, I think probably we both want to hand up books -- or hard copies of our PowerPoints and the exhibits we have covered today.

I think both parties have that.

MR. HANLEY:  Your Honor, we have two.  If Your Honor only wants one --

THE COURT:  I think one will be enough.  I'm trying to clear out chambers.

MR. HANLEY:  We also have, Your Honor -- and I think they do, as well -- we have copies, hard copies of the exhibits that we submitted with our briefs.  So Your Honor has those available.

THE COURT:  I think we have those, as well.

MR. SWEENEY:  Yeah, you do.  We have extra copies of our brief and those exhibits.  They're all in the binder.

THE COURT:  Do we need extra copies?  I have everything, I

think, right?

Okay.  Just the PowerPoints.

MR. SWEENEY:  We have it in sort of one continuous thing, Your Honor, so it's going to be kind of hard to disassemble it.

THE COURT:  He just disassembled it?

MR. SWEENEY:  He's smarter than I am.

THE COURT:  Okay.  Thank you.  Thank you.

And then we will get out a claim construction order.  I don't know what your future dates are, but they will not be my dates because I'm planning on retiring next month.

So you will get your claim construction.  Please, whatever you do, do not harass the next judge with a motion for reconsideration on the claim construction.

Live with it and go on from there.  Okay?

MR. SWEENEY:  Thank you, Your Honor.

MR. HANLEY:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

THE CLERK:  Court is in recess.

                    *(Proceedings concluded at 5:02 p.m.)*

CERTIFICATE OF REPORTER

I, the undersigned, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named, or in any way interested in the outcome of the cause named in said caption.

The fee charged and the page format for the transcript conform to the regulations of the judicial conference.

Furthermore, I certify the invoice does not contain charges for the court reporter's certification page.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day May 2011.

/s/ Margo Gurule

_____

MARGARET "MARGO" GURULE, CSR