**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE**

```
------------------------------)
                              )
Trans Video Electronics, Ltd., )
                              )
                Plaintiff,    )
                              )
      v.                      )   No. C 09-3304 (EMC)
                              )
Sony Electronics, Inc.,       )
et al.,                       )
                              )
                Defendants. ) San Francisco, California
                              ) Friday, September 23, 2011
------------------------------)    (52 pages)
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**        **Locke, Lord, Bissell & Liddell, LLP**
                        **44 Montgomery Street**
                        **Suite 2400**
                        **San Francisco, California 94104**
                    **BY:  JOHN F. SWEENEY**
                        **MATTHEW K. BLACKBURN**
                        **ZACHERY D. SILBERSHER**

**For Defendants:**       **Kenyon & Kenyon, LLP**
                        **One Broadway**
                        **New York, New York 10004**
                    **BY:  WALTER E. HANLEY JR.**
                        **BRETT N. WATKINS**
                        **MEGAN WHYMAN OLESAK**
                        **MICHELLE N. McLEOD**

                        **JIM LEONG**
                        **Senior Corporate Counsel**
                        **Sony Computer Entertainment America**

Friday, September 23, 2011

(2:05 p.m.)

**(In open court)**

DEPUTY CLERK:  Calling Case C 09-3304, Trans Video versus Sony.

Counsel, please come to the podium and state your name for the record.

MR. SWEENEY:  Good afternoon, your Honor.  John Sweeney, one of the attorneys for Trans Video.  I'm here with my colleagues, Matt Blackburn and Zach Silbersher.

THE COURT:  Thank you, Mr. Sweeney.

MR. HANLEY:  Good afternoon.  I'm Walter Hanley.  I'm counsel for the Sony defendants.  And with me are my colleagues from Kenyon & Kenyon:  My partner, John Flock; my partner Megan Olesek; and Brett Watkins.

And I'd like to introduce your Honor to Jim Leong, who's senior corporate counsel at Sony Computer Entertainment America.

THE COURT:  Thank you.  Welcome.

Do I understand correctly there's some demonstrative evidence or presentation that somebody wants to make?

MR. HANLEY:  Yes, your Honor.  We had some slides that we think would be helpful in presenting the argument.  Of course, that's up to your Honor as to whether they're helpful or not.

THE COURT:  All right.  I'm always open to something that's helpful.  These are slides that go beyond what's been presented in court in terms of the Figure 1B and Figure 5?

MR. HANLEY:  They're essentially figures in the patent, and a few quotations, which are all in the briefs that we submitted.

THE COURT:  Okay.  You have a presentation you want to make as a quasitutorial, or should I just start firing away?

MR. HANLEY:  I think your Honor can fire away, if that's what your wish is.

THE COURT:  All right.  Let me ask you this:

In terms of the first question is defining the universe of what embodies Claim 3 and where might we find the description that we have to then evaluate.

MR. HANLEY:  Right.

THE COURT:  And it seems to me that Figure 1B, which is certainly one embodiment -- I have a problem -- I don't know what the allegations are, but I have a problem understanding how that embodies Claim 3, for the simple reason, I don't see a video clip storage unit, which is an important aspect.  I understand that there are backups that are tied to the hub and CSU/DSU, but unlike Figure, 5 where there is a clear demarcation, I don't see it in 1B.

MR. HANLEY:  And I think your Honor doesn't see it because it's not there.  The claim requires each storage data

related to a particular subject matter.  So you don't find those in Figure 1B.  It also requires a menu storing unit.  And likewise, there's nothing in Figure 1B, or the description related to it, that goes to a menu storing unit.  However, in Figure 5, you do have the units that are identified as video clip storage units, and you do have a menu storing unit.

THE COURT:  Yes, and that's what I would look at to make a determination whether there's a sufficient description, unless there's something else.  I don't know where else to look to other than Figure 5.

MR. HANLEY:  Well, I think your Honor is -- has happened on a pretty important point, and one that seems to have gotten lost, at least if ones reads the briefs submitted by Trans Video, and that is, this claim, Claim 3, is to a combination of six elements and to a particular interrelationship among them, which is set out in the claim. So in order to find written description support for that combination, which is what the inventor in the claim has put forth as the invention, one must look to the specification where that combination is described.  It's not sufficient to look for individual elements, you know, isolated from each other, or in other combinations.  One must find the combination as set forth in the claim.

And there's a couple of cases, your Honor, that we cited that bear on that.  One is *Hyatt vs. Dudas*, which is

cited on Page 6 of Sony's reply brief, and in that case basically the federal circuit acknowledged or recognized that a rejection by the patent office of a claim based on lack of written description was proper when the rejection said, although the specification shows these individual elements, there's nothing that shows them in combination with each other.

Similarly, there's a case that you know I commend to your Honor which goes to this issue.  It's another federal circuit case.  It's *Agilent vs. Affymetrix*, which we cited on Page 13 of our opening brief.  And there it was an appeal from the Northern District of California in which the district judge had denied a motion for summary judgment based on lack of written description, and the federal circuit reversed that denial.  They actually entered judgment for the moving party. The claim that was involved there -- it's to a different technology than we're dealing with here.  It's for a claim for a method of DNA analysis that involves manipulation of the sample fluid in a particular way.  And the claim had a combination of steps that included a step of introducing a sample fluid into a closed chamber; and another step which described using bubbles to mix the fluid.

So in the patent involved, there was an embodiment that showed and described the step of introducing the sample fluid into a closed chamber; and there was also a different embodiment that showed and described using bubbles to mix the

fluid.  However, there was no embodiment or no description of that combination, the combination of those two steps together. And based on that, the federal circuit found that there was no written description of the invention as claimed.

So we think that is an important point here, your Honor.  It's -- for written description analysis, it's unlike claim construction in the following sense:

One could see in Judge Patel's Markman order, in looking at individual terms, like "master communications unit" or "receiving station", Judge Patel look for instances of those terms in all the embodiments that she could find them in, and basically arrived at a construction of the term that embraced the various usages.  And that makes sense because these terms are in other claims, and they appear in the context of other combinations.

However, when one is looking at the written description issue, then where one must look in the specification is where is the combination that's set forth in the claim described.

THE COURT:  Right.  And that's why I say that the universe or the basis to which one looks appears to be Figure 5, and the description of what is embodied in Figure 5 that appears on Page 6, the bottom of Page 6 and the top of Page 7 of the claim, as well as the chart itself, and so -- and I -- you know, I think I sort of understand this schematic.

Maybe I don't.  But I think I have a general understanding of it.  But I wanted to first clarify that that's the ballpark within which we're working at this point, because I don't see any other description that seems to embody Claim 3.  Because I don't think it's 1B.  It seems to be 5.  And I don't see anything else in the specifications that talk about what we seem to be talking about in Claim 3.

So that's why I was going to focus on the description and the schematic of Figure 5.  And that's where I have some questions about whether or not, getting to the heart of the question, whether or not there is an adequate description here in light of the claim construction that has been provided by Judge Patel.

But before I go down that road, I want to see if there's a different view as to whether or not there's some other figure I'm missing, some other description that I should be incorporating into this ballpark, from any side.  I mean, do we agree that the ballpark is essentially Figure 5 and the description of Figure 5?

MR. HANLEY:  Certainly we agree, your Honor.

THE COURT:  Do we have any disagreement on the other side?

MR. SWEENEY:  Those figures, the figures you look to -- but I think we have a declaration in by Dr. Katz that says you can understand those, you can look at those together,

and you can look at what a CSU and a DSU is, and the written description is addressed to one of skill in the art, and it's viewed as a factual question as one of skill in the art would view it, and Dr. Katz has testified that in fact that written description -- that storage units can be looked at throughout the specification, and that disclosures can be combined, is a reasonable one. And I think that is a proper basis -- I think there is a general issue of fact. So there's a legal basis to this motion as to what Judge Patel construed in terms of master communication unit. I think that's Sony's principal argument.

But on the factual question, it is, in fact, a factual question, and one of ordinary skill in the art has testified that he can look at the totality of the patent specification and drawings.

THE COURT: So I understand Dr. Katz has something to say about Figure 5 and the schematic and the system that is laid out in Figure 5, but nobody's arguing that I should look at 1B?

MR. SWEENEY: I think you should look at 1B as well. I think you have to look at that together with Figure 5.

THE COURT: You agree that 1B doesn't, for instance, have a video clip storage unit?

MR. SWEENEY: It has the backup video clip storage units, but it does not have video clip storage units across the network. I agree with that.

THE COURT:  So if there was nothing in the -- in this patent specification but 1B, and only a description of 1B, you would agree that there would be a problem -- that Claim 3, as compared to just 1B by itself --

MR. SWEENEY:  Well, yes, but there is Figure 5 and Figure 1B, and you're supposed to look at a specification of a patent as a whole.  That's basic patent law.  You're not supposed to take one drawing in isolation.  And Dr. Katz is one of ordinary skill in the art.  That's how he reads the patent, as a whole, and he's permitted to and in fact required to look at the specification as a whole as to what it teaches him as a whole.

THE COURT:  All right.  What's your position, then?  Although you're supposed to look at all the elements, you draw on some from one figure, draw on another from another embodiment, and one of ordinary skill in the art at that time could have easily discerned an obvious combination that that's good enough?

MR. HANLEY:  No, your Honor.  I think what one skilled in the art -- it's -- one looks at the specification from one skilled in the art.  One doesn't -- it's not relevant what one skilled in the art would find obvious.  It's not relevant that one skilled in the art could speculate what the inventor could have included but didn't.  It's what one skilled in the art perceives the specification to describe, and here we have this

combination of six elements, and there isn't a reasonable or genuine issue that there's a description of the combination set forth there other than in Figure 5.

In fact, Dr. Katz -- he doesn't really address that in his declaration.  He talks about a piece of equipment, primarily, a CSU/DSU:  What it can do, what it couldn't do, its capabilities and so on.  It's really not germane to what the inventor described it as being in the context of this combination in Claim 3.

THE COURT:  So you think it would be one cannot satisfy the written description requirement by finding some elements in one embodiment supplemented by elements found in -- on the next page on a second embodiment?

MR. HANLEY:  No, your Honor.  That's like the *Agilent vs. Affymetrix* case I mentioned in the federal circuit.

THE COURT:  It has to be explicitly a combination.

MR. HANLEY:  Well, it has to be shown or -- it doesn't have to be -- you know, the phrase that's used is in Hyatt.  The spec doesn't have to say you combine these two things, but must show the combination, must teach the combination from the perspective of somebody skilled in the art, and having him hunt around and pick things from different embodiments, that's not a disclosure of the combination.

THE COURT:  Well, the figures are side by side rather than hunting around.  This is the actually one of the shorter

patents I've seen.  It's a little more manageable than some.

MR. HANLEY:  It's not that complicated.

THE COURT:  Let me cut to the chase here:  Here's what I see the problem -- if one were to look at just Figure 5 and compare that with Claim 3 to see what is disclosed or what is described or not, wholly apart from this question about, you know, whether there's a video input or not, I see a couple of problems.  First of all, Claim 3 requires that the master communications unit must receive a synchronous digital signal and then pass, I think, that same signal.  Because it says that there is a third element:

"A plurality of distribution amplifier units coupled to said master communications unit wherein each of the plurality of distribution amplifier units has an input -- input from the master communication unit to the distribution amplifier -- has an input that receives said synchronous digital signal corresponding to the data," etc., etc.

Doesn't "said" mean something?

MR. HANLEY:  It means the signal we were just talking about.  It's the same signal.

THE COURT:  So here -- I mean, if you look at what is inputted into the -- what's been deemed and I guess conceded to be master communication unit Number 516, these various CSUs/DSUs, they then output into the telephone line unit, Number 508, which then informs the video at its menu, which

then -- to hold the storage units, which ones to send.  And by the time you send it out and get to distribution amplifiers, Number 1, there's not a plurality of those distribution amplifiers coming out of the master communications unit; and, 2, what is inputted into the distribution amplifiers are the outputs of the video clip storage units.

So it is not the same synchronous digital signal. What is coming into it is coming from the LAN network, which I guess is calling up from the television station or whatever -- this clip.  But that's not then outputting said synchronous digital signal to the distribution units.  There's several steps in between.  So -- I'm not sure how that's described here.

MR. HANLEY:  I think that's exactly right, your Honor. In fact, that's what the patent says in Columns 6 and 7.  It's actually these items 516, which Judge Patel said, for purposes of claim construction, these meet the master communications unit element.  They receive a request signal, or a command from the user, requesting a video clip.  It's passed through telephone line unit 508.  And then at menu unit 504, processes, if you will, that request, and -- so there's where the signal -- if you're talking about the signal that came over the network, to 516, you know, it terminates at 504.  That unit, 504, then sends a different signal, a command signal, to the appropriate video clip storage unit, and they in turn send yet

a different signal, which represents the actual video being requested, to the requesting user.

So no, there is not a receipt of a signal from the network, synchronous digital signal by these so-called master communications unit, 516, which then goes to distribution amplifiers, then goes to communications units and then goes off to receiving stations. And that part really isn't disputed here.

I think, you know, our point is that what Judge Patel determined with regard to this claim, and particularly this master communications element, is that this element is receiving a signal that is not video data. In Figure 5, it's the command signal. So it wasn't an issue before Judge Patel as to whether or not the receipt of that non video data signal, you know, what happens to it. That wasn't germane to the discussion we were having about the claim terms at issue.

But taking what Judge Patel determined, that the claim doesn't cover it, uploading video, and that the claim relates to video that's already stored in the storage units, and therefore there isn't uploading of video through master communications unit, that the consequence of that, of that receipt of a non video signal, is that if you look at the rest of the elements of the claim that says, What happened to said signal, that's not described. In fact, Trans Video says that's absurd. It's exactly what Judge Patel determined. Judge Patel

determined that these items, 516, which receive a command signal, they correspond to the master communications unit, and that the signal they receive, this command signal, it corresponds to the video already stored in the storage units in the sense that it's related to it.  The signal is a request for a particular video.  So in that sense, it relates to video that's already --

THE COURT:  Corresponds means relates to, as opposed to equivalent to?

MR. HANLEY:  That's the way Judge Patel analyzed this in the Markman hearing.  And --

THE COURT:  But she also observes that, at least in general, as used throughout the patent, a master communications unit is not restricted to receiving video or non video.  Could receive both, right?

MR. HANLEY:  Right.  And that sort of relates to the point I was making earlier.  Judge Patel, you know, took the approach -- this is an appropriate approach.  When I'm looking at a term in a claim, and that term appears in fact in other claims, it appears in various contexts in the specification, then, for purposes of construing that term, I arrive at a construction that's inclusive of the various contexts in which that term appears in the patent.

When we're talking about written description we're looking at, okay, where's the combination described?

And so there's nothing inconsistent with Judge Patel having said master communications unit -- it has -- it's disclosed as having various functions.  In fact, we agreed in Figure 1B of the video, on the one hand.  And on the other hand, you know, Judge Patel's determination about the nature of the signal that it receives in this claim, and --

THE COURT:  In Claim 3.

MR. HANLEY:  In Claim 3.  And in Claim 3, that limitation, that's spelled out in the latter part of that master communications unit element, which says the signal corresponds to the data related to said particular subject matter stored in respect of one of said plurality of video clips storage units.

That's where the nature of the signal is defined in Claim 3.

THE COURT:  And she found that therefore, this does not contemplate -- I'll put in it crude terms -- an uploading of video clips.  It's really about getting a signal to then send out and distribute already stored clips.

MR. HANLEY:  Right.

THE COURT:  And so if that's the case, and that's her interpre -- I mean, if this were a different schematic -- I mean, 5 is not necessarily inherently consistent with that.  It does receive a non -- the control master communication unit does receive a non video digital signal -- some kind of

signal -- that then ultimately tells the storage units what to send out. So I'm not sure what the inconsistency or where that would be an inherent problem if, Number 1, Claim 3 contemplates that the unit would receive a non video signal -- and that is what is described in Figure 5B. It's -- the output of the communication unit is that -- where there seems to be a fairly substantial discrepancy between what seems to be described in Figure 5 and what is described in Claim 3.

MR. HANLEY: There is a flaw in the claim. The flaw -- as your Honor just pointed out -- the flaw is: What happens to the signal that corresponds to the already-stored? The sequence of events that happened to that signal are not described with regard to a non video data signal. That's the nub of our written description motion.

THE COURT: Let me ask your opponent then to describe or explain why I'm off base.

MR. SWEENEY: Your Honor, I think there's a misunderstanding of what Judge Patel did and what happened at the Markman ruling.

On Page 4 of her Markman ruling, at about Line 12, she describes the downloading of the video to the users through these communication units and amplifiers. So that's her understanding of what this distribution system is. Receives a request for the video and then sends the video to the consumer.

With respect to part of I think what the Court and

Mr. Hanley said about Claim 2, I agree.  If you look at --
she's repeated the claim there --

THE COURT:  Claim 2.

MR. SWEENEY:  Claim 3.  She has repeated Claim 3
there, and she's labeled six paragraphs, and it's -- if we look
at Paragraph 2, she talks about, Okay, that's that synchronous
digital signal that the master communication unit receives.  It
says that right in the claim:  Synchronous digital signal
corresponding to the data related to the particular subject
matter stored in perspective one of the video clips.  And, as
we'll see, she'll defined that term to the video clip data
itself.  And Mr. Hanley argued that very point.

THE COURT:  Where is that in her claim construction?

MR. SWEENEY:  If you permit me, your Honor, I will try
to get there.  But I agree, when you -- when you get to
Paragraph 4, it's that same synchronous signal that corresponds
to the video data and the video clips that's sent to the user.

Now, if we proceed in the opinion, because I think all
of this points the same way, on Page 8, Judge Patel says, "The
specification discloses that the master communications unit *can*
be used to input video...."

Not necessarily.  It can be used to receive video.  So
it's certainly capable of doing that.  But at the bottom of
Page 8 she says, A master communications unit cannot be
construed to require all the time that it receives video.  But

it certainly can.  It's broad enough to do that.

And if we go over to Page 11 --

THE COURT:  Although she does say that the embodiment at Figure 5 does not clearly disclose any uploading of video clips.

MR. SWEENEY:  That's correct, and we're not arguing that now.  Sony's motion is that they say that Judge Patel had a construction where a request for a video, "Please give me the movie *Titanic*," was sent up, and what this Claim 3 says is just send that same thing back to the user's computer.  "Please send me the movie *Titanic*."

THE COURT:  I don't necessarily have to buy that and still have a problem with the description.

MR. SWEENEY:  That's what they're arguing.  And they're saying, of course, the spec doesn't describe a system which just recirculates the request.  That's why I say that it's absurd.

And on Page 11 of our opinion, you know, she construes the next term in the -- the transaction.  And what this master communications unit does, it receives a synchronous signal "corresponding to the data related to the said particular subject matter stored in a respective one of said plurality of video clip storage units."

And she goes and to say, beginning the last paragraph, "Most obviously, the claim used the word 'stored' in the past

tense, indicating that the act of storing..." has already occurred.

Now, the argument at the Markman hearing, we were arguing that it's video to be stored, uploading.  And Mr. Hanley was arguing it's video that's already stored.  There's total agreement on the fact that the synchronous signal corresponding to the video means the video itself.

And that's what she finally held.

And I dug up --

THE COURT:  Where does she hold that?

MR. SWEENEY:  In the construction itself, on Page 24, she defines "corresponding to the data related to said particular subject matter stored in a respective one of said plurality of video clip storage units."

The definition is:  "The recited signal corresponds to the data that is already stored in the video clip storage unit that stores data relating to the particular subject matter."

So that is the video.

THE COURT:  I'm missing something.  How can it be the video if it says the signal corresponds to the data?  That is already --

MR. SWEENEY:  Yes, it's already stored.  It's a movie that's stored in the servers, in the storage units.  She didn't adopt what I was saying, video that would be coming in.  It's video that's already stored.  For instance, in Figure 5, that's

been downloaded to the user.  And that's exactly what Sony argued at the Markman hearing.  At Page 66 of the transcript Mr. Hanley said:  "That signal corresponds to or represents the data that's already stored in video clip storage units."

We submit this language is very clear -- this is Mr. Hanley -- and corresponds doesn't mean it's like, corresponding means corresponds.  Means:  This represents the data.  You know, it's not like the data; it represents the data.

There was no dispute about that, your Honor.

THE COURT:  What does that mean?

MR. SWEENEY:  The synchronous signal that's received by the master communication unit in Claim 3, that synchronous data is the data from the video clip storage units.  It's the movie that the user has asked for, and it's downloaded to the user.

THE COURT:  Why can't it be the command related to that particular user?  Why can't it bring up *Titanic*, and not the Titanic itself?  It corresponds?  Corresponds if you look at --

MR. SWEENEY:  I had argued something similar to that in the Markman hearing.  I said "corresponds" means it's like the movie that's already stored; it's similar to.

THE COURT:  Or related to.

MR. SWEENEY:  And Mr. Hanley argued, No, it represents

that data, and Judge Patel agreed with him, that is the data. That corresponds means it is the data. And it would make no sense for Judge Patel -- she understood that this was a downloading of video. It would make no sense for Judge Patel to say all we're doing is recirculating our requests.

THE COURT: So let me get my bearings here a little bit. If your interpretation of her interpretation is correct that corresponding data related to said particular subject matter is the video itself, and that Claim 3 requires that what the master communication unit does is receive that video, therefore it receives a video --

MR. SWEENEY: Yes.

THE COURT: -- then isn't Figure 5 problematic in that it doesn't seem to describe that? It seems to describe getting a command. Or am I missing something?

MR. SWEENEY: No, but Figure 1B certainly describes the master communication unit receiving a video, and that's where we get into a factual question as to whether a -- the written description is looked at as an issue of fact from one of ordinary skill in the art. You know, the cases are saying -- we have cited these in our brief -- you don't limit a claim to a single drawing or a single passage; you look at the patent as a whole.

THE COURT: So then we go back to the first question about whether or not in deciding whether the written

description requirement is satisfied, that you want to take certain elements of 1B such as the fact that you've got a situation here where the CSU/DSU, master control unit, accepts a video signal.  In this case, it's through an ACUNET, and that's like a land network, satellite system.

MR. SWEENEY:  It's a network.  And 3 talks about a network.  But that's distinct from the legal question.  That's a factual question, and it's going to vary on a case-by-case basis.  It's a question of what one of ordinary skill in the art, what he believes this describes to one of ordinary skill in the art.  Our declaration is unchallenged.  There is at the very minimum an issue of fact there.

Now, with respect to the claim construction, you know, Sony argues, Well, it doesn't matter what one of ordinary skill of art says here.  Judge Patel held as a matter of law that all this is doing is recirculating a command.  Well, you cannot honestly come to that conclusion if you read Mr. Hanley's argument during the Markman hearing, or Judge Patel's --

THE COURT:  I'm going a different place.  You want to combine 1B and 5 in a way that satisfies, but 1B, if you look at 1B, yeah, it has that part of it where it says that the control unit is going to accept some kind of video signal, but it's not one that is -- corresponds to data related to said particular subject matter stored in respective plurality of video clip storage.  It is coming from a network, almost like

it's live from a satellite.

MR. SWEENEY:  Well, it really is going to depend on what one of ordinary skill in the art is able to glean from this disclosure, and that's the issue of fact.  This is a very sophisticated art, and everyone who knows what a storage unit is -- the claim says it receives video data from storage.  I think one of ordinary skill in the art like Dr. Katz is free to review the entire specification as a whole.

THE COURT:  We're beginning to sound like enablement as opposed to written description.

MR. SWEENEY:  It's not enablement.  The cases say you must view written description from the perspective of one of ordinary skill in the art.  What that description means to him, that is a factual question.  And it will vary, depending on the type of invention.

THE COURT:  But how do these figures in the description for these two figures, which sort of has elements of both?  One is receiving video signal and then sending out said signal to a distribution amplifier for distribution to a receiving network, but it doesn't have the input side of it, what is described in terms of calling up stuff from a video clip storage unit.  That's found in Figure 5.  But then in that case, the MCU doesn't really output.  It outputs something different that goes through circuitry.

So you're saying that it's okay, given that these are

two different -- that that's still okay, as long as --

MR. SWEENEY:  I think it's going to depend on what one of ordinary skill in the art believes.  I think that's a question for trial.  But Figure 5 shows video.  Shows downloading of video.  Doesn't show storage units across a network.  But that is taught by -- shown by Figure 1B.  And to say that you can only look at one page or one line and you can't look at the teaching as a whole and see what the written description is is contrary to the law.  And it's making a hard, fast rule on what the federal circuit says is a question of fact to be viewed from one of ordinary skill in the art.

Now, we don't even have a declaration challenging Dr. Katz.

THE COURT:  Let me ask your opponent:  Why isn't that true?  If it is a question of what one of ordinary skill in the art at that time could have reasonably gleaned in determining what is it that's being invented, it seems not that hard to put two and two together here.

MR. HANLEY:  It's what one of ordinary skill in the art would understand the inventor to have actually described.  It's -- and I think the case that we cited that bears on this, it has a very, you know, relevant passage.  *Lockwood vs. American Airlines*.  Page 10 of our opening brief.

THE COURT:  What's the case again?

MR. HANLEY:  Lockwood against American Airlines.

THE COURT:  Okay.

MR. HANLEY:  It's a case often cited by the federal circuit for the proposition that what would be obvious to somebody of ordinary skill in the art from the disclosure, the fact that something would be obvious doesn't mean it's disclosed.  In fact, it's not disclosed.  What the Court said there is:

"It is not sufficient for purposes of the written description requirement of Section 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned but failed to disclose."

THE COURT:  Well, one could argue it's more than mere speculation.  You've got sort of key elements in one figure; three pages later, you have key elements of the other, and it's not that hard to figure out what's, you know -- I don't know if that's speculation.

MR. HANLEY:  It makes up an entirely different system. For example, as I pointed out to Judge Patel in the Markman argument, you take Figure 1B, which has a satellite uplink that goes to earth station to a network of a video clip that's received by this master CSU/DSU.  Okay.  So if you try to combine that with video clip storage units, each stored data related to a particular subject matter, where is the disclosure as to how the processing is done that identifies the subject

matter of the incoming video clip and puts it in the right storage unit?  It's not a simple combination.  There's no disclosure of anything.

Specification -- if you look at it from the abstract through to the end, it basically described two systems, and one is the system of Figure 1B, which combines a master communications unit, distribution amplifiers, communications units; and the other is the Figure 5 system, the video-on-demand system, which has the video units that store data related to particular subject matters.  And as the menu storing unit, it has the distribution amplifiers, communications units, and so on.

Those two systems are described separately.  There's no suggestion anywhere in the specification that one can mix those two things up.

And in fact, Judge Patel, she had it available to her -- when she was identifying, construing the term, kind of corresponding to the data, in which she said, This is video already stored, she had available to her the entire specification to read on to support her construction.  So what did she read it on?  She read it on Figure 5.  And she said, What meets the element in Figure 5 are these units 516, they receive a command signal.  This element does, in fact, hew closely, was her terminology, to the master communications unit because the signal received correspondence to the data already

stored.

The signal is the command center.

So Judge Patel did not rule, as Mr. Sweeney states, that Judge Patel ruled that this is a video signal.  In fact, Mr. Sweeney's alluded to an argument that I made during the Markman argument.  Yes, during the Markman argument, our position was:  The signal received by the master communications unit is video.  And that's because our position was that wasn't -- there was no master communications unit shown in Figure 5.  It's only in Figure 1B.  And that's its function in Figure 1B.  In so doing, I alerted Judge Patel to the fact that if one reads the claim that way, there's going to be a written description problem.  And that we would be dealing with that -- if she did not grant construction, we would deal with that at a later time.

Well, Judge Patel didn't agree that it's a video signal.  She found a different application.  She found that the signal corresponding to the data stored is this non video command signal.

So did not agree with me.  She found her own interpretation.  And based on that, we now have this written description problem that the motion is based on.

THE COURT:  And the description problem at this point, if we are to say to what she described is best embodied in Figure 5 -- because that's what the MCU gets, it gets a command

signal from this LAN network, which feeds the telephone line unit which feeds the video menu, which then feeds the video clip storage units. What's wrong? What's missing?

MR. HANLEY: It's the down-screen processing that the claim requires and that Judge Patel found the claim required. Signal that's received by the master communications unit, according to the claim, said signal is input to distribution amplifier units which divide them into a plurality of signals. That plurality of signals is ultimately passed on to receiving stations. And there's no description in the patent, certainly not in conjunction with, first, 5, or anywhere else, of a non video command signal being processed in that way.

Mr. Sweeney says that's absurd, by way of attempting to argue that you can't reach that result.

Well, two things about that. The fact that the claim is flawed and results in this absurd -- you know, what we characterize as an absurd outcome, isn't a basis for finding differently. It's not a basis for redoing the Markman rule.

Secondly, as we pointed out in our reply brief, it's not necessarily so absurd. It's just not described. You can have systems, you can conceive of systems where a request signal is received and then sent back to the user as a confirmation. That's not in this patent. But it's, you know, it's a possible, you know, non-absurd system that one could devise.

THE COURT:  Let me ask you this -- and I'm probably straying from what you all discussed.  I'm just looking at this.  Would you agree that Figure 5 -- that a non video command signal is sent from the network to the MCU, which is described in Figure 5, and consistent with at least one of the elements of Claim 3?  Right?

MR. HANLEY:  Right.

THE COURT:  It's getting a signal sent.  Arguably corresponds -- not equivalent but relating to or calling, etc., etc.  As you say, the problem is sort of the downstream, what comes out of it.  And when you look at Claim 3, it says -- it talks about the signal it receives, which I just described, and then it says, but then it requires there be a plurality -- element 3 requires that a plurality of distribution amplifier units coupled to the MCU -- and could one construe this -- when it says "coupled", does it mean directly coupled?  Does it mean having gone through the iterations of the telephone unit, Number 508, to 504, video editing unit, which then inputs into the various storage units, which then triggers a signal to the distribution amplifiers, 531A through H?  I mean, could "coupled" mean coupled through other circuitry?

MR. HANLEY:  Let's assume for the sake of argument one could read it that way.

THE COURT:  Yeah.

MR. HANLEY:  So, if that's the case, then the

signal -- the problem isn't the coupling.  I mean, that's a problem, but let's assume for the sake of argument that there's a coupling.  The problem is that the signal that is input to these distribution amplifiers, 531A through H, that's not said signal.  That's not the signal that was received by the master communications unit.  That's a different signal.  What the claim requires is that the master communications unit -- and this is the way Judge Patel articulated it -- it's received by the master communications unit, input to the distribution amplifiers, divided into a plurality of synchronous signals, and then sent to receiving stations.

Well, that signal that's input to the master of communications, that signal isn't processed that way.  Even if one assumes that there's the coupling that the claim requires.

THE COURT:  So "said" means exactly the same.  It can't be one that has been translated or modified through a telephone line unit and a video editing unit by the time it reaches the distribution amplifier.

MR. HANLEY:  I'm confident that even Mr. Sweeney would agree that "said" means exactly that.

THE COURT:  By the time it reaches the amplifier in Figure 5, at that point, it's a video?

MR. HANLEY:  It's video.

THE COURT:  Of course, what does this invention mean then?  I mean, you send in a non video and you get out a non

video that then feeds into a distribution amplifier, which of course does nothing more than amplify.  What does it mean?

MR. HANLEY:  It means that the claim is flawed.  This is not the first written description case that has ever been addressed to court, and each one represents an instance where the claim is flawed.

Most written description cases -- and this is like, you know, most -- they don't deal with a claim that was part of the original submission, that was submitted with the original specification.  They deal with claims that are entered later on in the course of the prosecution.  Things can happen in the course of prosecution that cause the attorney of the applicant or the applicant themselves to attempt to get claims to avoid prior art or get claims that cover something they really didn't describe in the original submission.  So you have cases like this that, after construction, proper construction, can be found not to be supported or not described in the specification.

And this is just one such case.  *Affymetrix* is another case.  It's a combination set forth -- in the commission there, the federal circuit found it wasn't described.

THE COURT:  So under your interpretation, essentially, Claim 3 is pretty meaningless.  You can't say this and have something meaningful because you've sent in the command signal, and the ultimate thing that gets sent to a distribution

amplifier is a command signal.

MR. HANLEY:  Well, that's correct.  But -- let me amend what your Honor said.  It's not described.  As I said, you know, you could have, with the inventor -- another inventor, perhaps, could devise a system where in what iteration the signal that's sent up by the user is sent back to the user a combination, as I said.  That would be a non-absurd implementation.  But that's not in this patent.

THE COURT:  That's clearly not what's contemplated here.  You're talking about a whole distribution network that goes on the output side.

So of course, Judge Patel didn't construe -- did she construe said -- no, she didn't.  She just construed synchronous digital signal.

MR. HANLEY:  Correct.  She didn't address "said".  But as I said, I don't think there's really an argument about "said".  "Said" is as much used in patent claims as any other term.  It always means the same thing.

THE COURT:  Let me see if there's a difference of opinion here.  "Said" is "said".

MR. SWEENEY:  Your Honor, I think we have a good argument, but it's not based upon "said".  It's really based upon what Judge Patel did.  Judge Patel, when she described this system on Page 4 of the Markman order, described it as a downloading system.  She then didn't go off and come up with a

construction that meant you're recirculating a command signal. That wouldn't make any sense.

And on Page 11, when she's talking about corresponding to the data in the video clips, what she's really saying is: This is the data in the video clips that's already stored. That's what that signal is that goes to the master communications unit.  It's not, like Mr. Hanley says, data that's going to be uploaded by the user.  That was the dispute. And everything points in that direction.

For instance, how to access each of said video clips. She describes that in her instruction on Page 24:  "Information that enables a user to request video clips from a particular video clip storage unit."  The whole totality of her opinion is that these video clips -- video is stored, the synchronous signal represents them.  They're already stored, not uploaded by a user.  That's the underlying assumption of the entire argument, and that's what Judge Patel decided.

What we're seeing here is a nitpick distortion of what she decided, and coming up with an impossible construction, and since we have an impossible construction, then there can't be a description of it.

THE COURT:  Then what's your possible construction?

MR. SWEENEY:  The possible construction, that corresponding the synchronous signal to the master communications unit is -- as Judge Patel said on Page 24 -- the

construction is that synchronous signal is, "The recited signal corresponds to the data that is already stored in the video clip storage unit."

THE COURT:  I.E., the video itself.

MR. SWEENEY:  The video itself.

THE COURT:  And you would agree that Figure 5 doesn't describe that because what's sent to the MCU is not the video itself, it's the command.

MR. SWEENEY:  Figure 5 describes storage units which store video.  And it describes downloading that video to users. The master communication unit, Figure 1B, is not there receiving things over a network.

But now we're getting into a factual question.  And in terms of we're talking about, can you combine drawings -- and there are cases that we cite on Page 16 and 17 of our brief -- there's the *Rexnord Corp. v. Laitram* case, Federal Circuit, 2001.  There's *SRI v. Matsuhita Corporation of America*, Federal Circuit, 1985.  *Martek Biosciences Corporation*, rejecting this written description argument because there's not an embodiment disclosed specifically on that claim.  That's not required.

It's a case-by-case thing.  At the very least, it merits experts testifying at trial.  You can't decide this as a legal matter.  This is a factual matter.  And we have a declaration in.

If -- you know, I think the inferences have to be

taken in our favor on summary judgment.  On the factual side, I don't think there can be any contest here.  And on the legal side of -- Sony's argument doesn't make any sense, because the predicate is wrong.  Judge Patel didn't hold that this is a recirculating of a command signal patent.

THE COURT:  So if your interpretation is that the synchronous signal corresponding to the video clips is the video itself, therefore, that's what's inputted into the master communications unit, what is the invention?  What is it?  Something gets -- what gets sent -- what gets distributed?

MR. SWEENEY:  This is a very early patent.  1993 it was filed.  And, you know, videos were not accessed in a parallel way by multiple users at that time.  This was quite a breakthrough.  It seems pretty ordinary in 2011.  But back in 1993, that was a breakthrough.  That had not been done before.

THE COURT:  So what is taught under your construction?  That the synchronous signal is the video itself?  We start then with your premise that a video directly inputs into the CSU/DSU?

MR. SWEENEY:  That's correct.

THE COURT:  Then what?

MR. SWEENEY:  And then it is amplified, and it's sent out with distribution units through communications units to users who have requested the particular video.

THE COURT:  That's in Figure 1B.

MR. SWEENEY:  The users are shown in Figure 5.

THE COURT:  But where does the video clip storage unit come in?

MR. SWEENEY:  The video clip storage unit, it says the master communication unit receives the synchronous signal. It's connected to a network.  So the video storage units would be remote.  You would have to get some information from the teachings of 1B.

THE COURT:  So your interpretation is that the element that there be a -- something stored in one of the video clip storage units is a remote unit, not part of this invention?

MR. SWEENEY:  Well, it is part of the invention.  It is Claim 3.  If you look at 1B, for instance, your Honor, there could be storage units across the network from the master communication unit.  It shows it coming in live in Figure 1B. But there would be nothing to prevent, as Claim 3 says, storage units feeding the network and then feeding the master communication unit.

THE COURT:  I guess I'm looking at it and I see backup.  But I would hazard a guess it would be a very different schematic, because coming out of -- the video gets inputted into the master CU, rather than being directed directly to almost real-time, it would have to be stored somewhere.  That's a pretty significant set of circumstances.

MR. SWEENEY:  But it teaches you you can store it, and

one of ordinary skill in the art can look at it.  These are all federal circuit cases I've cited.

THE COURT:  But Figure 5 teaches more how you can call it up once it's already been stored.  You use a --

MR. SWEENEY:  You look at a patent as a whole, and you look at all of the embodiments.

THE COURT:  How do you get from input coming in, a video coming into the CSU, to a storage unit, and then back out of the storage unit for distribution?

MR. SWEENEY:  The input coming into the CSU, there's nothing to prevent that input from being stored.

THE COURT:  So where in the patent does it explain to one of ordinary skill in the art how you do that?

MR. SWEENEY:  Figure 5 shows you how to store a video.

THE COURT:  Tells you how to call it up.  Doesn't tell you how to store it.

MR. SWEENEY:  The storage units are shown at the top of Figure 5.

THE COURT:  How did it even get there?  I guess in those days it would have been a VHS or something.

MR. SWEENEY:  Disk storage was widely available at that time.  Video's been stored for many, many years.  But that is, at root, a factual question.  As to -- and to one of ordinary skill in the art, you know, storage devices are well known.  But what we have here is a mix of sort of a legal

argument and a factual argument.  The legal argument is really based upon an incorrect predicate as to what Judge Patel found.  And the factual argument ignores evidence that has been presented.  And against that evidence, we have attorney argument, essentially.

THE COURT:  I think against that evidence is we have a claim, 3, that, at least as drafted, if "said" means "said" -- I don't know if you have a different interpretation of "said" -- it is almost a problematic -- intrinsic problematic --

MR. SWEENEY:  "Said" means the signal that's sent to the user is the signal that the master communication receives.  But Judge Patel was very clear that the signal that the master communication unit receives corresponds to the data stored in the video.  And everyone agreed at the Markman hearing that that meant the video data itself.  That's what Mr. Hanley argued, and he won on that point.

THE COURT:  I agree, if it weren't for the video clip storage unit and all the reference to that, you know, Figure 1B closely described that.  You have a video input, output, directly to the amplifier network, but that storage thing is not taught.

MR. SWEENEY:  Well, the storage thing is taught in Figure 5, and I think Mr. Katz is saying that he can use storage in Figure 1B, too, if he wants to.  It's there.  It's

taught.  And he can combine those teachings.  And, you know, the patent basically says, Take all of my embodiments.  And the federal circuit says you can't separate embodiments.

THE COURT:  Let me ask you then:  What's wrong with that?  Sounds like we start with 1B, which seems to sort of satisfy that the inputs and outputs are similar, or said, and the lack of reference to a video storage clip unit can be discerned or borrowed from available obvious technology at the time, as well as Figure 5.

MR. HANLEY:  Well, it's basically asking the person of ordinary skill in the art to sort of reinvent what the inventor invented.  This goes directly to the *Lockwood* case that I directed your Honor's attention to.

Moreover, Mr. Sweeney has said several times that what Judge Patel ruled is that the signal corresponding to the data is video.  In fact, that's directly contrary to what she ruled.  She says Claim 3 doesn't cover uploading video.  And, on Page 11 -- or Page 8 of her Markman ruling she said, and this is the key part, that and Footnote 1, she says, "Accordingly, the second --"

THE COURT:  Which page?

MR. HANLEY:  Page 8 of the Markman ruling, Line 19.  And she said, "Accordingly, the second disclosed embodiment in Figure 5 does not clearly disclose any uploading of video clips to the video storage units via a master communications unit.

Instead, the user sends a command to the menu unit via the master communications units/menu CSU/DSUs 516, which in turn sends a 'request-to-send' command to the appropriate storage unit to send the requested video clip to the user."

So Judge Patel's reading the master communications unit and the signal that it receives on Figure 5, that is 516, which she says receive a command signal.

THE COURT:  She's interpreting the second embodiment in Figure 5, which does not necessarily preclude an embodiment in 1B.  She's saying basically 5 does not include an uploading of video clips, which is obvious from this video five.  It doesn't necessarily mean that Claim 3 -- now, their argument is -- I guess it's partially embodied by 1B -- you can't do that.

MR. HANLEY:  As your Honor has observed Figure 1B, in terms of does it disclose the combination, it's missing video clip storage units; it's missing the menu storing unit.

THE COURT:  That's why I was asking it.  So the response I'm hearing is that you can combine one -- elements of 1B and 5, and known technology at the time, wasn't a big deal to create video storage units, and you combine that, and together that constitutes a fair description?

MR. HANLEY:  It's like saying, Here's a pile of auto parts.  You know, you, person of ordinary skill in the art. You put it together.  You put something together out of these.

I mean, that's essentially the argument that's being made.  And that's not a general issue of fact.

THE COURT:  It sounds like at some point -- I hate to use the term obviousness, because it then implies enablement and other things, but at some point it is speculative, throwing out a bunch of parts and say, You figure it out, versus having two things that are obviously related and didn't take much -- how difficult is it to put two and two together?  And you're saying it's very difficult here.

MR. HANLEY:  I'm saying that might be a proper analysis when one is talking about enablement, because that can bring in a knowledge of a person of ordinary skill to fill in the blanks.  When you're talking about written description, it's not about that.  It's what did the inventor -- what did the inventor describe?  What did he give to the public?  What did he contribute to the art?  Not what someone of ordinary skill in the art can take and build on, change, modify, you know.

That's -- you know, that's the rule.

THE COURT:  Did you have a comment to Counsel's citation of the three cases that reject that you have to keep specific embodiments?  Do any of those cases, in your view, stand for the proposition that you can do a bit of inferential work and a bit of combining?

MR. HANLEY:  I'd have to look at the cases to see

exactly what happened, but you have cases where there is a sort of a general description, a conceptual description of the invention, and you have specific embodiments, and the claim can be found supported even though it's not identically set forth under embodiment.  If one can fairly satisfy that a person of ordinary skill in the art would perceive that this was embraced by what the inventor described.  It's not the instance we have here where you have a combination of elements, which is what supposedly has been contributed to the field, and you have no distribution of that combination.

THE COURT:  All right.  I'll give you the last word.

MR. SWEENEY:  Your Honor, I don't have much.  Just two points.  One, there is a passage in the patent, Column 6, Line 42, that relates to Figure 5 and Figure 1B.  It says that the storage units in Figure 5 are similar to the backup units in Figure 1B.  So the patent is sort of telling you you can look at these things together.

With respect to the cases --

THE COURT:  You can look at certain things, as -- to draw upon?

MR. SWEENEY:  If you look at them together -- let's just go that far.  You can look at them together.  And it's true, you know, there's a difference between just a pile of junk and what one of ordinary skill in the art can figure out as opposed to what a reference teaches when you look at it as a

whole.  That's a factual question.  And right now we have attorney argument and we have one of ordinary skill in the art. I think that's sufficient on the factual part of the motion to defeat the summary judgment motion.

I wanted to mention the *Lampi* case, too, also a federal circuit case we cite on Page 17.  It says the federal circuit rejected the argument the patent was limited to identical half-shells simply because the patent's drawing showed only identical half-shells.

So there's a lot of law on this.  And these cases don't go to the federal circuit, you know, normally, after summary judgment.  They go after a full trial, after there's testimony on both sides.

Thank you, your Honor.

THE COURT:  All right.  Well, I appreciate that.  This has been helpful to me.  You know, as in many things, I think it's a question of degree.  It's evident to me that neither 5 nor 1, 1B alone, would constitute a fair description of Claim 3.  Claim 3 is made additionally problematic by -- I don't know if it's a drafting error or not, but the somewhat paradox that's created by the "said".  But in any event, I think the question does boil down to what does case law say about how much disparity can be tolerated and how much sort of inference and extrapolation can be indulged in determining whether or not the written description requirement is met.

And I will certainly take a look at the cases you've cited as well as relook at the papers here.  But it's been very helpful.  I appreciate it.

All right?

MR. SWEENEY:  Your Honor, we also have the case management conference.  I don't know if you plan to do that today or some other day.

THE COURT:  Well, let me address that.

I'm reluctant to -- this is a very substantial motion, obviously, and issue.  But let me ask you:  If I deny summary judgment at this juncture, what do you propose in terms of -- I see you have two proposed deadlines that are a little different, but not all that different, leading to an either September or October trial date, as you proposed.  I'm wondering how realistic that is.

MR. SWEENEY:  I think it's realistic.  I think the parties aren't that far off on the schedule.  They're only a month or two apart.  So we came up with the proposal, and Sony responded, putting things a little later.  We can live with their schedule.

We have -- there are two things that are in the case management conference that are worth pointing out.  One is that Judge Patel had stayed damages discovery pending the Markman ruling, and then she retired, so we would ask that that go forward.  Sony has produced quite a few documents to us

already, and some of them do bear on damages already.  But we feel we should get rid of, you know, the discovery in the case. We have made a production, and we'll be making another production this week or next week, early next week.

The other issue is that, you know, we argued at the Markman hearing that there was user uploading of videos, which was an adverse ruling.  And based upon that adverse ruling, we have proposed in the case management conference to bring a motion to amend our infringement contentions to add Claim 4. Sony has put in a statement of the various reasons they think that should not be done.  But we would plan to bring such a motion in any event, and -- I don't necessarily have to go into it now; it's been a long day.  But we could argue that some other time.

THE COURT:  Right.  And I did see that.

Let me first say, in terms of scheduling, how long of a trial -- I don't know if you've estimated.  Did you estimate the length of trial in your papers?

MR. SWEENEY:  I can't remember right now, but my estimate would be two weeks, your Honor.

THE COURT:  Do you concur on that?

MR. HANLEY:  I think that's fair, your Honor.  I think we addressed that in the very first case management statement submitted in November of 2009.  I can't remember what was said, but --

THE COURT:  All right.  Betty, the dates you gave me, they accommodated --

DEPUTY CLERK:  Yes.

THE COURT:  All right.  Well, based on my schedule, it is somewhat academic as between whose proposed trial date, because I can accommodate neither.  I can do the first part of December, December 3rd.  And I think that will, if we proceed, that will give us enough time to, Number 1, allow me to rule on this without backing you up; two, if you want to file your motion to amend the complaint, you know, there's time for that.  But why don't you put down December 3rd as a trial date.

MR. HANLEY:  I don't know if your Honor understood.  The dates that are proposed are September, October of 2012.

THE COURT:  Yeah, I'm talking about December of 2012.

MR. HANLEY:  Okay.

THE COURT:  We're setting things out more than a year in advance right now.  It's just the nature of the cases.  We're double- and triple-setting at that.  I'm sorry.  I'd like to move things along.  But -- I know this case has been pending for awhile, and it puts us past the three-year period.  But right now that's the best I can do in terms of trial date.

I will say that with respect to Claim 4 -- and I'm not going to prejudge this yet, but, you know, you're going to have a pretty substantial burden of demonstrating why -- I think what the rules contemplate -- what the patent rules

contemplate, an amendment of infringement and validity contention in regard to constructions of that claim that didn't turn out the way you expected, and therefore you have to alter perhaps the contentions, but to bring a brand-new claim on a theory that, Well, we thought it was going to go this way and that way, I see that as a straight Rule 15 analysis, not a local patent rule. And therefore there's issues of timing and diligence, prejudice, etc., etc. And I understand the rule of liberality, but there's also -- I expect I'm going to hear something about how this completely upsets the scheduling and prejudices the --

MR. SWEENEY: We can get to that at a later day. Claim 4 does not have the term "master communications unit" in it. It's -- all the other substantive terms are there. It's a little broader. I think the constructions that have been made already will probably be -- you know, take care of it. I think if there are other terms Mr. Hanley wants to construe, I think we very possibly will stipulate to them. So I don't think it's going to add anything to the case.

THE COURT: You've gotten a little preview now on this thing, where he's going in terms of new terms that he thinks may be problematic, parallel separate connections, multiple direct communications, etc. So you have a preview of what you can --

MR. SWEENEY: If he offers me the constructions, maybe

I can agree to them and remove that issue.

THE COURT:  Maybe there can be a quid pro quo there.

MR. HANLEY:  Your Honor, it's certainly noteworthy that Mr. Sweeney says Claim 4 is broader, and yet at the time they were deciding which claims to assert, they picked Claim 3 if Claim 4 is broader, then that necessarily would in their judgment be infringed as well.  So there's certainly no reason, no basis for them to bring Claim 4 in at this late stage.

THE COURT:  I understand that.  And you understand the factors the Court will consider on Rule 15.

MR. SWEENEY:  There's a couple of issues, your Honor. When we selected Claim 3, we hadn't been through a reexamination where the patent office had reviewed all of the prior art that Sony had submitted.  And, you know, there was some concern.  I was caught picking a claim that I thought was narrower, but that issue with respect to prior art has been largely removed by the patent office in reexamination.

MR. HANLEY:  The reexamination was concluded in December of 2010.

THE COURT:  Well, let's -- we can argue the full scope when we get there.

With respect to the stay on damages discovery, do you have any thoughts on that?

MR. HANLEY:  Our proposal was that it be continued. We have this motion that we want to bring, that we believe

strongly in.  And we have another motion relating to liability that we contemplate that would require some discovery.  It relates to just a straightforward issue of:  Is it what Sony is doing, or what its contractors, these networks, are doing, does that fit within certain limitations of the claim?  And we submit that those issues should be resolved before we get into damages.

THE COURT:  Well, here's the situation:  The December 3rd trial date of next year implies a normal discovery cutoff, and I've had a look at your proposed schedule, but it normally implies a discovery cutoff of mid next year, later than what you're contemplating here, which is February.  So it would give additional time.  So maybe it does make sense to wait a bit on damages discovery because you'll have at least until, you know, a couple months into April.

MR. SWEENEY:  The case has been pending two and a half years.  We've been asking for this two and a half years.  I think we have to start getting ready to try the case.  Damages discovery is complex.  It also, without damages discovery, there's no possibility of having a meaningful settlement discussion.  So we've been held off -- you know, we're in our third denial of damages discovery here.  So...

THE COURT:  That raises a great segue to what I was going to ask you in terms of ADR process.  Is there any ongoing ADR process, or is it something you are contemplating or

interested in or discussing at this point?

MR. SWEENEY:  We did have a mediation before the reexamination.  Former Judge Fern Smith was the mediator, through JAMS.

THE COURT:  Right.

MR. SWEENEY:  But it was unsuccessful.  But that was before the reexamination.  So, you know, we'd be willing to do that again.  But I think we do need some damages discovery.

THE COURT:  What are your thoughts?

MR. HANLEY:  Well, it seems to me that -- you know I'm not negative on mediation, your Honor, but we've had discussions with each other, with Mr. Sweeney and I.  We don't have a hostile relationship.  And I question whether we would need a mediator.  It's really an interest on their side, you know, in reasonable settlement.  We've talked an awful lot.

MR. SWEENEY:  I'd be glad to have further discussions directly with Mr. Hanley, but I'd need damages discovery first.

THE COURT:  That's what he's saying.  In order to meaningfully assess the settlement position, he needs damages discovery.  Have you talked about phasing damages discovery so it's not all-out barrage but somewhat more focused?

MR. SWEENEY:  He's produced a couple hundred thousand documents to us already, including research reports and things that do bear on damages.  The only thing I really don't have is certain financial information in terms of sales and

profitability.  And I don't necessarily need 200,000 documents. I just need the figures.

THE COURT:  Well, why don't we -- I'd like you to meet and confer and see if you can come up with a damages discovery plan that's keyed to mediation.  So not the all-out, We're going to trial, but the focused core documents, protective orders -- I'm sure you have all that in place.  If not, I'm sure you will.  But why don't you focus on, you know, asserting your damages discovery to kind of facilitate settlement talks. I don't know if you want to engage Judge Smith again or use one of the court processes that we have available.  If you are, let me know, and I can make a referral.  But I want to facilitate whatever I can in terms of settlement talks.

MR. SWEENEY:  We'll confer on that.

THE COURT:  I'll reopen discovery, damages discovery, to allow sort of narrowly-tailored -- that's the code word I'll use, to facilitate ADR.

MR. SWEENEY:  Thank you, your Honor.

THE COURT:  And hopefully you all can work that out.

MR. HANLEY:  Thank you, your Honor.

THE COURT:  So I will get out a scheduling order, but obviously I'm going to adjudicate this and see where we go from there.  Maybe we should at least tentatively schedule a further status conference as this thing moves along.  Perhaps sometime next year.  Late January.

DEPUTY CLERK:  January 20th at 10:30.

MR. SWEENEY:  Thank you, your Honor.

MR. HANLEY:  Thank you, your Honor.

THE COURT:  I appreciate your help, Counsel.  It's been very useful.  Thank you.

(Adjourned)

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_Connie Kuhl_

Connie Kuhl, RMR, CRR
Friday, September 30, 2011